# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

———————————————

Nº 12-CV-6383 (JFB) (AKT)

———————————————

## SKY MEDICAL SUPPLY INC.,

Plaintiff,

VERSUS

## SCS SUPPORT CLAIMS SERVICES, INC., ET AL.,

Defendants.

———————————

**MEMORANDUM AND ORDER**
May 7, 2014

———————————

JOSEPH F. BIANCO, District Judge:

Plaintiff Sky Medical Supply, Inc. ("Sky Medical" or "plaintiff") commenced this action on December 27, 2012, against close to ninety individual and corporate defendants, alleging violations of the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO") and numerous state law claims. On July 31, 2013, plaintiff filed an amended complaint, which reduced the number of defendants to forty-four. The gravamen of the amended complaint is that defendants— vendors who handle independent medical examinations ("IMEs") and peer reviews for no-fault insurance companies, their owners, and the doctors who claim to have performed these IMEs and peer reviews—have colluded to generate fraudulent IME and peer review reports that result in the denial of no-fault insurance claims. As a medical equipment provider who has submitted claims to no-fault insurers for the reimbursement of

benefits furnished to injured parties, many of which have been denied, plaintiff asserts financial loss as a result of defendants' alleged scheme.

Numerous defendants have moved to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, the motions to dismiss are granted in part, and plaintiff's request for leave to file a second amended complaint is granted. First, the Court cannot determine at this juncture whether plaintiff's RICO claims are time-barred, particularly in light of plaintiff's allegations of fraudulent concealment. Second, the Court concludes that plaintiff has adequately alleged RICO violations (both its substantive and conspiracy provisions) as to all moving defendants who are actually named defendants in the RICO causes of action. Third, the Court concludes that plaintiff has failed to satisfy RICO's ripeness requirement, *i.e.*, to allege clear and definite

damages that were caused by the alleged RICO violations. According to plaintiff's own representations to the Court, plaintiff is currently challenging the denials of an unknown number of its no-fault claims in arbitration proceedings and state court actions. At issue in those proceedings are the same no-fault claims whose denials have prompted this action. Thus, the full extent of plaintiff's RICO damages is contingent upon the results in pending proceedings, and is not clear and definite at this time. Under these circumstances, clear Second Circuit law requires dismissal of plaintiff's RICO claims, as to all defendants, without prejudice to plaintiff bringing its RICO claims once its damages have become clear and definite. Fourth, the Court concludes that plaintiff has adequately alleged the causation element of a RICO claim. In sum, the Court concludes that plaintiff's RICO claims must be dismissed without prejudice. Because the RICO claims are plaintiff's only federal claims, the Court declines to exercise supplemental jurisdiction over plaintiff's remaining state law claims.

The Court also considers plaintiff's request for leave to file a second amended complaint. Specifically, plaintiff's counsel indicated at oral argument that plaintiff could remedy its inadequate allegations of RICO damages by including in a second amended complaint a list of all denied no-fault claims underlying this lawsuit, along with information about whether each claim is pending or not in state court or arbitration proceedings. Given plaintiff's counsel's representation at oral argument, and the fact that plaintiff's RICO claims are otherwise well-pleaded, the Court grants plaintiff leave to amend its RICO claims within thirty days of this Memorandum and Order. If plaintiff does not file a second amended complaint within thirty days, then the Court will order the Clerk of the Court to close the case and enter judgment of dismissal, without prejudice to plaintiff bringing a new action

when its RICO injury has become clear and definite.

## I. BACKGROUND

### A. New York No-Fault Insurance Law

Under New York's no-fault automobile insurance scheme, an insurer can deny an insured's claim for medical treatment if the treatment is not medically necessary. *See* N.Y. Comp. Codes R. & Regs. tit. 11, § 65-1.1; *see also McGee v. State Farm Mut. Auto. Ins. Co.*, No. 08-CV-392 (FB) (CLP), 2009 WL 2132439, at *1 (E.D.N.Y. July 10, 2009) [hereinafter *McGee I*]; *Healing Hands Chiropractic, PC v. Nationwide Assurance Co.*, 787 N.Y.S.2d 645, 647 (N.Y. Civ. Ct. 2004). To verify a treatment's medical necessity, an insurer may require the claimant to "submit to medical examination by physicians selected by, or acceptable to, the [insurer], when, and as often as, the [insurer] may reasonably require." N.Y. Comp. Codes R. & Regs. tit. 11, § 65-1.1. "These examinations are referred to as 'independent medical examinations' ('IMEs')." *McGee I*, 2009 WL 2132439, at *1. An insurer may also submit the injured party's medical and other records to a third party physician, who reviews the records and renders an opinion on the medical necessity of the treatment at issue in a so-called "peer review report." *See, e.g.*, *Consol. Imaging P.C. v. Travelers Indem. Co.*, 924 N.Y.S.2d 308 (N.Y. Civ. Ct. 2011). The insurer may deny a claim for lack of medical necessity on the basis of an IME or peer review report. *See, e.g.*, *Healing Hands*, 787 N.Y.S.2d at 647.

After an insurer denies a claim, the claimant "is entitled to 'seek immediate redress, and to recover both the amount of any overdue claim and reasonable attorney's fees in securing payment.'" *Hosp. for Joint Diseases v. Allstate Ins. Co.*, 773 N.Y.S.2d 427, 428 (N.Y. App. Div. 2004) (quoting

*Roggio v. Nationwide Mut. Ins. Co.*, 66 N.Y.2d 260, 262 (1985)). Specifically, the claimant has two options: (1) "file suit seeking payment of the claim," or (2) "pursuant to Insurance Law § 5106(b), submit the dispute to arbitration, pursuant to simplified procedures promulgated by the Insurance Department." *Id.* at 428–29.

### B. Allegations in the Amended Complaint and Amended RICO Statement

The following facts are taken from the amended complaint, amended RICO statement, and the exhibits attached thereto, and are not findings of fact by the Court. Instead, the Court will assume these facts to be true and, for purposes of the pending motions to dismiss, will construe them in a light most favorable to plaintiff, the non-moving party.[1]

### 1. The Parties

Plaintiff is a medical equipment provider that furnishes medical equipment to injured parties who are covered by no-fault insurance. (Am. Compl. ¶¶ 72–75.) In exchange for plaintiff's medical equipment, an individual assigns plaintiff his insurance claim. (*Id.* ¶ 73.) Plaintiff then submits a claim for reimbursement to the individual's no-fault insurer. (*Id.* ¶¶ 72–75.)

Defendant SCS is a medical consulting vendor that contracts with no-fault insurance carriers to perform IMEs and peer reviews. (*Id.* ¶¶ 12, 79.) SCS is owned by defendant Linda Ackerman ("Ackerman"), but defendant Eitan Dagan ("Dagan") manages and controls all of SCS's operations. (*Id.* ¶ 13, 79.)

Defendant Patient Focus provides back office and clerical services to no-fault IME and peer review vendors like SCS. (*Id.* ¶¶ 13, 80.) Although Patient Focus is a professional corporation, plaintiff alleges that unlicensed individuals are the actual owners of Patient Focus, in violation of New York law. (*Id.* ¶ 102.) Specifically, Patient Focus is formally owned by defendant Tatiana Sharahy ("Sharahy"). (*Id.* ¶ 13, 31, 80.) However, plaintiff asserts that Patient Focus is actually owned and operated by defendants Svetlana Osiashvili ("S. Osiashvili"), Benjamin Osiashvili ("B. Osiashvili"), Mikael Osiashvili ("M. Osiashvili"), Aleksey Vayner ("Vayner"), and five unidentified individuals. (*Id.* ¶¶ 13, 80.) S. Osiashvili, B. Osiashvili, and M. Osiashvili operate Patient Focus through their management company, defendant Nationwide Management Inc. ("Nationwide"); Vayner operates Patient Focus through his management company, defendant BAB Management Inc. ("BAB"); and the five unidentified individuals operate

---

[1] "On a motion to dismiss RICO claims, the Court must accept the factual allegations contained in the Complaint and RICO Statement as true, and draw all reasonable inferences in favor of the non-movant . . . ." *Allen v. New World Coffee, Inc.*, No. 00-CV-2610 (AGS), 2001 WL 293683, at *2 (S.D.N.Y. Mar. 27, 2001); *see McLaughlin v. Anderson*, 962 F.2d 187, 189 (2d Cir. 1992) ("In analyzing the issues on this motion to dismiss, we must take as true the facts as alleged in the complaint and as supplemented by the RICO case statement ordered by the district court."). Although the Court considers the allegations in the amended RICO statement in deciding the present motions, the Court regards the amended complaint, and not the amended RICO statement, as the controlling pleading concerning the complete list of defendants, causes of action, and theories of the case. *See, e.g., DelRio-Mocci v. Connolly Props. Inc.*, Civil Action No. 08-2753 (WJM), 2009 WL 2989537, at *3 (D.N.J. Sept. 16, 2009) ("[T]he purpose of a RICO case statement is to enhance a vague complaint with additional details, not to raise new arguments or theories of the case for the first time."), *aff'd*, 672 F.3d 241 (3d Cir. 2012). This is significant because, as discussed *infra*, plaintiff filed the amended complaint *after* filing the amended RICO statement, and the amended RICO statement identifies as defendants many individuals whom the original complaint had named as defendants, but who are no longer defendants according to the amended complaint.

Patient Focus through their own, unidentified management companies. (*Id.* ¶¶ 13, 80.) The amended complaint outlines specific steps that these individuals have allegedly taken to obscure Patient Focus's true ownership. (*See id.* ¶¶ 103–07.) These steps include the alleged creation of fake rental invoices and lease agreements, forgery, perjury, and the failure to file certain financial documents with the New York Department of Taxation and Finance. (*Id.* ¶ 103.)

Defendants Sharahy, Mitchell Ehrlich ("Ehrlich"), Joseph C. Cole ("Cole"), Julio Westerband ("Westerband"), William A. Ross ("W. Ross"), Warren Cohen ("Cohen"), Renat R. Sukhov ("Sukhov"), William S. Kritzberg ("Kritzberg"), Robert A. Sohn ("Sohn"), Stanley Ross ("Ross"), Mitchell L. Weisman ("Weisman"), Mark Weber ("Weber"), Gary J. Florio ("Florio"), Antonio Martins ("A. Martins"), Damion A. Martins ("D. Martins"), Dante Brittis ("Brittis"), Christopher Ferrante ("Ferrante"), Brian Freindlich ("Freindlich"), Wayne Kerness ("Kerness"), Denis Mann ("Mann"), Andrew Miller ("Miller"), Andrew Bazos ("Bazos"), and Drew Stein ("Stein") (collectively, the "Doctor Defendants") are medical doctors and independent medical consultants who provide IME and peer review reports in response to requests made by SCS and Patient Focus.[2] (*Id.* ¶¶ 31–53; Am. RICO Statement, at 9–24.)

## 2. The Alleged Fraud

Dagan, S. Osiashvili, B. Osiashvili, M. Osiashvili, Vayner, and the five unidentified individuals (collectively, the "Manager Defendants") allegedly partnered to generate a mass production of fraudulent IME and peer review reports. (Am. Compl. ¶ 81.)

Under their arrangement, Dagan—operating through SCS—contracted with no-fault insurers to perform IMEs and peer reviews. (*Id.*) Pursuant to these contracts, SCS agreed to scan all medical records at the insurer's place of business, to find the medical consultants who would conduct the peer reviews and IMEs, and to provide a venue for the IMEs to be administered. (*Id.* ¶¶ 81–82.) The remaining Manager Defendants— operating through Patient Focus—handled the administrative duties essential to carrying out these tasks. (*Id.* ¶ 83.) They provided the personnel necessary to scan the medical records, selected the doctors whose names would appear on the reports, arranged for doctors to perform IMEs, and scheduled court appearances for those doctors to testify in support of their reports. (*Id.*)

According to the amended complaint, no doctor was ever involved in the preparation or review of the IME and peer review reports. (*Id.* ¶ 89.) Instead, after the medical records were scanned in New York, they were sent to Florida, where individuals working at the direction of Yaniv Dagan, Dagan's brother, used a computer software program to create and electronically sign peer review reports. (*Id.* ¶ 84.) The results of each IME and peer review report were predetermined to conclude that the medical treatment at issue was not medically necessary; they did not depend on the individual circumstances of a particular claim. (*Id.* ¶ 89(a)–(b).) However, each report contained the name and signature of a doctor, who averred that he or she had prepared and read the report, "certif[ied] and affirm[ed]" the findings and conclusions in the report, and stated that he or she had reviewed all medical records in the file. (*Id.* ¶¶ 84, 89(c)–(f).) Contrary to these representations, plaintiff asserts that the Manager Defendants used unlicensed

---

[2] At oral argument, counsel for plaintiff informed the Court that he believes defendants W. Ross and S. Ross are now deceased. However, none of the parties have confirmed at this time whether that is the case.

individuals to prepare the reports, whose results were predetermined, and paid the Doctor Defendants for the use of their names on the reports. (*Id.* ¶¶ 85–86, 89.) Once the reports were completed and signed, they were sent by mail and e-mail to the insurance carriers, who relied on the reports to determine whether to deny a given insurance claim for medical treatment as not medically necessary. (*Id.* ¶ 84.) Because there is no review of IME or peer review reports (other than by filing a lawsuit or commencing arbitration), plaintiff claims that the defendants have been able to perpetuate this alleged scheme without detection. (*Id.* ¶¶ 77–78.)

By allowing SCS and Patient Focus to create and sign IME and peer review reports in their names, the Doctor Defendants were allegedly paid for the creation of more IME and peer review reports than they possibly could have genuinely produced. (*Id.* ¶ 85.) For instance, over an unspecified period of time, Sharahy, W. Ross, and Florio each have purportedly reviewed between 750,000 and one million pages of medical records, and over 23,000 reports bearing one of the three's names have been submitted to no-fault insurers with a recommendation that the claimed treatment was not medically necessary. (*Id.* ¶ 91.) In addition, more denials of no-fault claims led to more court appearances for the Doctor Defendants, who were paid to give testimony in support of their IME and peer review reports. (*Id.* ¶¶ 85–86.) Specifically, in 2010, Sharahy, W. Ross, and Florio each appeared in court to testify in support of IME and peer review reports on at least one hundred days. (*Id.* ¶ 91.) They were paid only to appear in court—not to review the underlying reports—which plaintiff asserts is "an indication that testimony would be predetermined." (*Id.*)

As further evidence that the Doctor Defendants never created the IME and peer review reports at issue, the amended complaint alleges that many of the IME and peer review reports submitted through SCS were nearly identical. (*Id.* ¶ 92.) In fact, plaintiff alleges that it has submitted dozens of sample IME and peer review reports to a linguistics expert, who found "evidence of plagiarism and common authorship." (*Id.* ¶ 93.) Not only do the reports contain common language, but also the analysis in these reports "never varie[d] in any meaningful way, regardless of the merits of the claims and medical conditions of the injured parties whose records are allegedly reviewed." (*Id.* ¶ 94.) Moreover, the peer review reports at issue consistently cited the same medical literature that the Doctor Defendants allegedly knew to be outdated or irrelevant. (*Id.* ¶ 95.) These reports also "fail[ed] to discuss in any detail how the medical records allegedly reviewed by the Doctor Defendants factored into their determinations." (*Id.* ¶ 97)

As the assignee of injured parties' insurance claims, plaintiff has submitted claims for reimbursement to no-fault insurers. In many cases, plaintiff's claims have been denied based on the conclusions of the IME and peer review reports created by SCS and Patient Focus. (*Id.* ¶¶ 130–31.) Although plaintiff has not specified precisely how many of its insurance claims were denied on the basis of the alleged fraud, plaintiff has appended to the amended complaint a "Report and Denial Chart," which is "a sample of the claims, which is certainly not exhaustive, that were denied as a direct result of Defendants' collective activity." (*Id.* ¶ 134.) Specifically, this chart shows in table form the following information for 103 peer review reports: (1) the date the report was mailed, (2) the name of the Doctor Defendant that appears on the report, (3) the state to which the report was mailed from Florida, (4) the date the insurer denied plaintiff's claim, (5) the name of the

injured party, and (6) the allegedly false statements contained in the report. (*Id.* ¶ 134 & Ex. 1.) Plaintiff has alleged that the following five statements in each report are fraudulent: (1) the Doctor Defendant certified and affirmed that he or she had prepared and read the report, (2) the Doctor Defendant certified and affirmed his or her findings and conclusions, (3) the Doctor Defendant electronically signed the report, (4) the Doctor Defendant claimed to have reviewed the medical records listed in the report, and (5) the report itself claimed that its purpose was to "determine the medical necessity of" the treatment at issue. (*Id.*; *see also id.* ¶ 117 (identifying these statements as the basis for mail fraud).)

## C. Procedural History

Plaintiff commenced this action on December 27, 2012. Many of the defendants named in the original complaint requested a pre-motion conference in anticipation of moving to dismiss the complaint. The Court held a pre-motion conference on April 3, 2013, at which time the Court set a briefing schedule on the anticipated motions to dismiss.

Meanwhile, several defendants requested that Magistrate Judge Boyle stay discovery while motions to dismiss were pending. In response, on April 2, 2013, Magistrate Judge Boyle ordered plaintiff to file a RICO case statement. Plaintiff filed the RICO case statement on May 2, 2013. Several weeks later, on May 29, 2013, plaintiff moved to file an amended RICO case statement, which Magistrate Judge Boyle granted. During a status conference held on June 5, 2013, Judge Boyle suggested that plaintiff file an amended complaint in light of discrepancies between the original complaint and the amended RICO statement. After the conference, Magistrate Judge Boyle granted defendants' request to stay discovery pending the outcome of their motions to dismiss. Thereafter, the parties participated in a telephone conference with the undersigned on June 17, 2013, at which time the undersigned directed plaintiff to file an amended complaint.

Plaintiff filed the amended complaint on July 31, 2013. Many of the defendants moved to dismiss on October 23, 2013. Plaintiff opposed the motions on January 6 and 7, 2014. The moving defendants replied on February 11, 2014. The Court heard oral argument on the motions on February 20, 2014. The Court has fully considered the submissions of the parties.

## II. STANDARDS OF REVIEW

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See, e.g., Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006); *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005).[3] "In order to survive a motion to dismiss under Rule 12(b)(6), a complaint must allege a plausible set of facts sufficient 'to raise a right to relief above the speculative level.'" *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). This standard does not require "heightened fact pleading of specifics, but only enough facts

---

[3] The Court also accepts the factual allegations set forth in plaintiff's amended RICO statement as true, and draws all reasonable inferences in plaintiff's favor. *See, e.g., McLaughlin*, 962 F.2d at 189; *Allen*, 2001 WL 293683, at *2.

to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

The Supreme Court clarified the appropriate pleading standard in *Ashcroft v. Iqbal*, setting forth two principles for a district court to follow in deciding a motion to dismiss. 556 U.S. 662 (2009). The Court instructed district courts first to "identify[ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* Second, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

In addition, where a case concerns allegations of fraud or mistake, Rule 9(b) of the Federal Rules of Civil Procedure requires claims to be pled with particularity. *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."); *see, e.g.*, *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 119 (2d Cir. 2013) (RICO claim with predicate act of mail fraud is subject to heightened pleading standard of Rule 9(b)). Generally, to comply with Rule 9(b)'s specificity requirements, "'the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)); *see Lundy*, 711 F.3d at 119. Conclusory allegations of fraud will not survive Rule 9(b)'s heightened pleading standard, and therefore, will be subject to dismissal at the motion to dismiss stage. *E.g. Nasso v. Bio Reference Labs., Inc.*, 892 F. Supp. 2d 439, 446 (E.D.N.Y. 2012) (citing *Shemtob v. Shearson, Hammill & Co.*, 448 F.2d 442, 444 (2d Cir. 1971)).

The Court notes that, in adjudicating a motion to dismiss under Rule 12(b)(6), it is entitled to consider: (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents integral to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence. *E.g. Jones v. Nickens*, 961 F. Supp. 2d 475, 483 (E.D.N.Y. 2013); *David Lerner Assocs., Inc. v. Phila. Indem. Ins. Co.*, 934 F. Supp. 2d 533, 539 (E.D.N.Y. 2013), *aff'd*, 542 F. App'x 89 (2d Cir. 2013); *SC Note Acquisitions, LLC v. Wells Fargo Bank, N.A.*, 934 F. Supp. 2d 516, 524 (E.D.N.Y. 2013), *aff'd*, 548 F. App'x 741 (2d Cir. 2014).

## III. RICO

Under RICO, it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). Section 1962(d) makes it "unlawful for any person to conspire to violate . . . the provisions of subsection . . . (c)." 18 U.S.C. § 1962(d). "When § 1962 is violated, in addition to criminal penalties, the

RICO statutes also authorize civil lawsuits, which, if successful, can entitle a plaintiff to treble damages, costs, and attorney's fees." *DLJ Mortg. Capital, Inc. v. Kontogiannis*, 726 F. Supp. 2d 225, 236 (E.D.N.Y. 2010) (citing 18 U.S.C. § 1964(c)). Specifically, RICO provides a private cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C. § 1964(c). "From this language, courts have extracted the conditions a plaintiff must meet to satisfy RICO's standing requirements: '(1) a violation of section 1962; (2) injury to business or property; and (3) causation of the injury by the violation.'" *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 767 (2d Cir. 1994) (quoting *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir. 1990)).

Courts have described civil RICO as "'an unusually potent weapon—the litigation equivalent of a thermonuclear device.'" *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996) (quoting *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir. 1991)), *aff'd*, 113 F.3d 1229 (2d Cir. 1997). "Because the 'mere assertion of a RICO claim . . . has an almost inevitable stigmatizing effect on those named as defendants, . . . courts should strive to flush out frivolous RICO allegations at an early stage of the litigation.'" *Id.* (quoting *Figueroa Ruiz v. Alegria*, 896 F.2d 645, 650 (1st Cir. 1990)); *see DLJ Mortg. Capital*, 726 F. Supp. 2d at 236. Indeed, although civil RICO may be a "potent weapon," plaintiffs wielding RICO almost always miss the mark. *See Gross v. Waywell*, 628 F. Supp. 2d 475, 479–83 (S.D.N.Y. 2009) (conducting survey of 145 civil RICO cases filed in the Southern District of New York from 2004 through 2007, and finding that all thirty-six cases resolved on the merits resulted in judgments against the plaintiffs, mostly at the motion to dismiss stage). Accordingly, courts have expressed skepticism toward civil RICO claims. *See, e.g.*, *DLJ Mortg. Capital*, 726 F. Supp. 2d at 236 ("[P]laintiffs have often been overzealous in pursuing RICO claims, flooding federal courts by dressing up run-of-the-mill fraud claims as RICO violations.").

Although civil RICO presents many hurdles for a plaintiff to overcome, the Supreme Court has also "made clear that it would not interpret civil RICO narrowly." *Attorney Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 139 n.6 (2d Cir. 2001) (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985)). In *Sedima*, the Supreme Court rejected an interpretation of civil RICO that would have confined its application to "mobsters and organized criminals." 473 U.S. at 499. Instead, the Court held: "The fact that RICO has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." *Id.* (internal citation and quotation marks omitted); *see also Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 479 (2006) (Breyer, J., concurring in part and dissenting in part) ("RICO essentially seeks to prevent organized criminals from taking over or operating legitimate businesses. Its language, however, extends its scope well beyond those central purposes."). Thus, a court should not dismiss a civil RICO claim if the complaint adequately alleges all elements of such a claim, even if the alleged conduct is not quintessential RICO activity.

With the foregoing principles in mind, the Court evaluates the moving defendants' objections to the sufficiency of plaintiff's pleadings.

## A. Statute of Limitations

"RICO claims are subject to a four-year statute of limitations." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 148 (2d Cir. 2012);

see *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156–57 (1987). In *Bankers Trust Co. v. Rhoades*, the Second Circuit held that "each time a plaintiff suffers an injury caused by a violation of 18 U.S.C. § 1962, a cause of action to recover damages based on that injury accrues to plaintiff at the time he discovered or should have discovered the injury." 859 F.2d 1096, 1102 (2d Cir. 1988). This is known as the "separate accrual" rule, "under which a new claim accrues, triggering a new four-year limitations period, each time plaintiff discovers, or should have discovered, a new injury caused by the predicate RICO violations." *Bingham v. Zolt*, 66 F.3d 553, 559 (2d Cir. 1995). In *Bingham*, the Second Circuit recognized the following, "necessary corollary of the separate accrual rule":

> plaintiff may only recover for injuries discovered or discoverable within four years of the time suit is brought. As long as separate and independent injuries continue to flow from the underlying RICO violations—regardless of when those violations occurred—plaintiff may wait indefinitely to sue, but may then win compensation only for injuries discovered or discoverable within the four-year "window" before suit was filed, together, of course, with any provable future damages.

*Id.* at 560 (internal citations omitted); *see, e.g.*, *Elsevier, Inc. v. Grossman*, No. 12-CV-5121 (KPF), 2013 WL 6331839, at *8 (S.D.N.Y. Dec. 5, 2013) ("Regardless of when Plaintiff discovered its claims, Plaintiff may only be *compensated* for injuries discovered or discoverable within the four-

year 'window' before suit was filed . . . ." (emphasis in original)).

Here, defendants argue that most, if not all, of plaintiff's claims are time-barred because most of plaintiff's no-fault claims appended to the amended complaint were denied more than four years before plaintiff commenced this action. Plaintiff responds that it only discovered the alleged fraud less than one year before filing suit (*see* Am. Compl. ¶ 57), that it did not miss any "storm warnings" before discovering the alleged fraud, and that, in any event, defendants' fraudulent concealment tolled the statute of limitations (*see id.* ¶¶ 122–29).

"At this time, the Court will not make a ruling as to whether [plaintiff's] claims are barred by the statute of limitations." *Allstate Ins. Co. v. Elzanaty*, 916 F. Supp. 2d 273, 300 (E.D.N.Y. 2013). As a preliminary matter, the Court notes that plaintiff's causes of action under RICO accrued when plaintiff discovered or should have discovered that its claims were fraudulently denied, and not when its claims for reimbursement were denied, as some defendants suggest. *See, e.g.*, *Koch*, 699 F.3d at 151–53 (RICO cause of action accrued when plaintiff became aware that wine might have been fraudulently labeled, not when he first purchased the wine). Furthermore, the matter of when plaintiff discovered or should have discovered the alleged fraud is a "fact sensitive issue" that "cannot be determined at this time." *Elzanaty*, 916 F. Supp. 2d at 300–01; *see, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Rabiner*, 749 F. Supp. 2d 94, 104 (E.D.N.Y. 2010) ("In light of Plaintiff's allegations, it is plausible that Plaintiff could not discover defendants' fraudulent acts until sometime after the actual injury occurred. Without discovery, the Court cannot make the 'fact-sensitive' determination of when this fraud could reasonably have been discovered." (citation omitted)); *State Farm*

*Mut. Auto. Ins. Co. v. Accurate Med., P.C.*, No. 07-CV-51 (ENV)(MDG), 2007 WL 2908205, at *2 (E.D.N.Y. Oct. 4, 2007) ("[D]efendants' argument that plaintiff's claims . . . are barred by the statute of limitations necessarily assumes facts that are beyond the pleadings and that have yet to be developed."). For the same reason, "the Court cannot decide at this early stage whether the doctrine of fraudulent concealment will ultimately be successful." *Elzanaty*, 916 F. Supp. 2d at 301. Therefore, at this juncture, the Court denies the motions to dismiss the RICO claims as time-barred.

## B. Elements of a RICO Cause of Action

Because the Court cannot conclude at this juncture that plaintiff's claims are time-barred, the Court turns to the sufficiency of plaintiff's pleadings as it relates to the elements of a RICO claim. As stated *supra*, a RICO claim contains three elements: (1) a violation of 18 U.S.C. § 1962; (2) injury to plaintiff's business or property; and (3) causation of the injury by the violation. The Court groups the moving defendants' arguments by element. For the reasons discussed below, the amended complaint has adequately alleged the first and third elements, but has failed to allege the second element (*i.e.*, RICO injury). Accordingly, the Court dismisses the amended complaint, without prejudice to plaintiff either filing a second amended complaint or commencing a new action when its RICO injury becomes clear and definite.

## 1. Violations of 18 U.S.C. § 1962

The first element of a civil RICO claim is the violation of 18 U.S.C. § 1962. Here, plaintiff alleges violations of §§ 1962(c) (RICO's substantive provision) and 1962(d) (RICO conspiracy). The Court considers each, in turn.

### a. Violation of § 1962(c)

To state a violation of § 1962(c), a plaintiff must plead "'(1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity.'" *Anatian v. Coutts Bank Ltd.*, 193 F.3d 85, 88 (2d Cir. 1999) (quoting *Sedima*, 473 U.S. at 496); *see also S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir. 1996) ("[A] plaintiff must allege that a defendant, 'employed by or associated with' an enterprise affecting interstate or foreign commerce, conducted or participated in the conduct of this enterprise's affairs 'through a pattern of racketeering activity.'" (quoting 18 U.S.C. § 1962(c); *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir. 1983))).[4]

### i. Enterprise

A RICO enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Although RICO "does not specifically define the outer boundaries of the 'enterprise' concept," *Boyle v. United States*, 556 U.S. 938, 944 (2009), it is clear that "any

---

[4] Additionally, plaintiff must allege that the enterprise is engaged in, or the activities of the enterprise affect, interstate or foreign commerce. 18 U.S.C. § 1962(c). However, "RICO plaintiffs may satisfy this element by showing only 'a minimal effect on interstate commerce.'" *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 173 n.12 (2d Cir. 2004) (quoting *De Falco v. Bernas*, 244 F.3d 286, 309 (2d Cir. 2001)). Here, defendants do not challenge the commerce clause element of plaintiff's RICO claims, and the Court notes that the alleged fraud occurred across state lines. "Thus, Plaintiff[] alleged at least a de minimis impact on interstate or foreign commerce." *Id.*

legal entity may qualify as a RICO enterprise," *First Capital Asset Mgmt.*, 385 F.3d at 173.

In the instant case, plaintiff alleges that SCS and Patient Focus are the RICO enterprises. (Am. Compl. ¶¶ 142, 158, 172, 188, 202, 218, 234, 250.) Defendants argue that plaintiff has failed to allege a RICO enterprise because it has not pleaded the elements of an association-in-fact enterprise.[5] This argument misses the mark. Plaintiff does not allege an association-in-fact enterprise; instead, it alleges that SCS and Patient Focus themselves are the enterprises, "and corporations are expressly included in the definition of enterprise." *Allstate Ins. Co. v. Lyons*, 843 F. Supp. 2d 358, 368 (E.D.N.Y. 2012) (rejecting similar argument concerning failure to plead association-in-fact enterprise, where alleged enterprises were professional corporations). By identifying SCS and Patient Focus—a corporation and professional corporation, respectively—as the RICO enterprises, plaintiff has properly pleaded the enterprise element of a RICO claim. Moreover, SCS and Patient Focus themselves are not included as RICO defendants. Thus, plaintiff does not run afoul of the so-called distinctness requirement, according to which "a corporate entity may not be both the RICO person [who is held liable] and the RICO enterprise under section 1962(c)." *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339,

344 (2d Cir. 1994); *see, e.g.*, *4 K & D Corp. v. Concierge Auctions, LLC*, --- F. Supp. 2d - ---, No. 13-CV-2527 (JGK), 2014 WL 904451, at *4 (S.D.N.Y. Mar. 10, 2014) ("Courts have repeatedly dismissed § 1962(c) claims alleging that a corporation was simultaneously a RICO 'person' and a RICO 'enterprise' (or part of a RICO 'enterprise' from which the corporation is not distinct).") (collecting cases).[6] In sum, plaintiff has properly pleaded a RICO enterprise.

### ii. Conduct

In addition to pleading a RICO enterprise, a civil RICO plaintiff must also allege that each defendant "conduct[ed] or participate[d], directly or indirectly, in the conduct of such enterprise's affairs." 18 U.S.C. § 1962(c). The Supreme Court has interpreted this statutory language to mean that the RICO defendant must have participated "in the operation or management of the enterprise." *DeFalco*, 244 F.3d at 309 (citing *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993)); *see, e.g.*, *First Capital Asset Mgmt.*, 385 F.3d at 176 (holding that "'one is liable under RICO only if he participated in the operation or management of the enterprise itself'" (quoting *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 521 (2d Cir. 1994))). Under this standard, a person may not be held liable merely for taking directions and performing tasks that are "necessary and

---

[5] "[A]n association-in-fact enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct.'" *Boyle*, 556 U.S. at 946 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). In *Boyle*, the Supreme Court held that "an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* Where a complaint alleges an association-in-fact enterprise, courts in this Circuit look to the "hierarchy, organization, and activities" of the association to determine whether "its members

[6] The distinctness requirement "does not foreclose the possibility of a corporate entity being held liable as a defendant under section 1962(c) where it associates with others to form an enterprise that is *sufficiently distinct from itself*." *Riverwoods Chappaqua*, 30 F.3d at 344 (emphasis added). Thus, "a defendant may be a RICO person and one of a number of members of the RICO enterprise." *Id.* (internal quotation marks omitted).

functioned as a unit." *First Capital Asset Mgmt.*, 385 F.3d at 174 (internal citations and quotation marks omitted).

helpful to the enterprise," or for providing "goods and services that ultimately benefit the enterprise." *U.S. Fire Ins. Co. v. United Limousine Serv., Inc.*, 303 F. Supp. 2d 432, 451–52 (S.D.N.Y. 2004) (internal citations and quotation marks omitted). Instead, "the RICO defendant must have played '*some* part in directing [the enterprise's] affairs.'" *First Capital Asset Mgmt.*, 385 F.3d at 176 (quoting *De Falco*, 244 F.3d at 310) (emphasis and brackets in original). "In this Circuit, the 'operation or management' test typically has proven to be a relatively low hurdle for plaintiffs to clear, especially at the pleading stage." *Id.* (internal citations omitted); *see, e.g.*, *Aiu Ins. Co. v. Olmecs Med. Supply, Inc.*, No. 04-CV-2934 (ERK), 2005 WL 3710370, at *8 (E.D.N.Y. Feb. 22, 2005) ("[W]here the role of the particular defendant in the RICO enterprise is unclear, plaintiffs may well be entitled to take discovery on this question.").

In the instant case, several of the Doctor Defendants and Vakhidova contend that plaintiff has failed to allege their participation in the operation or management of SCS and/or Patient Focus. The Court disagrees. Based on the allegations in the amended complaint and the amended RICO statement, which the Court must accept as true for purposes of the instant motions, the Doctor Defendants did more than merely provide professional services to SCS and Patient Focus. *Cf. Azrielli*, 21 F.3d at 521–22 (holding that provision of legal services related to fraudulent real estate transaction was not management of RICO enterprise); *Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison*, 955 F. Supp. 248, 254 (S.D.N.Y. 1997) ("[I]t is well established that the provision of professional services by outsiders, such as accountants, to a racketeering enterprise, is insufficient to satisfy the participation requirement of RICO, since participation requires some part in directing the affairs of the enterprise itself."); *Indus. Bank of Latvia v. Baltic Fin. Corp.*, No. 93-CV-9032 (LLS), 1994 WL 286162, at *3 (S.D.N.Y. June 27, 1994) (dismissing RICO claim against bank and individual officers on basis that providing "banking services—even with knowledge of the fraud—is not enough to state a claim under § 1962(c)"). Instead, the amended complaint and amended RICO statement allege that the Doctor Defendants were "vital actors who enabled the scheme" by allowing others to use their names on IME and peer review reports, and by testifying falsely in support of those reports. *Aiu Ins.*, 2005 WL 3710370, at *8–9 (holding that complaint adequately pleaded participation of defendant-doctors in conduct of RICO enterprise concerning insurance fraud, where complaint alleged that doctors had provided misleading prescriptions that "facilitated the submission of fraudulent claims to plaintiffs"); *see also U.S. Fire Ins.*, 303 F. Supp. 2d at 453 (holding that defendants were "key participants" in conducting RICO enterprise "by making critical misrepresentations, creating false documents, and . . . serving as the point of communication"). Furthermore, "[g]iven the early stage of the proceedings, plaintiff[] may not yet have had the opportunity to fully understand the nature of the roles of each category of defendant with regard to their respective management or operation capacity." *Aiu Ins.*, 2005 WL 3710370, at *9. However, plaintiff has alleged enough to withstand a motion to dismiss on this issue, and "[a]ny future doubts involving moving defendants' relative level of participation should be resolved on summary judgment." *Id.*[7]

---

[7]Plaintiff has not alleged any RICO cause of action against defendant Vakhidova. Accordingly, the Court need not consider whether plaintiff has alleged a plausible RICO claim against Vakhidova.

iii. Pattern

The pattern element of a RICO claim requires the plaintiff to "plead at least two predicate acts, show that the predicate acts are related, and that they amount to, or pose a threat of, continuing criminal activity." *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 97 (2d Cir. 1997) (citing *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)); *see* 18 U.S.C. §§ 1961(5), 1962(c). The predicate acts must have been committed within ten years of each other. 18 U.S.C. § 1961(5). "Predicate acts are 'related' for RICO purposes when they 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *Schlaifer Nance & Co.*, 119 F.3d at 97 (quoting *H.J. Inc.*, 492 U.S. at 240). As to the threat of continued criminal activity, "a plaintiff in a RICO action must allege either an 'open-ended' pattern of racketeering activity (*i.e.*, past criminal conduct coupled with a threat of future criminal conduct) or a 'closed-ended' pattern of racketeering activity (*i.e.*, past criminal conduct 'extending over a substantial period of time')." *GICC Capital Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 466 (2d Cir. 1995). The Supreme Court has explained the continuity requirement as follows:

> "Continuity" is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. . . . A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the *threat* of continuity is demonstrated.

*H.J. Inc.*, 492 U.S. at 241–42 (emphasis in original).

"To satisfy open-ended continuity, the plaintiff . . . must show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999). Alternatively, to establish a "closed period of repeated conduct" sufficient to satisfy the continuity requirement, *H.J. Inc.*, 492 U.S. at 241, "'a plaintiff must provide some basis for a court to conclude that defendants' activities were neither isolated nor sporadic,'" and that defendants engaged in such activity for a substantial period of time. *De Falco*, 244 F.3d at 321 (quoting *GICC Capital*, 67 F.3d at 467 (additional quotation marks omitted)); *accord Kades v. Organic Inc.*, No. 00-CV-3671 (LTS), 2003 WL 470331, at *12 (S.D.N.Y. Feb. 24, 2003).

Many of the Doctor Defendants argue that plaintiff has failed to allege a pattern of racketeering by each of them individually. *See, e.g.*, *Hoatson v. N.Y. Archdiocese*, No. 05-CV-10467 (PAC), 2007 WL 431098, at *3 (S.D.N.Y. Feb. 8, 2007) (granting motion to dismiss civil RICO claims where "[t]here

is not even a minimal attempt to allege which predicate acts were performed by which Defendants"), *aff'd*, 280 F. App'x 88 (2d Cir. 2008); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young*, No. 91-CV-2923 (CSH), 1994 WL 88129, at *28 (S.D.N.Y. Mar. 15, 1994) ("The Court must consider whether the Complaint adequately alleges a pattern of racketeering acts as to each defendant."). Specifically, they contend that, even if plaintiff has adequately alleged predicate acts—an issue the Court considers separately, *infra*—plaintiff has not alleged that each engaged in a *pattern* of RICO predicate acts.

### (1) Closed-Ended Continuity

With respect to closed-ended continuity, "[p]redicate acts extending over a few weeks or months . . . do not satisfy this requirement." *Cofacredit*, 187 F.3d at 242 (quoting *H.J. Inc.*, 492 U.S. at 242). In calculating the duration of the pattern of racketeering activity, actions that do not constitute predicate racketeering activity are not included; rather, the duration "is measured by the RICO predicate acts the defendants commit." *De Falco*, 244 F.3d at 321 (citing *Cofacredit*, 187 F.3d at 243; *GICC Capital*, 67 F.3d at 467). Notably, "[s]ince the Supreme Court decided *H.J., Inc.*, [the Second Circuit] has never held a period of less than two years to constitute a 'substantial period of time'" for purposes of

closed-ended continuity. *De Falco*, 244 F.3d at 321. Furthermore, "[w]hile closed ended continuity is primarily concerned with the time period of the activities, the court also considers factors such as the 'number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes' as relevant when determining whether closed ended continuity exists." *SKS Constructors, Inc. v. Drinkwine*, 458 F. Supp. 2d 68, 78 (E.D.N.Y. 2006) (quoting *De Falco*, 244 F.3d at 321).

In the instant case, of all Doctor Defendants moving on this issue, plaintiff alleges that the following committed multiple acts of mail fraud over a period lasting longer than two years: Brittis (*see* Am. Compl. Ex. 6; Am. RICO Statement, at 20 & Ex. 16); Cohen (*see* Am. RICO Statement, at 13–14); Cole (*see* Am. Compl. Ex. 6; Am. RICO Statement, at 11–12 & Ex. 6); Kerness (*see* Am. RICO Statement, at 22–23); Mann (*see id.* at 23–24 & Ex. 18); D. Martins (*see id.* at 19 & Ex. 15); S. Ross (*see id.* at 16 & Ex. 11)[8]; Sohn (*see* Am. Compl. Ex. 6; Am. RICO Statement, at 15); Sukhov (*see* Am. Compl. Ex. 6; Am. RICO Statement, at 14–15 & Ex. 9); Weber (*see* Am. Compl. Ex. 6; Am. RICO Statement, at 17 & Ex. 12); and Westerband (*see* Am. Compl. Exs. 1, 6; Am. RICO Statement, at 12 & Ex. 7). These allegations that the foregoing Doctor Defendants committed multiple acts of mail fraud over a period spanning more than two

---

[8] Defendant S. Ross argues that most of the reports bearing his name relate to a different medical supply company—Alfa Medical Supplies, Inc.—and not Sky Medical. However, with respect to the pattern element of a RICO claim, "[w]hile Plaintiff may not be able to collect damages with respect to the injuries of other, unnamed parties, it does not necessarily follow that Plaintiff may not allege injury to others in support of allegations of an ongoing fraudulent scheme, or pattern of racketeering activity." *SKS Constructors*, 458 F. Supp. 2d at 80. "[I]f only those acts involving the named plaintiff could be considered when

determining the continuity of any scheme, 'then schemes could remain in force, provided the orchestrators changed targets prior to the actual accrual of a 'substantial' period of time.'" *Id.* (quoting *Wells Fargo Century, Inc. v. Hanakis*, No. 04-CV-1381 (SLT) (VVP), 2005 WL 1523788, at *5 (E.D.N.Y. June 28, 2005)). Accordingly, allegations that S. Ross permitted his name to be used on fraudulent IME and peer review reports are relevant to the pattern element of the RICO claims, even if some of those reports were not prepared for plaintiff's no-fault claims.

years are sufficient to satisfy the pattern requirement of a RICO claim at this juncture.

However, plaintiffs have not sufficiently alleged closed-end continuity with respect to some of the moving Doctor Defendants. Specifically, plaintiffs have failed to allege that the following Doctor Defendants committed acts of mail fraud over a period of two years or more: Ehrlich (reports dated 2007 and 2008); Ferrante (reports dated 2007 and 2008); Kritzberg (reports dated 2011); and Weisman (reports dated 2011 and 2012). (*See* Am. Compl. Exs. 1, 6; Am. RICO Statement.) Given the shorter period of time within which these defendants allegedly committed mail fraud, the Court concludes that plaintiff has not adequately alleged closed-end continuity with respect to these defendants. *See, e.g.*, *DeFalco*, 244 F.3d at 322 (holding that period of "less than a year and a half" was "of insufficient length to demonstrate closed-ended continuity under this Court's precedents"); *see also Landy v. Mitchell Petroleum Tech. Corp.*, 734 F. Supp. 608, 624 (S.D.N.Y. 1990) (closed-end continuity requirement met only with respect to defendants who had allegedly committed predicate acts over extended period of time, but not with respect to those defendants whose alleged role had lasted a few months).

### (2) Open-Ended Continuity

In the alternative, plaintiff argues that it has alleged open-ended continuity with respect to all defendants. "Where an inherently unlawful act is performed at the behest of an enterprise whose business is racketeering activity, there is a threat of continued criminal activity, and thus open-ended continuity." *DeFalco*, 244 F.3d at 323. "However, 'where the enterprise primarily conducts a legitimate business, there must be some evidence from which it may be inferred that the predicate acts were the regular way

of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity.'" *Id.* (quoting *Cofacredit*, 187 F.3d at 243).

Under this standard, plaintiff's allegations suffice to establish open-ended continuity with respect to all moving defendants. Specifically, the gravamen of plaintiff's amended complaint and amended RICO statement is that SCS and Patient Focus operated primarily by committing mail fraud, even if they also conducted some legitimate business. Moreover, plaintiff alleges that each moving defendant played some role in this fraudulent scheme. Accordingly, "[w]hile this may prove to be a difficult fact to establish at trial, it is sufficient to establish open ended continuity for the purpose of this motion to dismiss." *SKS Constructors*, 458 F. Supp. 2d at 80; *see, e.g.*, *Lyons*, 843 F. Supp. 2d at 370 (holding that open-ended continuity allegation withstands a motion to dismiss where "it would be reasonable to infer that defendants' acts of mail fraud constituted a regular way of conducting the affairs of [the alleged RICO enterprises]").

### iv. Racketeering Activity

RICO defines racketeering activity to mean "any act which is indictable" under specified provisions of Title 18, including mail fraud. 18 U.S.C. § 1961(1)(B). Here, the amended complaint relies on the mailings of the IME and peer review reports to establish mail fraud as the predicate act to RICO liability. "'To prove a violation of the mail fraud statute, plaintiff[] must establish the existence of a fraudulent scheme and a mailing in furtherance of the scheme.'" *Lundy*, 711 F.3d at 119 (quoting *McLaughlin v. Anderson*, 962 F.2d 187, 190–91 (2d Cir. 1992)). Moreover, pursuant to Federal Rule of Civil Procedure 9(b), a plaintiff must plead

the elements of mail fraud with particularity in order to survive a motion to dismiss, and "[b]are-bones allegations do not satisfy Rule 9(b)." *Id.* Rather, as noted *supra*, "the 'complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements.'" *Id.* (quoting *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir. 1989)).

The moving defendants argue first that plaintiff has failed to allege a fraudulent scheme with particularity. This Court disagrees. The amended complaint alleges that the following statements in the IME and peer review reports were false: the prepared and read statement, the findings and conclusions statement, the fraudulent signature, the review of records statement, and the predetermined results statement. (*See* Am. Compl. ¶¶ 7, 89.) In addition, Exhibit 1 to the amended complaint identifies specific reports containing the allegedly fraudulent statements, and provides the following information for each report: the date it was mailed, the insurance company recipient, the name of the doctor on the report, the date that plaintiff's claim was denied, and the injured party's name. Finally, as discussed *supra*, the amended complaint alleges the manner in which those statements were false by alleging specific facts that, if true, would support the existence of a fraudulent scheme. Contrary to defendants' arguments on this point, the amended complaint goes beyond the conclusory accusation that the statements were false. Instead, the amended complaint provides specific allegations that explain why plaintiff believes the IME and peer review reports were generated with predetermined results and without the involvement of doctors. Specifically, plaintiffs have alleged

that the Doctor Defendants could not have possibly created the thousands of medical records that they claim to have prepared, particularly in light of the number of days they appear in court each year to testify in support of those reports. (*See* Am. Compl. ¶ 91.) Moreover, the amended complaint alleges that many of the IME and peer review reports were identical and failed to discuss in any detail how the specific medical records factored into the report's ultimate conclusion. (*Id.* ¶¶ 92–97.) Although plaintiff acknowledges that the use of boilerplate reports, without more, is not conclusive evidence of fraud, the allegation of identical reports in the context of all other allegations in the amended complaint suffices to withstand a motion to dismiss. In short, plaintiff is not required to prove mail fraud at this juncture, and the allegations in the amended complaint, amended RICO statement, and exhibits attached thereto "clearly direct[] defendants to the specific misrepresentations [plaintiff] is alleging. Under the circumstances, the specificity requirement of 9(b) requires no more regarding the who, what, where, when, how, and why of the alleged fraud in this case." *Lyons,* 843 F. Supp. 2d at 373.

*McGee v. Allstate Insurance Co.*, a decision upon which defendants rely, is distinguishable from the instant case. *See* No. 08-CV-842, 2011 WL 3497527 (E.D.N.Y. Aug. 3, 2011) [hereinafter *McGee II*]. In *McGee II*, as is the case here, the court considered whether the plaintiff had sufficiently alleged that the defendants' creation of IME and peer review reports constituted mail fraud. *See id.* The court held that the plaintiff had failed to do so, even though the plaintiff had attached to his complaint sixty-one IME and peer review reports containing allegedly false statements. *McGee II* held that those reports did "little to advance the ball" because the complaint had

failed to explain *why* the specific statements in the reports were fraudulent. *See id.* at *3. Here, by contrast, as explained *supra*, plaintiff has provided supporting allegations explaining why the IME and peer review reports were fraudulent.

Second, some of the moving defendants also argue that, even if plaintiff has pleaded a fraudulent scheme with particularity, it has failed to allege that each defendant committed the fraud by the use of the mails. The Court disagrees with defendants on this point, as well. To establish the mailing element of mail fraud, "there is no requirement that the defendant personally mail a letter"; instead, "the plaintiff must show '1) that the defendant 'caused' the mailing . . . and 2) that the mailing was for the purpose of executing the scheme or . . . 'incidental to an essential part of the scheme.'" *McLaughlin*, 962 F.2d at 191 (quoting *United States v. Bortnovsky*, 879 F.2d 30, 36 (2d Cir. 1989) (quoting *Pereira v. United States*, 347 U.S. 1, 8–9 (1954))). Moreover, the Second Circuit has construed "'[the mail fraud statute's] causation requirement liberally." *Abramovich v. Oliva*, No. 11-CV-1755 (ERK)(SMG), 2012 WL 3597444, at *10 (E.D.N.Y. Aug. 20, 2012) (quoting *United States v. Tocco*, 135 F.3d 116, 124 (2d Cir. 1998)) (alteration in original). "In order to show that the defendant 'caused' the mailing, it need only be shown that he acted 'with knowledge that the use of the mails will follow in the ordinary course of business,' or that 'such use can reasonably be foreseen, even though not actually intended.'" *Tocco*, 135 F.3d at 124 (quoting *Pereira*, 347 U.S. at 8–9).

The allegations in the amended complaint satisfy this standard. In particular, plaintiff specifically alleges that the reports "were physically mailed by persons acting at the direction of the Manager Defendants," and that the "Doctor Defendants authorized the mailings of the reports bearing their names and purported signatures." (Am. Compl. ¶ 118.) These allegations, along with plaintiff's inclusion of specific dates that the allegedly fraudulent reports were mailed, are enough to withstand a motion to dismiss on this issue. *See, e.g.*, *Tocco*, 135 F.3d at 124; *cf. McGee I*, 2009 WL 2132439, at *5 (dismissing RICO claim based on mail and wire fraud because "the Complaint specifie[d] no dates of any uses of the interstate mails or wires").

### b. Violation of § 1962(d)

Plaintiff has also alleged that the Manager Defendants and Doctor Defendants violated 18 U.S.C. § 1962(d) by conspiring to violate § 1962(c). Section 1962(d) makes it "unlawful for any person to conspire to violate . . . the provisions of subsection . . . (c)." 18 U.S.C. § 1962(d). Based upon this language, "the Second Circuit has instructed that a plaintiff must prove that (i) the defendants agreed to form and associate themselves with a RICO enterprise; (ii) the defendants agreed to commit two predicate acts in furtherance of a pattern of racketeering activity in connection with the enterprise; and (iii) if the agreed-upon predicate acts had been carried out, they would have constituted a pattern of racketeering activity." *Elsevier*, 2013 WL 6331839, at *11 (citing *Cofacredit*, 187 F.3d 229, 244–45 (2d Cir. 1999)). "Because the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement." *Hecht*, 897 F.2d at 25. Although a plaintiff is not subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) in pleading a RICO conspiracy, *see id.* at 26 n.4, a RICO

conspiracy claim "should be more than a conclusory add-on at the end of a complaint." *FD Prop. Holding, Inc. v. U.S. Traffic Corp.*, 206 F. Supp. 2d 362, 373 (E.D.N.Y. 2002) (internal citations omitted); *see, e.g.*, *4 K & D Corp.*, 2014 WL 904451, at *12 (dismissing RICO conspiracy claim where plaintiffs alleged "no facts to show specifically that the defendants had any 'meeting of the minds' in the alleged violations").

Under this standard, plaintiff has alleged a plausible RICO conspiracy committed by the Manager Defendants and Doctor Defendants. As detailed *supra*, the amended complaint, amended RICO statement, and attached exhibits, contain detailed allegations about a fraudulent scheme perpetuated by these defendants. These allegations are not conclusory. Instead, the pleadings outline the specific role played by the Manager Defendants in running SCS and Patient Focus, and in coordinating the production of fraudulent IME and peer review reports. The pleadings and exhibits attached thereto also identify specific IME and peer review reports bearing the names of the Doctor Defendants, which plaintiff alleges are fraudulent. These well-pleaded allegations that each of the Manager Defendants and Doctor Defendants violated § 1962(c) also support an inference of an agreement to join a RICO conspiracy. *See City of New York v. Chavez*, No. 11-CV-2691 (BSJ), 2012 WL 1022283, at *8 (S.D.N.Y. Mar. 26, 2012) ("Thus, to the extent the Complaint adequately alleges that the Chavez defendants have committed CCTA violations in furtherance of the CD2U enterprise, it also alleges facts supporting an inference of an agreement to join the RICO conspiracy." (citing *United States v. O'Mally*, 796 F.2d 891, 399 (7th Cir. 1986) ("When a defendant has personally committed several acts of racketeering in furtherance of the enterprise's affairs, the inference of an agreement [to join the

conspiracy] is unmistakable."))); *see also Hoyle v. Dimond*, 612 F. Supp. 2d 225, 233 (W.D.N.Y. 2009) (holding that plaintiff adequately alleged agreement between defendants to commit at least two predicate acts, where plaintiff stated plausible violation of § 1962(c) by alleging specific facts of defendants' scheme to defraud); *Burke v. Dowling*, 944 F. Supp. 1036, 1068 (E.D.N.Y. 1995) (same).

\*     \*     \*

In sum, plaintiff has adequately alleged that all moving defendants who are included as RICO defendants violated 18 U.S.C. §§ 1962(c) and 1962(d).

## 2. Injury

"'A RICO plaintiff 'only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the [RICO] violation[,]'' and only when his or her 'actual loss becomes clear and definite.'" *Denney v. Deutsche Bank AG*, 443 F.3d 253, 266 (2d Cir. 2006) (quoting *First Nationwide Bank*, 27 F.3d at 767–69 (quoting *Sedima*, 473 U.S. at 496)); *see also Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135 (2d Cir. 2003) (where amount of damages was not "clear and definite," holding that "Plaintiffs lack statutory standing under RICO because their claims are unripe"). Under this rule, a claim will be dismissed for lack of statutory standing "where the extent of damages are still unknown, [and therefore] a RICO injury remains speculative and unprovable." *DLJ Mortg. Capital*, 726 F. Supp. 2d at 237 (internal citations and quotation marks omitted). "That is because RICO damages are netted against recovery obtained by collateral and other sources. . . ." *Uzan*, 322 F.3d at 135. In essence, therefore, "statutory standing under RICO incorporates an

enhanced ripeness requirement." *DLJ Mortg. Capital*, 726 F. Supp. 2d at 237.

Defendants contend that plaintiff's claims do not satisfy RICO's ripeness requirement. As noted *supra*, when a no-fault insurer denies a claim for benefits, the claimant has two options to obtain relief: (1) file suit against the insurer in New York Civil Court, or (2) submit the dispute to arbitration. Here, by plaintiff's own admission, plaintiff is currently litigating in state court or arbitration at least some of the no-fault claims that form the basis for the present action. Before filing the amended complaint, in a conference before Magistrate Judge Boyle, counsel for plaintiff confirmed that many of the no-fault claim denials underlying its RICO claims were "open claims," meaning their validity was currently being litigated in state court or arbitration. (*See* ECF No. 215; Zwerling Decl., Oct. 23, 2013, Ex. 9, at 42–44.) Plaintiff's counsel informed Magistrate Judge Boyle that it would not be difficult to provide the Court with a spreadsheet showing the status of each no-fault claim (*i.e.*, whether plaintiff sought to litigate the claim in state court or arbitration, and whether that claim is still pending). (*See id.*) However, plaintiff filed no such spreadsheet, and the amended complaint does not indicate how many of plaintiff's no-fault claims underlying the RICO causes of action are currently pending in other fora. At oral argument on February 20, 2014, plaintiff's counsel again confirmed that some portion of the no-fault claim denials are being litigated in state court or arbitration. Thus, of all the no-fault claims that plaintiff asserts were wrongfully denied as a result of defendants' alleged fraudulent scheme, at least some are being litigated in state court or arbitration. In other words, the extent of the injury plaintiffs have alleged—wrongful denial of their insurance claims—is contingent upon determinations in state court

and arbitration proceedings that plaintiff is not entitled to reimbursement for its claims.

Plaintiff does not dispute the fact that some portion of its alleged RICO injury is contingent upon the results of pending litigation in state court and arbitration proceedings. Nonetheless, plaintiff contends that the line of cases dismissing RICO claims on ripeness grounds "is limited to the context of secured lenders pursuing nonpaying debtors." (Pl.'s Opp'n to SCS's Mot. at 3.) The Court disagrees. Although many of the cases in this area do concern secured creditors bringing a RICO claim against a debtor before attempting to collect on the debt at issue, the "clear and definite" principle is not so limited. *See, e.g.*, *Am. Med. Ass'n v. United Healthcare Corp.*, 588 F. Supp. 2d 432, 441 (S.D.N.Y. 2008) ("If the Second Circuit intended for its decisions in this line to be interpreted so narrowly, it would have explicitly said so in at least one of the cases within the line of prevailing case law. Plaintiffs' argument that the doctrine is only applicable in instances of third party debt lacks the requisite foundation."); *see also Denney*, 443 F.3d at 266 (in class action against professional advisors for improper and fraudulent tax counseling, holding that some class members failed to meet the clear and definite damages element of civil RICO because some members had not yet been assessed a tax penalty); *DeSilva v. N. Shore-Long Island Jewish Health Sys., Inc.*, 770 F. Supp. 2d 497, 521 (E.D.N.Y. 2011) (where plaintiffs claimed that defendant-hospital's fraud had prevented them from bringing timely claims for unpaid wages, RICO claim was unripe because plaintiffs had not yet attempted to sue for unpaid wages, and thus "the injury alleged was contingent upon uncertain litigation-related events"). Moreover, the rationale for the ripeness requirement—that a RICO injury is speculative where the net amount of a

plaintiff's damages is subject to change—applies with full force to cases where the RICO damages depend on the results of pending litigation or arbitration proceedings.

The Second Circuit's decision in *Uzan* illustrates the principle's application to the present case. There, the plaintiffs had entered into financing agreements with a Turkish telecommunications company (Telsim) and, following several non-payments, the plaintiffs initiated arbitration proceedings against Telsim in Switzerland. *See* 322 F.3d at 132. Plaintiffs also filed a RICO claim against individuals alleged to have impaired the collateral for the financing agreements. *See id.* The Second Circuit held that plaintiff's RICO claim should have been dismissed because the plaintiffs had not yet foreclosed on the loans at issue, and because there were arbitration proceedings pending that concerned the same underlying transactions. *See id.* at 136. The Second Circuit recognized that "the RICO damages sought are in respect of a loss that would be abated to the extent that: Plaintiffs realize value on the collateral; *Plaintiffs recover in the Swiss arbitrations; or the size of the debt on the underlying contracts, or the obligation to pay it, is affected by any ruling on Telsim's defenses in the Swiss arbitration that is binding and enforceable*." *Id.* (emphasis added). In other words, separate and apart from the issue of plaintiff's status as a secured creditor, *Uzan* holds that a plaintiff's damages are not "clear and definite" so long as that plaintiff's damages could be mitigated or abated in pending litigation. *See Harbinger Capital Partners Master Fund I, Ltd. v. Wachovia Capital Markets, LLC*, 347

F. App'x 711, 713 (2d Cir. 2009) (summary order) ("Appellants argue that *Uzan* is limited to cases where a plaintiff has failed to exhaust its contractual remedies, but *Uzan*'s reasoning broadly extends to non-contractual remedies as well."). As a consequence of the pending litigation in *Uzan*, the Second Circuit ordered dismissal "without prejudice to reassertion at some appropriate later time." *Uzan*, 322 F.3d at 136–37.[9]

Likewise, in this case, plaintiff's damages are not "clear and definite" for so long as some of the no-fault claims that form the basis of plaintiff's RICO causes of action are still being litigated in state court or arbitration. Plaintiff could prevail on some or all of those claims, which would reduce the amount that plaintiff could recover under RICO. Accordingly, at this juncture, all of plaintiff's RICO causes of action must be dismissed without prejudice. *See, e.g.*, *Harbinger Capital Partners Master Fund I*, 347 F. App'x at 713 (affirming dismissal of RICO claim on basis that bankruptcy proceedings were still pending, and, therefore, the Second Circuit could not determine whether those proceedings would mitigate any of plaintiff's damages); *DLJ Mortg. Capital*, 726 F. Supp. 2d at 239 (dismissing RICO claim where "the amended complaint itself demonstrates that DLJ is already pursuing other contractual and legal remedies to recover damages arising out of the fraudulent transactions"); *DeSilva*, 770 F. Supp. 2d at 521 (holding that RICO claim was unripe where injury was premised on "hypothetical inability to recover" from defendant).[10]

---

[9] Additionally, in *Uzan*, it was irrelevant to the Second Circuit that the borrower (Telsim) was not a party to the RICO action. *See* 322 F.3d at 136. Accordingly, in this case, as well, it does not matter that the pending state court litigation and arbitration proceedings involve plaintiff and insurance companies, even though the insurance companies are not parties to this action.

[10] Plaintiff's reliance on *Brown v. Cassens Transportation Co.*, 675 F.3d 946 (6th Cir. 2012), and *Jackson v. Segwick Claims Management Services,*

The *Lyons* decision, upon which plaintiff relies, is not to the contrary. In *Lyons*, the plaintiff sought to recover damages based on the defendants' allegedly fraudulent claims for no-fault insurance benefits. 843 F. Supp. at 374. On the issue of RICO injury, the defendants argued that the plaintiff had not sustained clear and definite damages because the plaintiff could recover money "through state lawsuits for fraud, which would mitigate any injury suffered." *Id.* The court rejected this argument and held that the plaintiff's damages were sufficiently clear and definite. *Id.* Critically, unlike this case, *Lyons* concerned allegedly fraudulent claims for no-fault benefits that the plaintiff-insurance company had already paid, and, consequently, no state court litigation or arbitration proceedings concerning those claims could have been pending. *See id.* at 365–66. At most, therefore, *Lyons* holds that a plaintiff need not exhaust all possible remedies in state court before bringing a RICO suit. However, *Lyons* says nothing about the situation in the instant case, where there is pending litigation in a different judicial forum that could reduce or eliminate the plaintiff's alleged RICO injury. Contrary to plaintiff's suggestion, therefore, this Court's holding does not mean that a plaintiff must commence a state court action or arbitration proceeding for each and every no-fault claim denial before commencing a RICO suit.

Accordingly, the Court grants the moving defendants' motions to dismiss all RICO claims based on plaintiff's failure to allege a clear and definite RICO injury. As noted *infra*, dismissal is without prejudice to plaintiff filing a second amended complaint or commencing a new action when its damages become clear and definite.[11]

---

*Inc.*, 699 F.3d 466 (6th Cir. 2012) [hereinafter *Jackson I*], is unpersuasive for two reasons. First, the Sixth Circuit reheard the *Jackson* case *en banc*—thereby vacating *Jackson I*—and overruled *Brown* in the same opinion. *See Jackson v. Segwick Claims Mgmt. Servs., Inc.*, 731 F.3d 556, 558–59 (6th Cir. 2013) (en banc). Second, and more importantly, to the extent plaintiff contends that *Brown* and *Jackson I* support its argument on the issue of ripeness, the *Jackson I* decision explicitly acknowledged that the Sixth Circuit's approach is fundamentally at odds with the Second Circuit's approach. *See* 699 F.3d at 478 ("We acknowledge that one of our sister circuits currently disagrees with this approach. The Second Circuit has adopted a rule that RICO claims are not ripe until the amount of damages becomes clear and definite." (internal quotation marks omitted)). Of course, this Court is bound to follow binding precedent of the Second Circuit.

In addition, plaintiff's attempt to import the Second Circuit's prudential ripeness doctrine into the RICO ripeness requirement misses the mark. (*See* Pl.'s Opp'n to SCS's Mot. at 6–8); *cf. Simmonds v. Immigration & Naturalization Serv.*, 326 F.3d 351, 359 (2d Cir. 2003) (setting forth the following factors for a court to consider in deciding whether a case is unripe for review even though it satisfies Article III's ripeness requirement: "(1) whether an issue is fit for judicial decision and (2) whether and to what extent the parties will endure hardship if decision is withheld"). RICO ripeness, which derives from the RICO statute itself, "is a more rigorous matter than standing under Article III," *Denney*, 443 F.3d at 266, and is certainly a more rigorous matter than prudential ripeness. Thus, while the prudential ripeness factors may lead a court to *decline* to hear an otherwise ripe dispute, the prudential ripeness factors may not be used to hold that a RICO claim is ripe for review even though the claim fails the statutory ripeness requirement.

[11] The Court also rejects plaintiff's argument that, even if its RICO claims to recover the amount of wrongfully denied no-fault claims is unripe, plaintiff's RICO claims are ripe to the extent plaintiff seeks to recover attorneys' fees and costs incurred by litigating these claims in state court and arbitration. (*See* Pl.'s Opp'n to SCS's Mot. at 9–10); *cf. Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1166 (2d Cir. 1993) (recognizing that "legal fees may constitute RICO damages when they are proximately caused by a RICO violation"). Even assuming *arguendo* that plaintiff could divide its RICO damages in this way to avoid dismissal, the Court determines that the amount of these RICO damages also depends

### 3. Causation

As to the causation element, a plaintiff must allege that the defendant's alleged RICO violation was both the "but-for" and proximate cause of his injury. *E.g. Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010); *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 266 (1992); *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 132 (2d Cir. 2010); *First Nationwide Bank*, 27 F.3d at 769. "Central to the notion of proximate cause is the idea that a person is not liable to all those who may have been injured by his conduct, but only to those with respect to whom his acts were 'a substantial factor in the sequence of responsible causation,' and whose injury was 'reasonably foreseeable or anticipated as a natural consequence.'" *First Nationwide Bank*, 27 F.3d at 769 (quoting *Hecht*, 897 F.2d at 23–24). As the Supreme Court has explained, "proximate cause . . . requires 'some direct relation between the injury asserted and the injurious conduct alleged.' A link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient." *Hemi Grp.*, 559 U.S. at 9 (quoting *Holmes*, 503 U.S. at 268, 271, 274). Moreover, "where mail fraud is the predicate act for a civil RICO claim, the proximate cause element articulated in *Holmes* requires the plaintiff to show 'reasonable reliance.'" *Bank of China, N.Y. Branch v. NBM LLC*, 359 F.3d 171, 176 (2d Cir. 2004). "The Supreme Court has held that a plaintiff alleging a RICO violation need not demonstrate first person reliance to establish causation, but proof of at least third-party reliance is required." *Envtl. Servs., Inc. v. Recycle Green Servs., Inc.*, --- F. Supp. 2d ----, No. 13-CV-4568 (ADS) (WDW), 2014 WL 1259959, at *9 (E.D.N.Y. Mar. 25, 2014) (citing *Bridge v. Phoenix Bond & Indem. Co.*,

553 U.S. 639, 658 (2008) ("Of course, none of this is to say that a RICO plaintiff who alleges injury 'by reason of' a pattern of mail fraud can prevail without showing that *someone* relied on the defendant's misrepresentations.") (emphasis in original)); *see, e.g.*, *UFCW Local 1776*, 620 F.3d at 132.

In the instant case, the moving defendants argue that plaintiff has failed to allege causation for two reasons: (1) plaintiff alleges that *almost* all IME and peer review reports created by defendants concluded that the medical service at issue was unnecessary (*see* Am. Compl. ¶ 98 ("The peer review reports issued by Defendants almost universally find every service and supply in question to lack medical necessity . . . .")); and (2) non-party insurance companies, not defendants, ultimately decided to deny plaintiff's claims for no-fault benefits.

The Court concludes that plaintiff has sufficiently alleged but-for and proximate causation with respect to all moving defendants. On the first issue, plaintiff concedes that it may base its RICO claims only on the IME and peer review reports that recommended the denial of plaintiff's no-fault claims. (*See* Pl.'s Opp'n to SCS's Mot. at 30.) However, the causal relationship between those reports and plaintiff's injury is not undermined by the existence of other reports recommending the grant of certain no-fault claims. As to the second issue, defendants are not immune from RICO liability simply because non-party insurance companies, and not defendants, denied plaintiff's no-fault claims. Plaintiff has alleged specifically that insurance companies relied upon the allegedly fraudulent IME and peer review reports in denying plaintiff's

---

upon whether plaintiff is successful in the pending state court actions and arbitration proceedings. If plaintiff prevails in any of those actions, it may be entitled to recover certain fees and costs. *See* N.Y. Ins.

Law § 5106; N.Y. Comp. Codes R. & Regs. tit. 11, § 65-4.6. Accordingly, the amount of these RICO damages are not yet clear and definite.

claims. (*See* Am. Compl. ¶ 101 ("Plaintiff's claims for reimbursement were denied based upon the fraudulent reports.").) Indeed, plaintiff asserts that the insurance companies could not have denied plaintiff's claims for lack of medical necessity unless an IME or peer review report supported such a conclusion. (*Id.* ¶ 66); *see Healing Hands Chiropractic*, 787 N.Y.S.2d at 647 ("A denial premised on a lack of medical necessity must be supported by competent evidence such as an independent medical examination, a peer review or other proof which sets forth a factual basis and a medical rationale for denying the claim."). Moreover, plaintiff alleges that the insurance companies' denial of claim forms "clearly state on their face that the denials were issued as a result of the peer review and IME reports" prepared by defendants. (*Id.* ¶ 131.) Finally, plaintiff alleges that the reports themselves "go so far as to recommend that the insurance carriers do not pay Plaintiff for the bills that were submitted." (*Id.* ¶ 132; *see, e.g.*, Am. RICO Statement Ex. 5, at 4–5 (recommending that insurance company "[d]isallow" claims).) In short, plaintiff has sufficiently alleged that defendants' alleged conduct was, at the very least, a "substantial factor" in the insurance companies' decisions to deny plaintiff's no-fault claims, and that this result was "reasonably foreseeable" by all defendants involved in the production of IME and peer review reports for plaintiff's claims.[12]

## IV. OTHER CLAIMS

Plaintiff also seeks a declaratory judgment and asserts several causes of action under New York law. Defendants argue that, upon dismissal of the RICO claims, the Court should decline to exercise supplemental jurisdiction over the declaratory judgment and state law claims. The Court agrees.

Having determined that plaintiff's federal claims do not survive defendants' motions to dismiss, the Court concludes that retaining jurisdiction over any declaratory judgment claim or state law claims is unwarranted. *See* 28 U.S.C. § 1367(c)(3); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966); *see also Uzan*, 322 F.3d at 137 (after holding that RICO claims should have been dismissed for lack of standing, remanding the case to the district court to decide whether to retain supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367(c)); *Young-Wolff v. McGraw-Hill Cos.*, No. 13-CV-4372 (KMW) (JCF), 2014 WL 349711, at *7–8 (S.D.N.Y. Jan. 31, 2014) (holding that, upon dismissal of all federal claims, a court must dismiss a declaratory judgment claim unless the court has diversity or supplemental jurisdiction over such claim). "In the interest of comity, the Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of pursuant to Rule 12(b)(6) or summary judgment grounds, courts should 'abstain from exercising pendent jurisdiction.'" *Birch v. Pioneer Credit Recovery, Inc.*, No. 06-CV-6497T, 2007 WL 1703914, at *5 (W.D.N.Y. June 8, 2007) (quoting *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir. 1986)).

Therefore, in the instant case, the Court, in its discretion, declines to exercise supplemental jurisdiction over any remaining declaratory judgment or state law claims because "it 'has dismissed all claims over which it has original jurisdiction.'" *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122

_____

[12] In his letter-motion to dismiss, defendant Cohen contends that he never produced a single IME or peer review report related to one of plaintiff's no-fault claims and, therefore, that he could not have caused plaintiff's alleged injury. (*See* Cohen's Letter-Mot.) The Court cannot resolve this factual issue on a motion to dismiss. Instead, Cohen's argument is better left to a motion for summary judgment.

(2d Cir. 2006) (quoting 28 U.S.C. § 1367(c)(3)); *see also Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 250 (2d Cir. 2008) ("We have already found that the district court lacks subject matter jurisdiction over appellants' federal claims. It would thus be clearly inappropriate for the district court to retain jurisdiction over the state law claims when there is no basis for supplemental jurisdiction."); *Karmel v. Claiborne, Inc.*, No. 99-CV-3608 (WK), 2002 WL 1561126, at *4 (S.D.N.Y. July 15, 2002) ("Where a court is reluctant to exercise supplemental jurisdiction because of one of the reasons put forth by § 1367(c), or when the interests of judicial economy, convenience, comity and fairness to litigants are not violated by refusing to entertain matters of state law, it should decline supplemental jurisdiction and allow the plaintiff to decide whether or not to pursue the matter in state court.").

Accordingly, pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to retain jurisdiction over plaintiff's remaining declaratory judgment and state law claims, and dismisses such claims without prejudice.

## V. LEAVE TO AMEND

Finally, the Court considers plaintiff's request for leave to file a second amended complaint. For the following reasons, the Court grants this request.

"When a party requests leave to amend his complaint, permission generally should be freely granted." *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013); *see* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."). Nonetheless, "[a] district court has discretion to deny leave for good reason, including futility." *See McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). Leave to amend is futile if the amended complaint is meritless and would

fail to state a claim. *Ho Myung Moolsan Co., Ltd. v. Manitou Mineral Water, Inc.*, 665 F. Supp. 2d 239, 250 (S.D.N.Y. 2009); *see, e.g.*, *Ashmore v. Prus*, 510 F. App'x 47, 49 (2d Cir. 2013) (summary order) (holding that denial of leave to amend was proper where barriers to relief for se plaintiff "cannot be surmounted by reframing the complaint").

Under this liberal standard, the Court grants plaintiff's request to amend its RICO claims. First, although the Court has given plaintiff leave to amend its complaint once before, the Court did so only so that plaintiff's complaint would match its amended RICO statement; the Court had not identified any defects in plaintiff's pleadings at that time. Second, plaintiff's counsel has informed the Court that plaintiff could easily address its failure to plead clear and definite damages by submitting with an amended complaint a list of all no-fault claims underlying plaintiff's RICO claims. Moreover, for the reasons discussed *supra*, plaintiff's RICO claims are otherwise well-pleaded. Third, the Court cannot identify any prejudice to defendants by affording plaintiff the opportunity to amend. Whether plaintiff amends its complaint or not, dismissal of the RICO claims would be without prejudice. *See, e.g.*, *Uzan*, 322 F.3d at 136–37 (dismissing RICO claims without prejudice to plaintiff bringing new action when its damages become clear and definite). Accordingly, the Court cannot conceive of any meaningful difference to defendants between plaintiff reasserting its RICO claims in an amended complaint, or doing so in a new action. Accordingly, the Court grants plaintiff's request to amend its RICO claims against all defendants. *See, e.g.*, *Oliver Sch., Inc. v. Foley*, 930 F.2d 248, 253 (2d Cir. 1991) ("Where the possibility exists that the defect can be cured and there is no prejudice to the defendant, leave to amend at least once should normally be granted as a matter of course.").

Plaintiff shall file the second amended complaint no later than thirty days from the date of this Memorandum and Order. If plaintiff does not file a second amended complaint by that date, then the Court will assume that plaintiff has elected to bring a new action at some future date when its damages become clear and definite. At that time, if no amended complaint is filed, the Court will order the Clerk of the Court to close the case and enter a judgment of dismissal, without prejudice.

## VI. CONCLUSION

For the reasons set forth herein, the Court grants all moving defendants' motions to dismiss the RICO claims against them, without prejudice. Because the Court has dismissed all federal claims in this action, the Court declines at this juncture to exercise supplemental jurisdiction over the remaining declaratory judgment and state law claims, and those claims are dismissed without prejudice. Finally, the Court grants plaintiff's request for leave to amend its RICO claims. Plaintiff shall file a second amended complaint no later than thirty days from the date of this Memorandum and Order. If plaintiff does not do so, then the Court will order the Clerk of the Court to close this case and enter a judgment for all defendants that is consistent with this Memorandum and Order.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: May 7, 2014
        Central Islip, NY

\*       \*       \*

Plaintiff is represented by Gary Tsirelman, Stefan Belinfanti, Daniel Joseph Grace, Nicholas Paul Bowers, and Sarah A. Adam, Gary Tsirelman, P.C., 129 Livingston Street, Brooklyn, NY 11201. Defendants SCS, Brittis, Cole, Dagan, Ehrlich, Ferrante, Kritzberg, Mann, Sohn, Sukhov, Weber, Weisman, and Westerband are represented by Andrew Leslie Zwerling and Justin M. Vogel, Garfunkel Wild P.C., 111 Great Neck Road, Suite 503, Great Neck, NY 11021. Defendants Patient Focus, Sharahy, and Vakhidova are represented by Glenn Michael Jones, Offit Kurman, 4800 Montgomery Lane, 9th Floor, Bethesda, MD 20814. Defendants Nationwide, B. Osiashvili, M. Osiashvili, S. Osiashvili, and Vayner are represented by David S. Douglas, Gallet Dreyer & Berkey LLP, 845 Third Avenue, 8th Floor, New York, NY 10022. Defendants D. Martins and Kerness are represented by E. Christopher Murray, Ruskin Moscou Faltischek, P.C., East Tower, 15th Floor, 1425 RXR Plaza, Uniondale, NY 11556. Defendant S. Ross is represented by Peter S. Gordon, Gordon & Gordon, PC, 108-18 Queens Boulevard, 6th Floor, Forest Hills, NY 11375. Defendant Cohen proceeds *pro se*.