Stefan M. Belinfanti (SB 9027)
GARY TSIRELMAN, PC
129 Livingston Street
2nd Floor
Brooklyn, NY 11201
     *Counsel for Plaintiff*

**SECOND AMENDED COMPLAINT**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

Sky Medical Supply Inc.
               *Plaintiff*

     - against -

SCS Support Claim Services, Inc., Patient Focus Medical Examinations, PC d/b/a All Borough Medical, PC
          *Enterprise Defendants*

     And

Nationwide Management Inc., BAB Management Inc., Management Company A, Management Company B, Management Company C, Management Company D, Management Company E
         *Management Company Defendants*

     And

Benjamin Osiashvili a.k.a Veniamin Osiashvili, Mikael Osiashvili a.k.a Michael Osiashvili, Svetlana Osiashvili, Aleksey Vayner a.k.a Alex Vayner, Eitan Dagan, Manager Defendant A, Manager Defendant B, Manager Defendant C, Manager Defendant D, Manager Defendant E
         *Manager Defendants*

     And

Tatiana Sharahy, MD, Mitchell Ehrlich, MD, Joseph C. Cole, MD, Julio Westerband, MD, William A. Ross, MD, Warren Cohen, MD, Renat R. Sukhov, MD, William S. Kritzberg, MD, Robert A. Sohn, DC, Stanley Ross, MD, Mitchell L. Weisman, MD,

Docket No. 12-CV-06383

**Plaintiff Demands a Trial By Jury**

1

Mark Weber, MD, Gary J. Florio, MD, Antonio
Martins, MD, Damion A. Martins, MD, M.S., Dante
Brittis, MD, Christopher Ferrante, DC,   Brian
Freindlich, DC, Wayne Kerness, MD, Denis Mann,
DC, Andrew Miller, MD, Andrew Bazos, MD, Drew
Stein, MD

*Doctor Defendants*

And

Linda Ackerman
Evgeniya Vakhidova

*Other Defendants*
--------------------------------------------------------X

By this pleading, Plaintiff, by and through its counsel Gary Tsirelman, PC, brings claims
against Defendants, seeking monetary damages for the following:  (1) violations of the
Federal Racketeering Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C.
§1962(c);  (2) violations of the Federal Racketeering Influenced and Corrupt
Organizations (RICO) Act, 18 U.S.C. §1962 (d); (3) violations of N.Y. Business
Corporation Law §1507 and 1508; (4) common law fraud; (5) aiding and abetting fraud;
(6) unjust enrichment; and (7) tortious interference.


## I.  INTRODUCTION

1.      This is a story about corruption.  Specifically, the instant complaint discusses
corruption as it exists within New York's no-fault insurance industry.

2.      As the economic and corporate structure of this country have evolved, so too have
the players in deceitful enterprises.  Corruption is no longer the exclusive chattel of the
bootlegger, mobster or crooked politician.  Fraudulent coalitions now involve licensed
professionals, corporate entities and many other persons who use underhanded methods
for economic gain.

3.      Consequently, while the landscape may have changed, the motives have not.

4.      Contained within this document is a detailed description of a corrupt organization
consisting of controllers of an independent medical consulting company and a
fraudulently incorporated professional corporation, which, with the help and

authorization of co-Defendants, creates a mindboggling number of fraudulent peer review and IME reports on a consistent basis.

5.      As detailed in the complaint, Defendant SCS SUPPORT CLAIMS SERVICES INC. is a medical consultant "vendor" company that has been contracted with by various insurer clients to find independent medical consultants who perform ostensibly independent peer reviews and medical examinations in order to determine whether certain medical services covered by insurance policies should be paid or denied as not medically necessary. Defendant PATIENT FOCUS EXAMINATIONS PC D/B/A ALL BOROUGH MEDICAL is a domestic professional corporation that serves as a back office for various peer review companies; moreover, it has a vibrant IME consulting business in the state of New York.

6.      The true owners and controllers of SCS and PATIENT FOCUS – specifically, the above-named Manager Defendants - cause laypersons to create fraudulent peer review and IME reports containing predetermined opinions regarding the lack of medical necessity of the services in question.  Moreover, the above-named Doctor Defendants authorize and in fact facilitate Manager Defendants' conduct and allow the fraudulent reports containing the preordained findings to be passed off as "legitimate" reports that are the work product of Doctor Defendants.  In return for their cooperation, Doctor Defendants are paid for the peer review and IME reports bearing their names and signatures.  Doctor Defendants are also paid, through SCS and PATIENT FOCUS, for court and arbitration appearances in support of the fraudulent reports.

7.      The reports issued by Defendants are fraudulent for a variety of reasons, including, but not limited to the following:

> (a) *Predetermined Results (Peer Reviews):*   the peer reports at issue contain the statement that the purpose of the peer reviews is to determine the medical necessity of the services at issue; however, this particular statement is fraudulent since the medical necessity of the services at issue was predetermined before the reports were even created, and the conclusions of lack of medical necessity were preordained without regard for the condition of the patients as stated in the medical records.  Specifically, Defendants have colluded to deny all of the billed for

3

services as not medically necessary, without regard to the specifics and merits of the claims. The statements containing the predetermined conclusions that the services at issue were not medically necessary are memorialized in the reports irrespective of the merits of each individual claim, the number or type of documents allegedly reviewed by Doctor Defendants, and the physical condition of each individual injured party.

(b) *Predetermined Results (IMEs):* the IME reports at issue claim on their face to be performed on an independent and unbiased basis; moreover, the IME reports contain the following statement: "based on my examination, no further treatment is necessary." However, the conclusions contained in the reports regarding the necessity of further treatment are not based on the examinations. Defendants knowingly and willfully create IME reports that contain predetermined conclusions regarding the medical necessity of the services at issue without regard to the results of the examinations. Specifically, Defendants have colluded to universally deem further medical treatment as medically unnecessary, without regard to the specifics and merits of the claims. The statements containing the predetermined conclusions are memorialized in the reports irrespective of the merits of each individual claim, the number or type of documents allegedly reviewed by Doctor Defendants, and the physical condition of each individual injured party.

(c) *The "prepared and read" statement:* the peer review and IME reports at issue contain statements claiming that the Doctor Defendants, whose names and supposed signatures appear on the reports, certify and affirm under the penalty of perjury that they prepared and read the reports; however, the reports were not in fact prepared and read by the Doctor Defendants. Rather, as detailed in this complaint, the Manager Defendants utilize non-licensed persons to create the reports and pass them off as being the work product of Doctor Defendants.

4

(d) *The "certify and affirm the findings and conclusions" statement:* the peer review and IME reports at issue contain statements that that the Doctor Defendants whose names and supposed signatures appear on the reports "certify and affirm" the "findings and conclusions" contained within the reports; however, the findings and conclusions in the report were not certified and affirmed by the Doctor Defendants. In fact, the findings and conclusions are not even sourced from the Doctor Defendants. Rather, the Defendants utilize non-licensed persons to create the findings and conclusions and pass them off as the findings and opinions of Doctor Defendants.

(e) *The Electronic Signatures:* the peer review and IME reports contain electronic signatures allegedly placed on the reports by Doctor Defendants; however, the signatures are not placed on the reports by Doctor Defendants. Rather, Defendants utilize non-licensed persons to place the signatures on the reports and pass the reports off as having been signed by Doctor Defendants.

(f) *The "Review of Records" statement:* the peer review reports universally contain a section entitled *"Review of Records"* that lists a number of medical records that the Doctor Defendants purportedly reviewed. The reports also claim that the determination regarding whether the services were medically necessary are based on a review of said records. However, no such review by Doctor Defendants actually takes place. Rather, Defendants utilize non-licensed persons to list the medical records, so as to appear that medical records had been reviewed by Doctor Defendants prior to issuing the reports.

8.    The instant complaint details how Defendants have utilized deceptive practices, bad faith dealings and unethical methods in order to gain an economic benefit to the detriment of Plaintiff and other insured parties.

9.    Defendants have colluded to create and perpetrate a massive scheme to defraud Plaintiff and other insured parties out of substantial amounts of money, all for the purpose of financial gain.

10.    As a result of Defendants' conduct, Plaintiff now seeks relief from the wrongdoing described herein.

## II.  THE PARTIES

### A.  Plaintiff

11.    Plaintiff Sky Medical Supply, Inc., is a New York corporation with a principal place of business in the county of Queens, New York.  Plaintiff is authorized to transact business in the State of New York.

### B.  Defendants

#### 1.  Enterprise Defendants

12.    Defendant SCS SUPPORT CLAIM SERVICES INC., hereinafter "SCS", is a New York corporation with a principal place of business in Melville, New York.   SCS is managed and controlled by an individual named Eitan Dagan.  At all relevant times, SCS contracted with insurance carriers to perform independent peer review and IMEs to determine whether claims for benefits should be paid or denied.

13.    Patient Focus Medical Examinations, PC d/b/a All Borough Medical (hereinafter "PATIENT FOCUS") is a domestic professional corporation with a principal place of business in Richmond Hill, NY.  At all relevant times, PATIENT FOCUS provided back office and clerical services to peer review and IMEs vendors that operate in New York's no-fault and workers' compensation industries.  At all relevant times, PATIENT FOCUS managed an IME practice under its d/b/a name "All Borough" and split fees with licensed medical consultants who performed IMEs.  According to the NYS Department of State, PATIENT FOCUS is owned by Defendant Tatiana Sharahy, MD.  However, PATIENT

6

FOCUS is in fact a *Mallela*[1] corporation doing business in violation of the Business Corporation Laws of New York.  PATIENT FOCUS utilizes various management companies to direct money to the PC's true owners who, in actuality, own and control the company in violation of New York law. The true owners of PATIENT FOCUS are Defendants Svetlana Osiashvili, Benjamin Osiashvili, Mikael Osiashvili, Aleksey Vayner, and the remaining above-captioned Manager Defendants and Management Company Defendants.

## 2.  Management Company Defendants

14.     Defendant Nationwide Management Inc. (hereinafter "NATIONWIDE") is a domestic corporate entity that does business in the State of New York.  It is owned and managed by Manager Defendants Svetlana Osiashvili, Benjamin Osiashvili and Mikhael Osiashvili.  NATIONWIDE is used by its owners as an instrument to control PATIENT FOCUS and to funnel money to them.

15.     Defendant BAB Management Inc. (hereinafter "BAB"), is a domestic corporate entity that was formed in and does business in the State of New York.  It is owned and managed by Manager Defendant Aleksey Vayner a/k/a Alex Vayner.  BAB is used by its owner as an instrument to control PATIENT FOCUS and to funnel money to him.

16.     Defendant Management Company A (hereinafter "MANAGEMENT COMPANY A") is a domestic corporate entity that does business in the State of New York.  It is owned and managed by Manager Defendant A.  MANAGEMENT COMPANY A is used by its owner as an instrument to control PATIENT FOCUS and to funnel money to Manager Defendant A.

17.     Defendant Management Company B (hereinafter "MANAGEMENT COMPANY B") is a domestic corporate entity that does business in the State of New York.  It is owned and managed by Manager Defendant B.  MANAGEMENT COMPANY B is used by its owner as an instrument to control PATIENT FOCUS and to funnel money to Manager Defendant B.

---

[1] A *Mallela* corporation, as described in the seminal New York Court of Appeals case of *State Farm Mutual Auto. Ins. Co. v. Mallela*, 4 N.Y.3d 313, 794 N.Y.S.2d 700 (2005), is - in the medical context – a professional corporation that is nominally owned by a licensed physician but that is in truth and in fact owned and controlled by non-licensed entities.

18.     Defendant Management Company C (hereinafter "MANAGEMENT COMPANY C") is a domestic corporate entity that does business in the State of New York.  It is owned and managed by Manager Defendant C.  MANAGEMENT COMPANY A is used by its owner as an instrument to control PATIENT FOCUS and to funnel money to Manager Defendant C.

19.     Defendant Management Company D (hereinafter "MANAGEMENT COMPANY D") is a domestic corporate entity that does business in the State of New York.  It is owned and managed by Manager Defendant D.  MANAGEMENT COMPANY D is used by its owner as an instrument to control PATIENT FOCUS' and to funnel money derived from the peer review and IME business from PATIENT FOCUS to Manager Defendant D.

20.     Defendant Management Company E (hereinafter "MANAGEMENT COMPANY E") is a domestic corporate entity that was formed in and does business in the State of New York.  It is owned and managed by Manager Defendant E.  MANAGEMENT COMPANY E is used by its owner as an instrument to control PATIENT FOCUS' and to funnel money derived from the peer review and IME business from PATIENT FOCUS to Manager Defendant E.

### 3.  Manager Defendants

21.     Defendant Eitan Dagan (hereinafter "E. DAGAN") resides in and is a citizen of New York.  E. DAGAN is not a licensed medical professional.  E. DAGAN is the de facto manager and controller of SCS.

22.     Defendant Svetlana Osiashvili (hereinafter "S. OSIASHVILI") resides in and is a citizen of New York.   S. OSIASHVILI is not a licensed medical professional. S. OSIASHVILI is an owner of NATIONWIDE.  S. OSIASHVILI is one of the true owners of PATIENT FOCUS.   Through NATIONWIDE, S. OSIASHVILI controlled and managed PATIENT FOCUS in violation of New York Law.

23.     Defendant Benjamin Osiashvili a/k/a Veniamin Osiashvili (hereinafter "B. OSIASHVILI") resides in and is a citizen of New York.  B. OSIASHVILI is not licensed to practice medicine.   B. OSIASHVILI is the President of NATIONWIDE. B. OSIASHVILI is one of the owners of NATIONWIDE. He is one of the true owners of

PATIENT FOCUS.  Through NATIONWIDE, B. OSIASHVILI controlled and managed PATIENT FOCUS in violation of New York law.

24.     Defendant Mikael Osiashvili a/k/a Michael Osiashvili (hereinafter "M. OSIASHVILI") resides in and is a citizen of New York.  M. OSIASHVILI is not licensed to practice medicine.  M. OSIASHVILI is one of the owners of NATIONWIDE.  He is one of the true owners of PATIENT FOCUS.   Through NATIONWIDE, M. OSIASHVILI controlled and managed PATIENT FOCUS in violation of New York law.

25.     Defendant Aleksey Vayner a.k.a Alex Vayner (hereinafter "VAYNER") resides in and is a citizen of New York.  A. VAYNER is not licensed to practice medicine.  A. VAYNER is the owner of BAB.  A. VAYNER is one of the true owners of PATIENT FOCUS.  Through BAB, M. OSIASHVILI controlled and managed PATIENT FOCUS in violation of New York law.

26.     Manager Defendant A (hereinafter "MANAGER DEFENDANT A") resides in and is a citizen of New York.  MANAGER DEFENDANT A is not a licensed medical professional.   MANAGER DEFENDANT A is the owner of MANAGEMENT COMPANY A and is also a true owner of PATIENT FOCUS.

27.     Manager Defendant B (hereinafter "MANAGER DEFENDANT B") resides in and is a citizen of New York.  MANAGER DEFENDANT B is not a licensed medical professional.   MANAGER DEFENDANT B is the owner of MANAGEMENT COMPANY B and is also a true owner of PATIENT FOCUS.

28.     Manager Defendant C (hereinafter "MANAGER DEFENDANT C") resides in and is a citizen of New York.  MANAGER DEFENDANT C is not a licensed medical professional.   MANAGER DEFENDANT C is the owner of MANAGEMENT COMPANY C and is also a true owner of PATIENT FOCUS.

29.     Manager Defendant D (hereinafter "MANAGER DEFENDANT D") resides in and is a citizen of New York.  MANAGER DEFENDANT D is not a licensed medical professional.   MANAGER DEFENDANT D is the owner of MANAGEMENT COMPANY D and is also a true owner of PATIENT FOCUS.

30.     Manager Defendant E (hereinafter "MANAGER DEFENDANT E") resides in and is a citizen of New York.  MANAGER DEFENDANT E is not a licensed medical

professional.   MANAGER DEFENDANT E is the owner of MANAGEMENT COMPANY E and is also a true owner of PATIENT FOCUS.

### 4. Doctor Defendants

31.    Defendant Tatiana Sharahy, MD (hereinafter "SHARAHY"), is an individual licensed to practice medicine in the States of New York and New Jersey.  SHARAHY resides in and is a citizen of New Jersey.   SHARAHY is also the paper owner of PATIENT FOCUS, though she does not truly own or control that professional corporation.

32.    Defendant Mitchell Ehrlich, MD (hereinafter "EHRLICH") is an individual licensed to practice medicine in the State of New York.  EHRLICH resides in and is a citizen of New York.  EHRLICH is a board member of SCS.

33.    Defendant Joseph C. Cole, MD (hereinafter "COLE") is an individual licensed to practice medicine in the State of New York.  COLE resides in and is a citizen of New York.

34.    Julio Westerband, MD (hereinafter "WESTERBAND") is an individual licensed to practice medicine in the State of New York.  WESTERBAND resides in and is a citizen of New York.

35.    William A. Ross, MD (hereinafter "W. ROSS") is an individual licensed to practice medicine in the State of New York.  W. ROSS resides in and is a citizen of New York.

36.    Warren Cohen, MD (hereinafter "COHEN") is an individual licensed to practice medicine in the State of New York.  COHEN resides in and is a citizen of New York.

37.    Renat R. Sukhov, MD (hereinafter "SUKHOV") is an individual licensed to practice medicine in the State of New York.  SUKHOV resides in and is a citizen of New York.

38.    William S. Kritzberg, MD (hereinafter "KRITZBERG") is an individual licensed to practice medicine in the State of New York.  KRITZBERG resides in and is a citizen of New Jersey.

39.    Robert A. Sohn, DC (hereinafter "SOHN") is an individual licensed to practice chiropractic medicine in the State of New York.  SOHN resides in and is a citizen of New York.

40.     Stanley Ross, MD (hereinafter "S. ROSS") is an individual licensed to practice medicine in the State of New York.  S. ROSS resides in and is a citizen of New York.

41.     Mitchell L. Weisman, MD (hereinafter "WEISMAN") is an individual licensed to practice medicine in the State of New York.  WEISMAN resides in and is a citizen of New York.

42.     Mark Weber, MD (hereinafter "WEBER") is an individual licensed to practice medicine in the State of New York.  WEBER resides in and is a citizen of New York.

43.     Gary J. Florio, MD (hereinafter "FLORIO") is an individual licensed to practice medicine in the State of New York.  FLORIO resides in and is a citizen of New York.

44.     Antonio Martins, MD (hereinafter "A. MARTINS") is an individual licensed to practice medicine in the State of New York.  A. MARTINS resides in and is a citizen of New York.

45.     Damion A. Martins, MD, M.S., (hereinafter "D. MARTINS") is an individual licensed to practice medicine in the State of New York.  D. MARTINS resides in and is a citizen of New Jersey.

46.     Dante Brittis, MD (hereinafter "BRITTIS") is an individual licensed to practice medicine in the State of New York.  BRITTIS resides in and is a citizen of Connecticut.

47.    Christopher Ferrante, MD (hereinafter "FERRANTE") is an individual licensed to practice chiropractic medicine in the State of New York. FERRANTE resides in and is a citizen of New York.

48.    Wayne Kerness, MD (hereinafter "KERNESS") is an individual licensed to practice medicine in the State of New Jersey. KERNESS resides in and is a citizen of New York.

49.     Denis Mann, DC (hereinafter "MANN") is an individual licensed to practice chiropractic medicine in the State of New York. MANN resides in and is a citizen of New York.

50.    Andrew Miller, MD (hereinafter "MILLER") is an individual licensed to practice medicine in the State of New York. MILLER resides in and is a citizen of New York.

51.     Andrew Bazos, MD (hereinafter "BAZOS") is an individual licensed to practice medicine in the State of New York. BAZOS resides in and is a citizen of New York.

52.    Brian Freindlich, DC (hereinafter "FREINDLICH") is an individual licensed to practice chiropractic medicine in the State of New York. FREINDLICH resides in and is a citizen of New York.

53.    Drew Stein, MD (hereinafter "STEIN") is an individual licensed to practice chiropractic medicine in the State of New York. STEIN resides in and is a citizen of New York.

### 5.  Other Defendants

54.    Defendant Linda Ackerman (hereinafter "ACKERMAN") resides in and is a citizen of New York. ACKERMAN is the nominal owner of SCS.

55.    Evgeniya Vakhidova resides in and is a citizen of New York.  Vakhidova is the General manager of PATIENT FOCUS' Accounting Department with direct supervision of payroll, billing and collections aspects. Vakhidova is responsible for organizing the company's finance-related issues, such as billing, contract management, budgeting, financial planning & analysis and account management.


### III.  JURISDICTION, VENUE AND STATUTE OF LIMITATIONS

56.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs. Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 through 1968 (the Racketeer Influenced and Corrupt Organizations ("RICO") Act) because they arise under the laws of the United States. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367. Venue in this District is appropriate pursuant to 28 UJ3.C. §. 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

57.    The causes of action detailed within this complaint fall within the pertinent statute of limitation requirements.  Notably, the corrupt organization and fraudulent conduct as alleged below was discovered by Plaintiff less than one year prior to the date of this

action's original complaint and less than three years prior to the date of this second amended complaint.  Moreover, as detailed in the following paragraphs, Defendants to this action have engaged in multiple acts of fraudulent concealment in order to delay discovery of the conduct delineated herein to the greatest extent possible.

## IV.  OVERVIEW OF NO-FAULT INSURANCE

58.     In the State of New York, all non-garaged motor vehicles are required to carry insurance coverage, including liability coverage, uninsured/underinsured coverage and no-fault personal injury protection (PIP) coverage.

59.     Regulation 68 (11 NYCRR 65), promulgated by the New York Superintendent of Insurance, governs the responsibilities of motor vehicle insurance carriers for the purposes of processing claims for no-fault insurance benefits.  Regulation 68 requires insurance carriers doing business in the State of New York to cover "basic economic loss" as suffered by parties injured as a result of motor vehicle accidents.  Basic economic loss, as defined by the regulation, includes but is not limited to expenses incurred for medical services, including medical equipment, provided to eligible injured persons.

60.     Under the subject policies of insurance, carriers are required to cover expenses for medical services and equipment provided to injured parties.  Every motor vehicle insurance policy issued in the state of New York must as a matter of law contain the Mandatory Personal Injury Protection Endorsement provision of Regulation 68, which details the duties and obligations of insurers that issue motor vehicle insurance policies.  By way of statute, the "No-Fault Endorsement" automatically attaches to all motor vehicle insurance policies in New York state, even those that do not contain the Endorsement within their provisions.

61.     As stated by the New York Court of Appeals in *New York & Presbyterian Hosp. v. Country Wide Ins. Co.*, 17 NY3d 586 (2011): "The primary goals of New York's no-fault automobile insurance system are to ensure prompt compensation for losses incurred by accident victims without regard to fault or negligence, to reduce the burden on the

courts and to provide substantial premium savings to New York motorists" (quoting *Matter of Med. Socy. of State of N.Y. v. Serio*, 100 NY2d 854, 860 [2003]).

62. The Court of Appeals also noted that "[i]n furtherance of these goals, the Superintendent of Insurance has adopted regulations implementing the No-Fault Law (Insurance Law art 51), including circumscribed time frames for claim procedures" (Hospital for Joint Diseases, 9 NY3d at 317). We described the basic no-fault regime as follows:

> Upon receipt of one or more of the prescribed verification forms used to establish proof of claim, . . . an insurer has 15 business days within which to request 'any additional verification required by the insurer to establish proof of claim' (11 NYCRR 65-3.5[b]). An insurer may also request 'the original assignment or authorization to pay benefits form to establish proof of claim' within this time frame (11 NYCRR 65-3.11[c]). Significantly, an insurance company must pay or deny the claim within 30 calendar days after receipt of the proof of claim (*see* Insurance Law § 5106[a]; 11 NYCRR 65-3.8[c]). If an insurer seeks additional verification, however, the 30-day window is tolled until it receives the relevant information requested" (see 11 NYCRR 65-3.8[a][1])"

63. It is well settled that mere submission of claims forms (interchangeably referred to herein as "bills") by a health provider to an insurance carrier and a failure to pay the amounts on said forms within thirty days of receipt renders the claims overdue and outstanding. It is also black letter law that an insurer's failure to issue a timely denial or verification requests within thirty days of receipt of claims or bills for benefits precludes an insurance carrier from defending a claim for no-fault benefits on any basis, except in the very narrow instances where coverage was never existed in the first instance.

64. Injured parties who receive treatment for injuries sustained as a result of motor vehicle accidents that take place in New York have the option of assigning their contractual and statutory rights to reimbursement to the providers that provide them with medical services/equipment. This assignment is consummated through use of an assignment of benefits (AOB) form, one of the "prescribed forms" included in Appendix 13 to Regulation 68. Failure by an insurance carrier to request proof of an assignment or

challenge the assignment form constitutes a waiver regarding any objection concerning the standing of the assignee to obtain reimbursement.

65.     In order to adhere to Regulation 68 once a claim is received, an insurer must issue a denial of claim form for which no verification requests are outstanding.  One basis utilized by various insurance carriers to deny claims for no-fault benefits is that the billed-for services were not medically necessary.   This is commonly referred to as the "lack of medical necessity" (hereinafter "LOMN") defense.  The statute governing no-fault insurance claims has been decisively interpreted in a manner wherein a presumption of medical necessity automatically attaches to the services listed in claim forms that are submitted by health service providers to insurance carriers for reimbursement. Furthermore, it is well established that the LOMN defense is an affirmative defense that falls within the category of defenses that are precluded if not timely raised in denial of claim forms.

66.   The LOMN defense may only be asserted based on a peer review report or independent medical examination report from a licensed independent health consultant, as implicitly provided by Insurance Regulation 11 NYCRR 65-3.8(b)(4).  See *A.B. Med. Servs. v. Allstate Ins. Co.*, 2 Misc.3d 127, Slip Op. 51687(U) (2nd and 11th Jud. Districts 2003).

67.   Due to the fact that the regulations require the LOMN defense to be based upon either a peer review report or independent medical examination, when determining whether to issue payment for bills submitted by various health providers various insurance carriers forward claims and the injured parties' medical records to independent medical consultants or third party vendors in order for an unbiased determination to be made by the medical consultants as to whether the services should be paid or denied as not medically necessary.   There are two legally recognized vehicles that an insurance carrier has at its disposal for determining whether the billed-for services were medically necessary.  Said vehicles are:

> a) the "peer review" protocol, in which an independent medical consultant reviews the medical records pertaining to the claims at issue in order to determine in an unbiased fashion whether the billed-for services were

medically necessary, and then sends a signed, written report detailing his/her medical rationale and conclusions to the requesting party; and

b) the "<u>independent medical examination</u>" (IME), in which an independent medical consultant actually examines the eligible injured person, and then issues a signed, written report that provides an unbiased determination as to whether future medical services are required in order to adequately address the identified injuries

68.   Regardless of whether the peer review or IME protocol is utilized, the reports upon which the insurers' decisions to pay or deny must be legitimate and based on the merits of the claims in dispute.

69.   Regulation 68 (11 NYCRR 65), requires that insurance carriers that wish to deny claims on the basis of lack of medical necessity must do so within the 30 day timeline set forth within the statute.  Failure to do so precludes this defense, and any other defenses not stated with a high degree of specificity, at any point in the future.

70.   As illustrated herein, Defendants manipulated the peer review and IME protocols described above for economic gain, and perpetrated numerous frauds in order to do so.

### V.  ALLEGATIONS

71.   During the no-fault claims processing period, various insurance carriers have requested and continue to request that independent peer reviews and/or IMEs be performed in order to determine whether bills that are received from health care providers should be paid or denied as not medically necessary. The carriers either pay or deny reimbursement of services depending on what is contained within the reports, which are purportedly created and authored by independent medical experts who made their determinations on the merits of each claim.  The carriers operate on the premise that the reports that they receive are the work product of the licensed consultants, that the opinions and determinations contained therein are those of the consultants and that the statements contained within the reports are in fact genuine.

72.   PLAINTIFF did in fact submit claims to insurance carriers pursuant to the no-fault insurance regulations encapsulated within Regulation 68 (11 NYCRR 65). These

claims were for reimbursement of no-fault benefits for medical equipment that was provided by Plaintiff to various insured parties. PLAINTIFF is a medical equipment provider that falls under the definition of "health care provider" as defined by the no-fault insurance regulations. Samples of the aforementioned claims submitted by Plaintiff are contained within the REPORT AND DENIAL CHART annexed hereto as *Exhibit 1*. Plaintiff hereby incorporates the REPORT AND DENIAL CHART into this complaint.

73.     For each of the claims submitted by Plaintiff in this action, there was an insurance policy in effect that covered the motor vehicle accident in which the patient was involved. For each of the claims submitted by Plaintiff in this action, the injured party assigned his/her rights to Plaintiff to submit claims for reimbursement under the applicable policy of insurance. As an operation of fact and law, Plaintiff became the legal assignee under each contract of insurance before the claims for reimbursement were submitted to the insurance companies. Plaintiff therefore had standing to submit claims to insurance carriers for reimbursement of no-fault benefits.

74.     For each of the claim form submitted by Plaintiff in this action to the insurance carriers, the medical equipments listed therein are covered by statute and reimbursable under the subject policies of insurance. A presumption of medical necessity automatically attached to each of the forms as an operation of fact and law. At all times Plaintiff was entitled to reimbursement in the amounts reflected on the claim/bill forms

75.     Upon receipt of the claim form, the insurance carriers presented the assignors' (injured parties') medical records to Defendants in order for peer review or IME reports to be completed, so that a determination could be made based on the contents of those reports whether to pay PLAINTIFF for the amounts claimed or deny the services as not medically necessary. It is at this point that Defendants hijacked the claims process for personal gain and to the detriment of Plaintiff.

**A.  The Enterprise Defendants (SCS and PATIENT FOCUS)**

76.     Within the New York no-fault insurance industry, the sheer volume of claims that could potentially necessitate a review by a medical consultant for a determination on medical necessity is so large that it has created a fertile ground for the type of organization that this complaint describes.

17

77.     Further laying the groundwork for a corrupt organization to infiltrate the New York no-fault medical consultant industry is that Regulation 68 does not provide a review or appeal process for challenging the veracity of a peer review or IME reports prior to the issuance of denial of claim forms based on the content of such reports.  In other words, once a claim has been submitted to an insurance carrier for reimbursement under the contract of insurance, there is no requirement that the peer review or IME reports be submitted to the health provider prior to the determination whether to pay or deny.

78.     Additionally, there are no disciplinary provisions contained within the No-Fault Regulations that specifically address abuse of the peer review/IME protocol by recalcitrant individuals.  Unlike with New York Workers' Compensation Board, which is empowered to strip IME doctors of their certification and ability to conduct workers' compensation IMEs if they are found to have abused the process [Board Rule 12 NYCRR 300.2(b)(9)], no such authority exists in the no-fault paradigm.

79.     SCS, a medical consulting vendor that offers medical consulting services in the no-fault industry, is an active New York domestic corporation.  SCS was formed in the year 1991.  Prior to the partnership between the Manager Defendants and Doctor Defendants, SCS provided peer review services for certain insurers, but produced them on a scale that was a mere fraction of what would occur once the partnership with PATIENT FOCUS was formed.  SCS is owned on paper by ACKERMAN, but in truth its operations are managed and controlled by E. DAGAN.  E. DAGAN took over operation of SCS in the year 2000.

80.     PATIENT FOCUS is a New York professional corporation that performs back office services for no-fault peer review and IME vendors located in New York. PATIENT FOCUS was incorporated in 2004.  Its clients include, but are not limited to, no-fault medical consulting companies such as Empire Stat LLC and Medial Referral Inc. PATIENT FOCUS also provides IME services to insurance carriers in New York's workers' compensation industry.  PATIENT FOCUS has always been, and still is, a fraudulently incorporated entity.  It is owned on paper by SHARAHY but truly is owned and controlled by (1) B. OSIASHVILI, S. OSIASHVILI and M. OSIASHVILI through their management company NATIONWIDE; and by (2) ALEX VAYNER through his management company BAB; and by (3) the remaining above-captioned MANAGER

DEFENDANTS through their management companies.  In a classic "doc-in-the-box" setup, and in order to create a seemingly valid corporate entity, PATIENT FOCUS and SHARAHY entered into a relationship wherein SHARAHY sold her license to the OSIASHVILI Defendants and VAYNER in order for them to establish a medical professional corporation and divert sums of money to laypersons that they are not legally entitled to receive.  Most of the profit obtained by PATIENT FOCUS is filtered to Manager Defendants through their respective management companies.

### B. The Partnership Between Manager Defendants and Doctor Defendants

81.    The above-captioned Manager Defendants, including but not limited to E. DAGAN, S. OSIASHVILI, B. OSIASHVILI, M. OSIASHVILI and VAYNER, entered into a partnership that allowed for the mass production of peer review and IME reports pursuant to a fraudulent protocol.  Specifically, the partnership operates as follows: Manager Defendants utilize SCS to serve as the "legitimate" vendor company that enters contracts with insurance carriers to provide the carriers with peer review and IME consultant services.  Pursuant to these contracts, Manager Defendants are able to obtain a vast number of requests for peer reviews and IMEs from the carriers.  As an offered service, SCS agrees to provide personnel who travel to the insurers' places of business and perform the resource-heavy task of scanning into digital format the medical records of the various injured parties and electronically transmitting them in order for the reports to be created.  SCS also agrees under the contract to find the medical consultants who are supposed to conduct the peer reviews and IMEs, and to provide the office space where the IMEs take place.  All of the peer review and IME reports in question appear on SCS letterhead.  Manager Defendants also ensure that scheduling letters sent to injured parties informing them of IME appointments are on SCS letterhead.

82.    E. DAGAN is responsible for procuring contracts with insurance carriers and ensuring that the additional requests for peer review and IME consultations continue to occur.  E. DAGAN also ensures that the medical records that are obtained from the insurance carrier clients are obtained from the insurance carriers. Moreover, E. DAGAN is responsible for managing, through his brother Yaniv Dagan, the persons located in Florida who create the reports.

19

83.      S. OSIASHVILI, B. OSIASHVILI, M. OSIASHVILI and VAYNER are primarily responsible for providing the manpower for the scanning and transmission of medical records, performance of IMEs and preparation of peer review and IME reports. S. OSIASHVILI, B. OSIASHVILI, M. OSIASHVILI and VAYNER are also responsible for many of the administrative duties related to Manager Defendants' scheme. For instance, they are responsible for choosing the doctors whose names appear on the reports, scheduling which doctors are to perform the IMEs and scheduling court appearances for the doctors who testify in court in support of the reports. Manager Defendants have operated over 25 IME locations in the State of New York (see *Exhibit 2*).

84.      In order for the peer review and IME reports to be created, the records are then transmitted from New York to laypersons located in Florida. These laypersons are managed by Yaniv Dagan, who at E. DAGAN'S direction is responsible for upkeep of the software utilized to create the reports and the servers where the medical records and related documents are stored. Yaniv Dagan is a brother of E. DAGAN. The laypersons located in Florida utilize a computer software program to create and electronically sign the peer review reports. Each report contains the name and purported signature of a specific doctor, and is passed off as being the work product of such doctor. The reports, once created and signed, are submitted by mail and email to the insurance carrier clients, who rely upon the statements contained within the reports when determining whether to pay claims for benefits or deny them as "not medically necessary".

### C.  Doctor Defendants

85.      Doctor Defendants are participants in the corrupt activity described herein, though their roles are vastly different from the non-doctor co-Defendants. Specifically, Doctor Defendants authorize Manager Defendants to create a massive amount of peer review and IME reports bearing their respective names. Doctor Defendants have a symbiotic relationship with Manager Defendants. Doctor Defendants are essential to the fraudulent scheme in that Manager Defendants would not be able engage in the peer review and IME business unless the reports submitted to the insurance carrier clients contained the name and purported signatures of licensed health care practitioners. Moreover, a significant portion of the organization's revenue is derived from expert witness fees paid

20

to SCS for Doctor Defendants' court appearances in support of the fraudulent reports. These fees would not be attainable without licensed doctors actually appearing in court or at arbitration to testify.  Insofar as economic benefits to Doctor Defendants are concerned, absent the involvement with PATIENT FOCUS and SCS, "valid" peer review and IME reports could not be generated at a volume, speed and cost comparable to what could be accomplished once the fraudulent scheme was up and running.  By allowing SCS and PATIENT FOCUS to create and sign the reports, Doctor Defendants are able to obtain payment as the purported authors of an exponentially larger number of reports than if they were actually doing legitimate peer reviews and IMEs.  Moreover, Doctor Defendants agreed with SCS and PATIENT FOCUS that the peer review reports and IME reports would, without regard to the facts or merits of each claim, contain predetermined opinions that the services rendered by health care providers universally lacked medical necessity.  One of the reasons for this is that the more reports that are issued triggering denial of benefits, the more court appearances would be needed for testimony by Doctor Defendants in support of the reports.

86.     As such, Manager Defendants entered into a partnership with Doctor Defendants, wherein Doctor Defendants authorized Manager Defendants to create the reports with predetermined opinions and numerous false statements in the name of Doctor Defendants and pass them off as though they were the work product of Doctor Defendants.  In return, Doctor Defendants are paid a sum of money per report in exchange for their willingness to allow the reports to be generated in their names, and are also paid for court and arbitration appearances on those very same reports.

87.     With respect to the performance of the actual IMEs themselves, Doctor Defendants are paid money to perform the illegitimate examinations using space provided by Manager Defendants.  The reports that are generated based on those examinations are created by the unlicensed lay persons and passed off as though created by and possessing the findings and opinions of Doctor Defendants.

88.     The following sections discuss the specific aspects of the peer review and IME reports that render them disingenuous.

### D.  Fraudulent Peer Review and IME Reports

89.     Plaintiff SKY MEDICAL SUPPLY INC. has suffered damages as a result of its claims for reimbursement being denied based on fraudulent and illegitimate peer review reports.  The peer review and IME reports at issue are fraudulent and illegitimate for a number of reasons, including but not limited to the following:

(a) *Predetermined Results (Peer Reviews):*  the peer reports at issue contain the statement that the purpose of the peer reviews is to determine the medical necessity of the services at issue; however, this particular statement is disingenuous since the medical necessity of the services at issue was predetermined before the reports were even created, and the conclusions regarding lack of medical necessity were preordained without regard for the condition of the patients as stated in the medical records.  Specifically, Defendants have colluded to deny all of the billed for services as not medically necessary, without regard to the specifics and merits of the claims.  The statements containing the predetermined conclusions that the services at issue were not medically necessary are memorialized in the reports irrespective of the merits of each individual claim, the number or type of documents allegedly reviewed by Doctor Defendants, and the physical condition of each individual injured party.

(b) *Predetermined Results (IMEs):*  the IME reports at issue claim on their face to be performed on an independent and unbiased basis; moreover, the IME reports contain the following statement: "based on my examination, no further treatment is necessary."  However, the conclusions contained in the reports regarding the necessity of further treatment are not based on the examinations.  Defendants knowingly and willfully prepare and draft peer review reports and IME (Independent Medical Examination) reports that contain predetermined conclusions regarding the medical necessity of the services at issue without regard to the results of the examinations.  Specifically, Defendants have colluded to universally deem further medical treatment as medically unnecessary, without

22

regard to the specifics and merits of the claims.  The statements containing the predetermined conclusions that future services are not medically necessary are memorialized in the reports irrespective of the merits of each individual claim, the number or type of documents allegedly reviewed by Doctor Defendants, and the physical condition of each individual injured party.

(c) *The "prepared and read" statement:*  the peer review and IME reports at issue contain statements claiming that the Doctor Defendants, whose names and supposed signatures appear on the report, certify and affirm under the penalty of perjury that s/he prepared and read the reports; however, the reports were not in fact prepared and read by the Doctor Defendants.  Rather, the Manager Defendants utilize non-licensed persons to create the reports and pass them off as being the work product of Doctor Defendants.

(d) *The "certify and affirm the findings and conclusions" statement:*  the peer review and IME reports at issue contain statements that that the Doctor Defendants whose names and supposed signatures appear on the reports "certify and affirm" the "findings and conclusions" contained within the reports; however, the findings and conclusions in the report were not certified and affirmed by the Doctor Defendants.  In fact, the findings and conclusions are not even sourced from the Doctor Defendants.  Rather, Manager Defendants utilize non-licensed persons to create the findings and conclusions and pass them off as the findings and opinions of Doctor Defendants.

(e)  *The Electronic Signatures:*  the peer review and IME reports contain electronic signatures purporting to be placed on the reports by Doctor Defendants; however, the signatures are in fact not placed on the reports by Doctor Defendants.  Rather, the Manager Defendants utilize non-licensed persons to place the signatures on the reports and pass the reports off as having been signed by Doctor Defendants.

(f)  *The "Review of Records" statement:*  the peer review reports universally contain a section entitled *"Review of Records"* that lists a number of medical records that the Doctor Defendants purportedly reviewed.  The reports also claim that the determination regarding whether the services were medically necessary are based on a review of said records.  However, no such review by Doctor Defendants actually takes place.   Rather, Manager Defendants utilize non-licensed persons to list on the reports each of the medical records obtained from the insurance carrier clients, in order to make it appear as though the medical records had been reviewed by Doctor Defendants prior to issuing the reports.

90.    Payment for the use of Defendant Doctors' names and credentials to promote the feigned "authorship" of the peer and IME reports, and for their involvement in the other aspects of the described scheme, are made by SCS and PATIENT FOCUS to Doctor Defendants.

### E.  Sample of Findings in Support of Allegations

91.    The volume of reports that Doctor Defendants allegedly prepared, and the number of medical reports allegedly reviewed by them in order to create the reports, is mindboggling and incredible.  Additionally, the frequency of Doctor Defendants' court appearances is astonishing.

a. For example, SHARAHY has purportedly reviewed close to a million pages of medical records.  Additionally, over eight thousand reports bearing the name and purported signature of SHARAHY have been submitted to insurance carriers recommending against reimbursement.

b. For calendar years 2010, SHARAHY was scheduled to appear, and in fact did appear, in court to testify in support of peer and IME reports created by Defendants at least one hundred and ten days out of the year, excluding weekends and holidays.  SHARAHY appeared for the purposes of testifying on behalf of reports bearing her name, in addition to reports bearing the names of other Doctor Defendants.   As an indication that testimony would be predetermined, SHARAHY was not paid to review any of peer review reports allegedly authored by other Doctor Defendants.  SHARAHY was also not paid to review any medical

24

records, regardless of how voluminous.  SHARAHY was only paid if she actually appeared in court, and she only appeared in Court if she would be testifying in support of the peer review reports.

c. W. ROSS has purportedly reviewed close to a million pages of medical records. Additionally, over eight thousand reports bearing the name and purported signature of W. ROSS have been submitted to insurance carriers recommending against reimbursement.

d. For calendar years 2010, W. ROSS was scheduled to appear, and in fact did appear, in court to testify in support of peer and IME reports created by Defendants at least one hundred days out of the year, excluding weekends and holidays.  W. ROSS appeared for the purposes of testifying on behalf of reports bearing her name, in addition to reports bearing the names of other Doctor Defendants.  As an indication that testimony would be predetermined, W. ROSS was not paid to review any of peer review reports allegedly authored by other Doctor Defendants.  W. ROSS was also not paid to review any medical records, regardless of how voluminous.  W. ROSS was only paid if he actually appeared in court, and he only appeared in Court if he would be testifying in support of the peer review reports.

e. FLORIO has purportedly reviewed over 750,000 pages of medical records. Additionally, over seven thousand reports bearing the name and purported signature of FLORIO have been submitted to insurance carriers recommending against reimbursement.

f. For calendar years 2010, FLORIO was scheduled to appear, and in fact did appear, in court to testify in support of peer and IME reports created by Defendants at least one hundred and twenty days out of the year, excluding weekends and holidays.  FLORIO appeared for the purposes of testifying on behalf of reports bearing his name, in addition to reports bearing the names of other Doctor Defendants.  As an indication that testimony would be predetermined, FLORIO was not paid to review any of peer review reports allegedly authored by other Doctor Defendants.  W. ROSS was also not paid to review any medical records, regardless of how voluminous.  FLORIO was only

25

paid if he actually appeared in court, and he only appeared in Court if he would be testifying in support of the peer review reports.

g. Peer review and IME reports bearing the names and purported signatures of the remaining Doctor Defendants, issued to insurers recommending non-payment of claims, were also issued in amounts that far exceed what would be reasonable if the reports were legitimate and based on the merits of each claim.

92.    A review of numerous peer review reports and IME results have resulted in findings of numerous reports that are so similar in language and citations used that it is impossible for the similarities to be mere coincidence.  This is because the preordained opinions contained in the reports are input by laypersons utilized by Defendants for the purpose of mass production.   These reports contain identical language despite being affirmed to have been prepared by the different Doctor Defendants. In fact, the pattern and practice described herein has even been been addressed by Arbitrators when ruling upon cases involving the very same Doctor Defendants.  For instance:

a. With respect to Defendants SHARAHY, W. ROSS and SCS, in a no-fault action wherein the health provider's bill was denied based on peer review reports bearing the names of SHARAHY and W. ROSS, the presiding Arbitrator issued a decision stating the following:

> "Peer reviewer **Tatiana Sharahy, M.D**. is an internist with an office in Richmond Hill, New York. Peer reviewer **William Ross M.D.** is a physician with an office in Mineola, New York. According to the affidavits submitted by Dr. Sharahy and Dr. Ross they "have no business or professional relationship." Despite having no affiliation and despite maintaining offices in different counties both physicians submitted nearly identical peer reviews in totally different matters. Both peer reviews were obtained through an entity known as **Support Claims Services**.
>
> **Respondent submitted affidavits from each doctor attempting to explain these remarkable "coincidences". Shockingly both affidavits are virtually identical**. They both contain the caption in exactly the same format and matching paragraphs including paragraph number 4 which reads: As part of my regular duties and responsibilities, and in the regular course of business, I am assigned to review medical files assigned to be by SCS for the purpose of determining whether the medical services rendered were medically necessary. Following my review of the medical

26

documentation assigned to me, I prepare a report known as a "peer review", which sets forth my medical opinion as to whether the medical services rendered were medically necessary.

**It is not known whether the doctors, the peer review company, or Respondent is behind this deception**. I will leave that conclusion to the appropriate authorities and personnel to decide. However, it is clear the two virtually identical peer review reports submitted herein are not a coincidence and are not credible." [emphasis added].

b. With respect to Defendants WESTERBAND, S. ROSS and SCS, in a no-fault action wherein the health provider's bill was denied based on peer review reports bearing the names WESTERBAND and S. ROSS, the presiding Arbitrator issued a decision stating the following:

"The peer reviewer herein, **Julio Westerband, M.D.** is a board certified orthopedic surgeon with an office in New York, New York according to the New York State Education Department Website. The peer review submitted by Respondent does not list any address for **Dr. Westerband**. The peer reviewer in Staten Island Medical and Surgical Supply, Inc. was **Stanley Ross M.D.** who is also a board certified orthopedic surgeon but with offices in Queens County and Nassau County**.** Despite having no apparent affiliation and despite maintaining offices in different counties **both physicians submitted nearly identical peer reviews in totally different matters**. Both peer reviews were obtained through an entity known as **Support Claims Services. Significantly and of utmost concern is the fact this has occurred before and has involved Respondent and Support Claims Services**…

**As I noted before, it is not known whether the doctors, Support Claims Services, or Respondent is behind this deception.** I will leave that conclusion to the appropriate authorities and personnel to decide. However, it is abundantly clear the two virtually identical peer review reports submitted herein are not a coincidence and are not credible. It is also clear this is not an isolated occurrence." [emphasis added].

c. With respect to Defendants SHARAHY and KRITZBERG, in a no-fault action wherein the health provider's bill was denied based on peer review reports

bearing the names of SHARAHY and KRITZBERG, the presiding Arbitrator issued a decision stating the following:

> "Respondent has denied payment for the testing based upon two peer reviews that found that the tests were not medically necessary. The September 7th testing was dealt with by Dr. Kritzberg who concluded that Respondent should not pay for the tests because, in sum, they are subjective and of questionable value. The October 27th tests were dealt with by Dr. Sarahy who, in his report, repeated the same reasons given by Dr. Kritzberg, almost verbatim."

d. With respect to Defendant STEIN, in a no-fault action wherein the health provider's bill was denied based on peer review reports, the presiding Arbitrator issued a decision stating the following:

> "Respondent denied Applicant's claims based upon peer reviews conducted by Drew Stein, M.D. and Jeffrey Passick, M.D., both of whom reviewed Assignor's medical records and opined the supplies in question were not medically necessary.

> Herein, both peer reviews are divided into the same five sections; purpose, review of medical records, impression, conclusion, summary and attestation. That in itself is neither suspicious nor surprising. However, in the conclusion section both peer reviewers proffer the same opinions, written in exactly the same language, citing to the same exact page in the same periodicals. These facts are both surprising and disconcerting…

> Not only do these peer review contain the same concepts, but identical paragraphs, an identical citation referencing the same exact page and are offered in the same format and order. Oddly both peer reviewers attest to the following: *I declare, under the penalties of perjury, that the information contained within this document was prepared and is the work product of the undersigned.*

> As I noted before, it is not known whether the doctors, the peer review service, or Respondent is behind this deception. I will leave that conclusion to the appropriate authorities and personnel to decide. However, it is abundantly clear the two virtually identical peer review reports submitted herein are not a coincidence and are not credible. Significantly, it is clear this is not an isolated occurrence."

93.     Plaintiff submitted dozens sample peer review and IME reports bearing Doctor Defendants' names and electronic signatures to a linguistics expert. The expert found that the reports examined contained evidence of plagiarism and common authorship.

94.     In addition to the above, various finders of fact have also noted another aspect of the reports that supports Plaintiff's contentions.  Namely, that the so-called analysis utilized by specific Doctor Defendants to reach the desired result of finding a lack of medical necessity for the services in dispute never varies in any meaningful way, regardless of the merits of the claims and medical conditions of the injured parties whose records are allegedly :reviewed.  For instance:

a.     With respect to Doctor Defendant COHEN, in a no-fault action wherein the health provider's bill was denied based on peer review reports issued by the aforementioned Defendants, the presiding Arbitrator issued a decision stating the following:

> "His conclusion is in the 'discussion' portion of his peer.  This 'discussion' section does not relate the unique medical findings and symptoms of this individual injured person to the testing or to the medical rationales for the testing. Instead, Dr. Cohen inserted his formulaic boilerplate statement against the testing. **His "discussion" and conclusion is identical, word for word, to peers he wrote in other cases involving this testing… No matter the unique clinical findings, complaints and test results for the injured person, the conclusion and discussion is the same in every single case**. The use of such a boilerplate statement, without analyzing the facts unique to the specific injured person, indicates that a button was pushed to accomplish **a predetermined result**." [emphasis added].

b.     With respect to Doctor Defendant D. MARTINS, in a no-fault action wherein the health provider's bill was denied based on peer review reports issued by the aforementioned Defendants, the presiding Arbitrator issued a decision stating the following:

> "In my opinion, Dr. Martins' peer review was structured to a pre-determined result.  Dr. Martins dismissed the findings of the cervical MRI and his dismissal has not been corroborated by presentation of the cervical MRI report referred to in his review Dr. Martins' did not engage in a precise factual analysis of the relevant medical facts concerning this particular injured person. Instead his opinion is based on a series of general statements concerning the alleged utility (or lack thereof) of the durable medical equipment."

29

Also, with respect to COHEN, in a different no-fault action wherein the health Provider's bill was denied based on peer review reports issued by the aforementioned Defendants, the presiding Arbitrator issued a decision stating the following:

> "Furthermore, the Applicant has submitted nine other peer review prepared by Dr. Cohen with respect to other Eligible Injured Parties. The wording of the discussion section of each of those nine peer reviews is almost word for word identical with the discussion in the peer review prepared in connection with this Injured Party."

b.      With respect to Doctor Defendant EHRLICH, in a no-fault action wherein the health provider's bill was denied based on peer review reports issued by the aforementioned Defendants, the presiding Arbitrator issued a decision stating the following:

> "Thus, with the exception of Dr. Ehrlich's brief review of the patient's history and Dr. Bleicher's records in the introductory portion of these reviews, the body of the discussion section of the      reviews totally ignores the clinical findings by Dr. Bleicher and all other health care providers, or any other diagnostic testing results, and he must simply use a boilerplate word processing summary to serve as his "discussion" of why the services in question were not medically necessary."

c.      With respect to Doctor Defendant SUKHOV, in a no-fault action wherein the health provider's bill was denied based on peer review reports issued by the aforementioned Defendants, the presiding Arbitrator issued a decision stating the following:

> "In the first place, the fact that the peer review physician performed a peer review of the medical necessity of needle EMG studies when in fact these studies were never performed in this case, and are not a part of this claim, because Assignor refused them, renders his entire peer review report less than persuasive. In addition, the peer review report, except for the very last paragraph, is exactly the same, verbatim, as other peer review reports submitted by this peer review physician, and this also impacts quite negatively on its persuasiveness."

95.     In addition to the above issues, the peer review reports consistently cite to medical literature in support of the conclusions contained in the reports.  However, such literature is continuously mischaracterized in an airbrushed attempt to make the reports' conclusions seem independent and legitimate; moreover, literature that Doctor Defendants knows to be outdated or irrelevant is nonetheless input by laypersons into reports bearing Defendant Doctors' signatures.   This exact issue, involving the very same Doctor Defendants, has been recognized and discussed by triers of fact and law. For instance:

      a.     With respect to Doctor Defendants COLE and EHRLICH, the presiding Arbitrator in a no-fault action reflected on various peer review report bearing COLE'S and EHRLICH'S purported signature.  The Arbitrator noted that, in support of the "lack of medical necessity" conclusions contained therein, were issued despite previous admissions under oath by COLE    that the very same literature was invalid and should not be followed.  The Arbitrator wrote:

> "I take judicial notice that in the case of Cambridge Medical, P.C. v. GEICO, 18 Misc.3d 1144A, 859 NYS2d 893, Dr. Cole testified under oath that the mimimonograph #32 was superceeded by the AANEM one year later. Dr. Cole admitted that the findings he cited were not valid since they were contradicted by different findings a year later. The Court noted: "In fact, an AAEM publication issued one year after the AAEM minimonograph #32 cited by Dr. Cole is dramatically opposed to Cole's position that the electrodiagnostic test is not medically necessary since it stated that a 'needle EMG is widely regarded as the technique of choice in the diagnostic evaluation of cervical radiculopathy.
>
> I find based on evidence that the Respondent failed to show that the EMG/NCV testing of the patient's upper and lower extremities conducted on December 16, 2008 were not medically necessary. The denials were based on peer reviews by Dr. Cole and Dr. Ehrlich where they cite and rely on a medical journal article that is not valid. They both supported their claim that the testing was not valid on a publication which was contradicted. Dr. Cole stated under oath that he knew or should have known that the minimonograph #32 was reversed. I find that both of these doctors have an obligation to verify what it stated in their peer reviews."

b.      With respect to Doctor Defendant FLORIO, the presiding Arbitrator in a no-fault action stated as follows:

"The Applicant's reply to the Respondent's post hearing submission indicated the following: After a review of the articles, it is clear they were misrepresented in the Peer Review of Dr. Ferrante, and cannot serve to support his report… I must agree with the Applicant."

96.     The above findings are merely a sample of findings that support various aspects of Plaintiff's claim.  For each of the Doctor Defendants in this case, findings exist that support the allegations contained herein.

97.     Additionally, the opinions and conclusions contained within the peer review reports consistently fail to discuss in any detail how the medical records allegedly reviewed by the Doctor Defendants factored into their determinations.  The reason for this is that the Doctor Defendants do not in fact review the medical records that the peer reports claim were reviewed.  Instead, the non-licensed individuals who create the peer review reports merely list all of the medical records received by Defendants from the insurance carriers in the "Review of Records" sections of the peer review reports.  The unlicensed individuals then use the computer program to input predetermined conclusions regarding the lack of medical necessity of the services in dispute regardless of whether the predetermined conclusions accurately and completely portray the data in the medical records that were allegedly reviewed.

98.     The peer review reports issued by Defendants almost universally find every service and supply in question to lack medical necessity even when no medical records for the EIPs were listed in the "records reviewed" section that depicted the medical condition of the injured parties for many months preceding the disputed services.  The documents that Defendants receive from the insurance carrier clients, no matter how sparse, are the only documents that the participants utilize.  Additional medical records are never requested.  This is because the outcomes of the reports are predetermined, and as such there is no need for the enterprise participants to know the pertinent aspects of the injured parties' conditions at or about the time that the services were rendered.  Moreover, this is also a result of the fact that the Doctor Defendants do not in fact review the medical records that the peer reports claim were reviewed, and are not responsible for creating the reports.  Instead, the non-licensed individuals who create the peer review

32

reports merely list all of the medical records received from the insurance carriers in the "Records Reviewed" sections of the peer review reports, regardless of the sufficiency of such reports, in order to portray the effect that the records actually factored into the determinations. The unlicensed individuals then use the computer program to input predetermined conclusions regarding the lack of medical necessity of the services in dispute even when necessary documentation is missing from the record. This exact issue, involving the very same Doctor Defendants, has been recognized and discussed by numerous triers of fact and law. Doctor Defendants universally never seek to acquire additional information or documentation regarding the patients' conditions even when the medical documents acquired and provided by SCS and co-Defendants are clearly not the entire medical file for the EIPs. This is because the outcome of the reports is predetermined, and as such there is no need to request additional documentation.

99.     Defendants conspired to create and in fact did create IME reports that on their face appear to be legitimate IME reports when in fact the determinations contained therein were predetermined in nature regardless of the conditions of the parties who were examined.

100.     The IME reports issued by Defendants falsely state that all of the injuries suffered by Plaintiffs assignors had "resolved" as of the date of the IMEs, despite the fact that their own examination findings and the assignors' medical records clearly establish that the injuries were still ongoing.

101.     Plaintiff's claims for reimbursement were denied issued based upon the fraudulent reports. Spreadsheets providing sample lists of specific claims that were denied is are annexed hereto as *Exhibit 1* and *Exhibit 7* and are incorporated herein by reference.

       **F.  Fraudulent Incorporation (*Mallela*)**

102.     PATIENT FOCUS is a professional corporation that is owned on paper by Doctor Defendant TATIANA SHARAHY. However, SHARAHY is not the true owner of PATIENT FOCUS. Rather, PATIENT FOCUS is a classic "*Mallela"* setup (a professional corporation that is in truth and in fact owned and controlled by non-licensed individuals in violation of New York law. It is a professional corporation, nominally owned by a medical doctor but in truth and in fact owned by laypersons. As examples as

33

to how Plaintiff is aware that SHARAHY is not the true owner of PATIENT FOCUS are the following (see transcript portions annexed as *Exhibit 3* and incorporated herein):

    (a)  SHARAHY has testified under oath that she does not know the exact d/b/a name of ALL BOROUGH

    (b)  SHARAHY has testified under oath that she does not know whether the d/b/a ALL BOROUGH has a "P.C." at the end

    (c)  SHARAHY has testified under oath that she has no idea how many management companies PATIENT FOCUS uses now or used at any point in the past

    (d)  SHARAHY has testified under oath that she has no idea how many bank accounts PATIENT FOCUS currently has

    (e)  SHARAHY has testified under oath that she has no idea how many people are employed by PATIENT FOCUS

    (f)  SHARAHY has testified under oath that she has no idea of the names of anybody else that has a credit or debit card for PATIENT FOCUS, despite admitting that other people probably do.

    (g)  SHARAHY has testified under oath that she has no idea how many locations out of which PATIENT FOCUS operates

    (h)  SHARAHY has testified under oath that she has no idea of the addresses of any of the locations out of which PATIENT FOCUS operates

    (i)  SHARAHY has testified under oath that she wouldn't even know how to get to any of the locations that PATIENT FOCUS operates out of without calling an associate of one of the *True Owner* management companies

    (j)  SHARAHY has testified under oath that she has no idea of the names of any of the landlords of the buildings or office spaces out of which PATIENT FOCUS operates

    (k)  SHARAHY has testified under oath that she is not sure if she ever signed any leases on behalf of PATIENT FOCUS

    (l)  SHARAHY has testified under oath that she has no idea how much PATIENT FOCUS pays in rent for any of the locations that it operates within.

    (m) SHARAHY has testified under oath that she is not even sure if PATIENT FOCUS or NATIONWIDE paid the rent at some of the aforementioned locations

    (n)  SHARAHY has testified under oath that she has no idea of the annual revenue of PATIENT FOCUS brought in for any given year, even when allowed the opportunity to provide an estimate in increments of five million dollars.

    (o)  SHARAHY has testified under oath that she is not able to give any kind of estimate as to how much money for which

34

PATIENT FOCUS has billed SCS for any particular time period, week, month or year

(p) SHARAHY has testified under oath that 117-12 Myrtle Avenue is and always was the headquarters of PATIENT FOCUS, including in the year 2009, where she employed W2 employees; however, SHARAHY has provided sworn written testimony under oath in a separate case that PATIENT FOCUS does not and has never operated out of that location and has never employed any people at that location.

(q) SHARAHY has testified under oath that she has no idea how much money she personally derives from PATIENT FOCUS for any year, even when offered the chance to give estimates in $100,000 increments.

(r) Sharahy has testified under oath that she does not receive any invoices for rent for the locations that PATIENT FOCUS does business in.

103.    In an effort to conceal the money that is filtered to PATIENT FOCUS' true owners, Manager Defendants and Management Company Defendants have, among other things:

(a) created fake rental invoices for the spaces PATIENT FOCUS operates; and
(b) created fake lease agreements for such offices; and
(c) forged the signatures of the landlords for the buildings out of which they operate; and
(d) provided fraudulent testimony under oath in unrelated cases; and
(e) provided false testimony and documentation to the New York Workers Compensation Board; and
(f) failed to file required biennial reports and related tax documents with the New York Department of Taxation and Finance despite being under an obligation to do so; and
(g) operated companies that have been dissolved by proclamation by the New York Department of State; and
(i) sent the documents referred to in subsections (a) through (e) above by mail and electronic mail

104.    Decisions regarding how much to pay Doctor Defendants for IMEs and peer review reports, setting of schedules, appointments with injured parties – all are made by Manager Defendants as opposed to SHARAHY.  Moreover, the very decision whether to hire a doctor to be on the panel of consultants is not made by SHARAHY, but rather by the true owners.

35

105.    Fees obtained by PATIENT FOCUS are split between SHARAHY and the Management Companies.  They are split in a manner wherein PATIENT FOCUS' true owners obtain the vast majority of the profits. Since the time of PATIENT FOCUS' inception, the agreement between SHARAHY and PATIENT FOCUS' true owners was based on illegal fee splitting.  In exchange to selling her license to Manager Defendants, SHARAHY would receive the following:  (1) ten percent (10%) of PATIENT FOCUS' share of the profits obtained as a result of IMEs performed by doctors other than SHARAHY; and (2) ten percent (10%) of PATIENT FOCUS' share of the profits obtained as a result of IME reports created in the names of doctors other than SHARAHY; and (3) ten percent (10%) of PATIENT FOCUS' share of the profits obtained as a result of peer review reports created in the names of  doctors other than SHARAHY; and (4) ten percent (10%) of PATIENT FOCUS' share of the profits for trial testimony by various doctors other than SHARAHY in support of the fraudulent peer review and IME reports.  The remaining 90% of PATIENT FOCUS' profit is funneled to Management Company Defendants and their owners.  Additionally, under the illicit agreement, SHARAHY is entitled to keep all of the money paid to PATIENT FOCUS that is derived from peer review reports bearing her name and for court testimony that SHARAHY herself provides.

106.    In return, SHARAHY is entitled to keep all profits directly linked to the peer review reports that bore her name on them, and also is entitled to the fees paid for court testimony requiring personal appearances.

107.    Forgery and fraud are not new to Manager Defendants.  In an effort to conceal the truth behind the true owners of PATIENT FOCUS, Defendants have forged lease agreements, backdated lease agreements, forged the signatures of the building's landlord and forged invoices receipts purportedly submitted by the landlords to Defendants.  See a landlord's sworn testimony from an Examination Before Trial regarding forged lease agreements and invoices annexed as *Exhibit 4*.   In fact, the lease wherein NATIONWIDE was allegedly the tenant of the premises and operating PATIENT FOCUS' business was forged by Defendants in a manner that it predates the formation of NATIONWIDE as a corporate entity by more than a year.  See *Exhibit 5* for a copy of the lease agreement and official Department of State formation date for NATIONWIDE.

### G.  Tortious Interference

108.    Defendants at all relevant times have known that a contract of insurance exists between Plaintiff's assignors and the Defendants' insurance carrier clients.   This is evidenced, among other things, by the fact that each of the peer review and IME reports lists the insurer, claim number and injured party under the applicable policy of insurance. Defendants also have known at all relevant times herein that Plaintiff is the assignee of benefits under the subject insurance policies.

109.    Moreover, Defendants at all relevant times have known that claims were submitted by Plaintiff to the Defendants' insurance carrier clients under the applicable policies of insurance for reimbursement of no-fault benefits. This is evidenced, among other things, by the fact that each of the peer review reports at issue list the items in dispute and corresponding amounts sought for reimbursement, as well as the fact that each of the peer review reports at issue recommends that the insurance carrier clients not reimburse Plaintiff the amounts sought on the claim forms.

110.    Furthermore, Defendants at all relevant times have known that insurance carriers seeking to decide whether to deny or pay claims for reimbursement rely upon the conclusions contained within the reports issued by Defendants and the belief that said conclusions are independent, reflective of the purported authors' findings, based on the merits of each individual case and are sourced from the doctors whose name appear on the reports. Defendants are aware that the insurer clients and Plaintiff rely upon the assertion that the peer review and IME reports were done on an independent basis, were the work product of licensed practitioners, and were based on the merits of each claim on a case by case basis.

111.    Defendants at all relevant times have known that the reports created by them are relied upon by the insurance carrier clients to determine whether to pay or deny Plaintiff's claims, and that breaches of contract result due to reliance by the insurance carrier clients on the fraudulent peer and IME reports.

112.  Defendants at all relevant times have known that Plaintiff suffers direct economic loss in that its claims are denied based on assertions in the reports that the services in dispute were not medically necessary.

113.   At all times herein, the interference by Defendants was both willful and intentional.

114.   At all times relevant herein, Defendants have not been parties to the contract between Plaintiff's assignors and Defendants' insurance carrier clients.

115.   The injuries underlying this complaint occurred when denial of claim forms were issued to Plaintiff directly based on the fraudulent and illegitimate peer review and IME reports created and disseminated by Defendants.

116.   As a result of the conduct detailed above, payment for numerous claims by Plaintiff have been denied based on the fraudulent reports submitted by Defendants.

## VI.  PREDICATE ACTS

117. Fraudulent peer review reports are sent by mail, interstate and intrastate, and by electronic mail, bearing the following false statements:

   **a.**  The "prepared and read" statement:  The peer review reports at issue each contain the following false statement that was purported to be made by the Doctor Defendant whose name appears on the report as its author: *"I certify and affirm, under the penalty of perjury, that I prepared and have read the above report."*  However, the statement is false in that the Doctor Defendant did not in fact prepare or read the reports.

   **b.**  The "findings and conclusions" statement:  The peer review reports at issue each contain the following false statement that was purported to be made by the Doctor Defendant whose name appears on the report as its author: *"I hereby certify and affirm my findings and conclusions..."*  However, the statement is false in that the Doctor Defendant did not certify or affirm the findings and conclusions.

   **c.**  The fraudulent signatures:  The peer review reports at issue contain electronic signatures that were purported to be placed on the reports by the Doctor Defendants, but were in fact placed by unlicensed individuals.

   **d.**  The "review of records" statement:  On their face the peer review reports at issue universally contain a section entitled *"Review of Records"* and list a number of medical records that the Doctor Defendants purportedly reviewed. Moreover the reports claim that the conclusions regarding medical necessity

were based on a review of the submitted documents, when in fact no such review took place by Doctor Defendants.

**e.**   The preordained statement:   The peer review reports at issue universally contain the statement that the purpose of the peer review is to *"determine the medical necessity of"* the services at issue.   This statement is false since the conclusions of the peer review regarding medical necessity have been predetermined before the alleged review even takes place.

118.   While the reports were physically mailed by persons acting at the direction of Manager Defendants, all of the captioned person Defendants conspired to and participated in making the above false statements.   Doctor Defendants authorized the mailings of the reports bearing their names and purported signatures.

119.   The peer review reports containing the above-mentioned statement were physically mailed across state lines by to the insurance carrier clients.   Specifically, SCS and PATIENT FOCUS caused the reports to be mailed from Florida to Georgia, New York, Virginia and Texas, among other states.   Additionally, the reports were electronically transmitted from Florida to the insurance carrier clients by electronic mail. The electronic submissions originated in Florida and were received by employees of the insurance carrier clients in the aforementioned states.

120.   The REPORT AND DENIAL CHART annexed as *Exhibit 1* provides a non-exhaustive sample of the claims that were denied as a direct result of Defendants' collective activity; furthermore, the chart illustrates the following (a) the date each fraudulent report was mailed; (b) the state that where each the report was mailed to and the recipient of each mailed report; (c) the name of doctor that appears on the report as the purported author; (d) the date that the denial of reimbursement based on the fraudulent report occurred; and (e) the name of the injured party the services were provided to by Plaintiff; and (f) the false statements contained therein.   All of the peer review reports listed in the REPORT AND DENIAL CHART contain the five fraudulent statements detailed in sections "a" through "e" of paragraph 117 above.

121.   In addition to the above REPORT AND DENIAL CHART, Plaintiff provides an additional chart (annexed hereto as *Exhibit 6* and incorporated herein by reference) organized by Doctor Defendant name, which specify the dates that the false written statements in the form of peer review and IME reports were made and issued through

interstate mail and electronic mail in furtherance of the fraudulent scheme.  The false statements contained in the reports depicted on said chart are the same as on the spreadsheet annexed hereto as ***Exhibit 1***.

## VII.  FRAUDULENT CONCEALMENT

122.    The Defendants legally and ethically are obligated to act honestly and with integrity in connection with the peer review and IME reports that they submit, or caused to be submitted, to the insurance carrier clients.  Additionally, Doctor Defendants are legally and ethically obligated to act honestly and with integrity in connection with the performance of peer reviews and IMEs.  In fact, Doctor Defendants are obligated pursuant to the Office for Professional Medical Conduct, which regulates the performance of Independent Medical Examinations, to perform independent medical exams in a manner that comports with the OPMC's tenets.

123.    To induce the insurance carrier clients to deny Plaintiff's claims, Defendants systemically have concealed their fraud and have gone to great lengths to accomplish this concealment.

124.    For instance, in each and every peer review report and IME report that is the subject of this action, there is a statement that the doctor whose name appears on the report "certifies" and "affirms" that they prepared and read the report.

125.    Additionally, in each and every peer review report and IME report that is the subject of this action, there is a statement that the doctor whose name appears on the report "certifies" and "affirms" the "findings and conclusions" contained therein.

126.    Furthermore, in each and every peer review report and IME report that is the subject of this action, there is what purports to be an electronic signature placed by the Doctor Defendants who are the purported authors of such reports.

127.    Moreover, in each and every peer review report that is the subject of this action, there is a statement that the doctor's purpose for conducting the peer review is to "determine the medical necessity" of the services at issue.

128.    Moreover, in each and every peer review and IME report that is the subject of this action, there is a notary section on the report along with attestation clauses, for the purposes of creating the appearance that the Doctor Defendant has adopted under the

40

penalty of perjury, and before a witness, the statements contained in the reports as true. Again, this protocol has been utilized to conceal the fact that Doctor Defendants do not prepare, create, certify, affirm or sign the reports at issue.  Defendants also caused notary publics who are affiliated with Defendants to notarize vast quantities of peer and IME reports outside of the presence of the doctors who purportedly signed the reports under the false affirmations under oath that said doctors had appeared before them and signed the reports in their presence.

129.    Likewise, the Defendants knowingly have misrepresented and concealed facts in order to prevent the insurance carrier clients and health providers, including SKY MEDICAL SUPPLY INC., from discovering that the peer reviews are not performed by the Doctor Defendant named therein in the first instance.

## VIII.  HARMS SUFFERED BY PLAINTIFF

### A.  Denial of Claims Based Upon the Fraudulent Reports

130.    As stated by Plaintiff, the injuries suffered by Plaintiff are a direct result of denial of reimbursement of no-fault insurance benefits based upon the conclusions contained within the fraudulent peer-reviewed reports an IME reports, as well as the false assertions regarding the alleged failure of the injured parties to appear for scheduled independent medical examinations.

131.    The denial of claim forms for the services in dispute clearly state on their face that the denials were issued as a result of the peer review and IME reports which that the Doctor Defendants' had found the services to be not medically necessary and that reimbursement should not be allowed.

132.    The defendants are and have at all times been well aware that their conduct directly affects whether or not Plaintiff is reimbursed for no-fault benefits. The Defendants have been aware that claims are forwarded to Defendants in order to determine whether to pay Plaintiff's claims or deny reimbursement based on lack of medical necessity.  In fact, the peer review reports are not limited to opining as to whether the services in question were medically necessary.  On the contrary, not only do the peer review reports claim that the supplies and services in question were not

41

medically necessary, they go so far as to recommend that the insurance carriers do not pay Plaintiff for the bills that were submitted.

133.    The peer review reports universally contain statements that the services and/or supplies in question "should not be recommended for payment". In addition to recommending against payments of insurance benefits, the peer review reports universally contain charts near the end of the reports that specify that the services from/supplies in question should be disallowed for reimbursement.

134.    The damages sustained by Plaintiff are due to denial of payment of its claims based directly and entirely upon the fraudulent peer review and IME reports that are the subject of this action. The spreadsheet annexed as *Exhibit 1* provides a non-exhaustive sample of the claims that were denied as a direct result of Defendants' collective activity; furthermore, the chart illustrates the following (a) the date the fraudulent report was mailed; (b) the name of Doctor Defendant that appears on the report as the purported author; (c) which insurance carriers the reports were mailed to; (d) the dates of the denials of reimbursement or dates of service; and (e) the name or initials of the injured party that Plaintiff provided services to.

**B.      Damages Based on Previously Litigated Claims**

135.    While Defendants have caused numerous claims to be denied by insurance carriers, the damages sought in the instant complaint are limited to those claims by Plaintiff that have already been litigated and are no longer pending in Civil Court. Specifically, unaware of Defendants' fraudulent actions as described herein, Plaintiff had filed civil actions in state court against the insurance companies that issued the denials based on the peer and IME reports issued by Defendants. Inasmuch as the fraud had not yet been discovered and none of the Defendants in the instant action were parties to the lawsuits brought by Plaintiff against the insurers, the causes of action brought in Civil Court were based on breach of contract.

136.  The damages sought by Plaintiff in the instant action are for those claims that were denied as a result of the fraudulent reports issued, and which were not offset despite litigating said claims in state court against the no-fault insurance carriers. These claims, which are listed on the "Damages Spreadsheet" annexed hereto and incorporated herein as *Exhibit 7,* were all denied based on peer review and IME reports issued by Defendants

42

which contain the same fraudulent statements identified in paragraph 117 (a)-(e) above. Specifically, the reports include the following statements:

    **a.** <u>The "prepared and read" statement:</u>  The peer review reports at issue each contain the following false statement that was purported to be made by the Doctor Defendant whose name appears on the report as its author: *"I certify and affirm, under the penalty of perjury, that I prepared and have read the above report."*  However, the statement is false in that the Doctor Defendant did not in fact prepare or read the reports.

    **b.** <u>The "findings and conclusions" statement:</u>  The peer review reports at issue each contain the following false statement that was purported to be made by the Doctor Defendant whose name appears on the report as its author: *"I hereby certify and affirm my findings and conclusions..."*  However, the statement is false in that the Doctor Defendant did not certify or affirm the findings and conclusions.

    **c.** <u>The fraudulent signatures:</u>  The peer review reports at issue contain electronic signatures that were purported to be placed on the reports by the Doctor Defendants, but were in fact placed by unlicensed individuals.

    **d.** <u>The "review of records" statement:</u>  On their face the peer review reports at issue universally contain a section entitled *"Review of Records"* and list a number of medical records that the Doctor Defendants purportedly reviewed. Moreover the reports claim that the conclusions regarding medical necessity were based on a review of the submitted documents, when in fact no such review took place by Doctor Defendants.

    **e.** <u>The preordained statement:</u>  The peer review reports at issue universally contain the statement that the purpose of the peer review is to *"determine the medical necessity of"* the services at issue.  This statement is false since the conclusions of the peer review regarding medical necessity have been predetermined before the alleged review even takes place.

137.   The ***Exhibit 7*** spreadsheet identifies all claims by Plaintiff that were denied as a result of Defendants' wrongdoing and that have already been litigated in Civil Court. These claims, which serve as the basis for Plaintiff's damages, have been disposed of by Civil Court and are no longer pending in that forum.  The ***Exhibit 7*** spreadsheet also provides detailed information regarding the damages sustained by Plaintiff and the offsetting of damages, if any, which occurred as a result of litigating those claims against the insurance carriers in Civil Court.  Specifically, ***Exhibit 7*** depicts the following claim-specific information:

**Column A** – <u>Claim Number</u>:  The claim numbers assigned by the insurance carriers to the specific claims submitted by Plaintiff for reimbursement

**Column B** – <u>Patient</u>:  Initials of Plaintiff's assignors to whom the medical supplies were provided (full names undisclosed to protect their identity)

**Column C** – <u>D.O.S.</u>:  The date of service as listed on each claim submitted by Plaintiff to the insurance carriers for reimbursement

**Column D** – <u>Claim Amount</u>:  The monetary amounts of the claims submitted by Plaintiff to the insurance carriers for reimbursement

**Column E** – <u>Suit Amount</u>:  The monetary amounts Plaintiff sued the insurance carriers for for as a result of nonpayment of the claims

**Column F** – <u>Recouped & Offset</u>:  The monetary amounts recouped (either through partial judgments in Plaintiff's favor or settlements with the insurance carriers) towards the claims, if any, as a result of the lawsuits against the insurers

**Column G** – <u>Balance</u>:  The balance remaining between the amounts of the claims submitted by Plaintiff for reimbursement and the amounts, if any, offset as a result of the lawsuits against the insurance carriers

**Column H** – <u>Court Costs</u>:  The amount of fees spent by Plaintiff in order to file and litigate the lawsuits in Civil Court against the insurance carriers.  It should be noted that those claims with a "court cost" of $0 indicates that those claims were included under an index number (Civil Court lawsuit) for another claim.

**Column I** – <u>Court Costs Recouped</u>:  The amount of money recouped towards the Court Costs, if any, as a result of the lawsuits against the insurance carriers

**Column J** – <u>Court Disposition Date</u>:  The dates that the Civil Court disposed of the actions brought by Plaintiff against the insurance carriers

138.   With respect to the claims listed in ***Exhibit 7***, and taking into account any offsetting occurred pursuant to litigation, the damages suffered by Plaintiff as a result of Defendants' actions are in the amount of **$149,202.25**.

## IX.  INTERSTATE COMMERCE

139.    The fraudulent activities described herein affect interstate commerce as follows: SCS SUPPORT CLAIM SERVICES and PATIENT FOCUS are domestic corporations domiciled in the state of New York.  PATIENT FOCUS is nominally owned by Doctor Defendant Tatiana Sharahy, MD, who is a resident of the State of New Jersey.  The peer review and IME reports are mailed and electronically transferred from Florida to insurance company clients across state lines.  Insurance carriers issue payment or, in the alternative, denials, across state lines to Plaintiff.  Doctor Defendant William Kritzberg, MD is a resident of the State of New Jersey.  Doctor Defendant Damion Martins, MD is a resident of the State of New Jersey.

## X.  CAUSES OF ACTION

### First Cause of Action (Count I)
### Against all Defendants
### [Declaratory Relief under 28 U.S.C. §§ 2201 and 2202)]

140.    Plaintiff incorporates, as though fully set forth herein, each and every allegation as set forth above.

141.    There is an actual case and controversy between Plaintiff and Defendants regarding more than $75,000 in claims that were denied based upon fraudulent peer review and IME reports.

142. All peer review and IME reports issued by Defendants causing Plaintiff's claims to be denied are null and void due to the fact that the conclusions contained in said documents were made pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants.

143.    All peer review and IME reports issued by Defendants are null and void because Vendor Defendant and Doctor Defendants are part and parcel of a corrupt organization that issues reports pursuant to fraudulent protocols designed solely to financially enrich the Defendants.

144.    Accordingly, PLAINTIFF requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that all peer review reports and

45

IME reports issued by Defendants pertaining to the medical necessity of the services and/or supplies rendered by Plaintiff are null and void.


**Second Cause of Action (Count II)**
**Against S. OSIASHVILI, B. OSIASHVILI, M. OSIASHVILI, VAYNER, E. DAGAN, MANAGER DEFENDANT A, MANAGER DEFENDANT B, MANAGER DEFENDANT C, MANAGER DEFENDANT D and MANAGER DEFENDANT E (Collectively "Count II Defendants")**
**[Violation of RICO, 18 U.S.C § 1962(c)]**

145.    PLAINTIFF incorporates, as though fully set forth herein, each and every allegation as set forth in the paragraphs above.

146.    SCS is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4). SCS engages in activities that affect interstate commerce.

147.    The Count II Defendants knowingly and willfully have conducted and participated in the conduct of SCS's affairs through a pattern of racketeering activity. Said pattern includes intentionally causing to be prepared and mailed fraudulent peer review and IME reports on a continuous basis for several years, causing claims for reimbursement submitted by Plaintiff to be denied. The reports are the result of pre-ordained decisions, are the work product of non-licensed entities, and deemed the medical services at issue to be not medically necessary on a predetermined basis regardless of the merits of the claims.  Said reports contain multiple false statements and were not prepared, read or signed by the doctors whose names appeared on the reports, despite the fact that they contain statements to the contrary.  Annexed as *Exhibit 1* and incorporated herein by reference are charts depicting the fraudulent statements contained within the reports.

148.    The Count II Defendants employed one or more mailings to cause denial of Plaintiff's claims, including, but not limited to, those dates identified in the *Exhibit 1* chart.

149.    As detailed above, the fraudulent peer review and IME reports were routinely delivered to insurance carriers across state lines through the U.S. Mail and by electronic mail.

150.     As a direct result of and in reasonable reliance upon these misleading documents and misrepresentations, the insurance carriers denied payment to Plaintiff which Plaintiff was legally entitled to receive and which, but for Defendants' actions, would otherwise have been paid.

151. The Count II Defendants' pattern of issuing fraudulent reports, each report appearing legitimate its face, also prevented the insurance carriers or Plaintiff from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

152. The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

153. By filing numerous fraudulent reports in an ongoing scheme, the Count II Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. §1962(c).

154. The activities alleged in this case had the direct effect of causing funds to be transferred from the insurance carrier clients of Defendants to the Count II Defendants for their benefit, while directly resulting in economic harm to Plaintiff as a result of denial of reimbursement of payments to which Plaintiff was entitled.

155. Plaintiff is in the business of providing prescribed medical equipment to persons who are injured in the state of New York as a result of motor vehicle accidents. Fraudulent schemes such as the one practiced by the Count II Defendants have a deleterious impact on Plaintiff's overall financial well-being.

156.     SCS constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

157.     The Count II Defendants associated with the foregoing enterprise, and participated-both directly and indirectly-in the conduct of this enterprise through a pattern of racketeering activities.

158.     Plaintiff is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count II Defendants' conduct.

159.     The Count II Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Plaintiff's injury.

160.   By virtue of the Count II Defendants' violations of 18 U.S.C. § 1962(c), Plaintiff is entitled to recover from them three times the damages sustained by reason of the reports submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.   Plaintiff is entitled to recover an amount to be determined at trial, but in no event less than $149,202.25, for claims denied as a result of the aforementioned conduct.

### Third Cause of Action (Count III)
**Against S. OSIASHVILI, B. OSIASHVILI, M. OSIASHVILI, VAYNER, E. DAGAN, MANAGER DEFENDANT A, MANAGER DEFENDANT B, MANAGER DEFENDANT C, MANAGER DEFENDANT D and MANAGER DEFENDANT E (Collectively "Count III Defendants")**
**[Violation of RICO, 18 U.S.C § 1962(c)]**

161.   PLAINTIFF incorporates, as though fully set forth herein, each and every allegation as set forth in the paragraphs above.

162.   PATIENT FOCUS is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4).   PATIENT FOCUS engages in activities that affect interstate commerce.

163.   The Count III Defendants knowingly and willfully have conducted and participated in the conduct of PATIENT FOCUS' affairs through a pattern of racketeering activity.   Said pattern includes intentionally causing to be prepared and mailed fraudulent peer review and IME reports on a continuous basis for several years, causing claims for reimbursement submitted by Plaintiff to be denied. The reports are the result of pre-ordained decisions, are the work product of non-licensed entities, and deemed the medical services at issue to be not medically necessary regardless of the merits of the claims.   Said reports contain multiple false statements and were not prepared, read or signed by the doctors whose names appeared on the reports, despite the fact that they contain statements to the contrary.   Annexed as **Exhibit 1** and incorporated herein by reference are charts depicting the fraudulent statements contained within the reports.

164.   The Count III Defendants employed one or more mailings to cause denial of Plaintiff's claims, including, but not limited to, those dates identified in **Exhibit 1** to this Complaint.

48

165.    As detailed above, the fraudulent peer review and IME reports were routinely delivered to insurance carriers through the U.S. Mail.

166.    As a direct result of and in reasonable reliance upon these misleading documents and misrepresentations, the insurance carriers denied payment to Plaintiff which Plaintiff was legally entitled to receive and which, but for Defendants' actions, would otherwise have been paid.

167. The Count III Defendants' pattern of issuing fraudulent reports, each report appearing legitimate its face, also prevented the insurance carriers or Plaintiff from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

168. The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

169. By filing numerous fraudulent reports in an ongoing scheme, the Count III Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. §1962(c).

170. The activities alleged in this case had the direct effect of causing funds to be transferred from the insurance carrier clients of Defendants to the Count III Defendants for their benefit, while directly resulting in economic harm to Plaintiff as a result of denial of reimbursement of payments to which Plaintiff was entitled.

171. Plaintiff is in the business of providing prescribed medical equipment to persons who are injured in the state of New York as a result of motor vehicle accidents. Fraudulent schemes such as the one practiced by the Count III Defendants have a deleterious impact on Plaintiff's overall financial well-being.

172.    PATIENT FOCUS constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

173.    The Count III Defendants associated with the foregoing enterprise, and participated-both directly and indirectly-in the conduct of this enterprise through a pattern of racketeering activities.

174.    Plaintiff is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count III Defendants' conduct.

175.   The Count III Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Plaintiff's injury.

176.   By virtue of the Count III Defendants' violations of 18 U.S.C. § 1962(c), Plaintiff is entitled to recover from them three times the damages sustained by reason of the reports submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.  Plaintiff is entitled to recover an amount to be determined at trial, but in no event less than $149,202.25, for claims denied as a result of the aforementioned conduct.

**Fourth Cause of Action (Count IV)**
**Against Tatiana Sharahy, MD, Mitchell Ehrlich, MD, Joseph C. Cole, MD, Julio Westerband, MD, William A. Ross, MD, Warren Cohen, MD, Renat R. Sukhov, MD,   William S. Kritzberg, MD, Robert A. Sohn, DC, Stanley Ross, MD, Mitchell L. Weisman, MD, Mark Weber, MD, Gary J. Florio, MD, Antonio Martins, MD, Damion A. Martins, MD, M.S., Dante Brittis, MD, Christopher Ferrante, DC,  Denis Mann, MD, Andrew Miller, MD, Andrew Bazos, MD, Drew Stein (Collectively "Count IV Defendants")**
**[Violation of RICO, 18 U.S.C § 1962(c)]**

177.   PLAINTIFF incorporates, as though fully set forth herein, each and every allegation as set forth in the paragraphs above.

178.   SCS is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4). SCS engages in activities that affect interstate commerce.

179.   The Count IV Defendants knowingly and willfully have conducted and participated in the conduct of SCS' affairs through a pattern of racketeering activity. Said pattern includes intentionally causing to be prepared and mailed fraudulent peer review and IME reports on a continuous basis for several years, causing claims for reimbursement submitted by Plaintiff to be denied. The reports are the result of pre-ordained decisions, are the work product of non-licensed entities, and deemed the medical services at issue to be not medically necessary regardless of the merits of the claims.  Said reports contain multiple false statements and were not prepared, read or signed by the doctors whose names appeared on the reports, despite the fact that they contain statements to the contrary.  Annexed as *Exhibit 1* and incorporated herein by reference are charts depicting the fraudulent statements contained within the reports.

50

180.   The Count IV Defendants authorized the one or more mailings of the fraudulent reports to cause denial of Plaintiff's claims, including, but not limited to, those dates identified in the *Exhibit 1* spreadsheets.

181.   As detailed above, the fraudulent peer review and IME reports were routinely delivered to insurance carriers through the U.S. Mail.

182.   As a direct result of and in reasonable reliance upon these misleading documents and misrepresentations, the insurance carriers denied payment to Plaintiff which Plaintiff was legally entitled to receive and which, but for Defendants' actions, would otherwise have been paid.

183. The Count IV Defendants' pattern of authorizing fraudulent reports to be issued in their names, each report appearing legitimate its face, also prevented the insurance carriers or Plaintiff from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

184. The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

185. By filing numerous fraudulent reports in an ongoing scheme, the Count IV Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. §1962(c).

186. The activities alleged in this case had the direct effect of causing funds to be transferred from the insurance carrier clients of Defendants to the Count IV Defendants for their benefit, while directly resulting in economic harm to Plaintiff as a result of denial of reimbursement of payments to which Plaintiff was entitled.

187. Plaintiff is in the business of providing prescribed medical equipment to persons who are injured in the state of New York as a result of motor vehicle accidents. Fraudulent schemes such as the one practiced by the Count IV Defendants have a deleterious impact on Plaintiff's overall financial well-being.

188.   SCS constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

189.   The Count IV Defendants associated with the foregoing enterprise, and participated-both directly and indirectly-in the conduct of this enterprise through a pattern of racketeering activities.

190.    Plaintiff is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count IV Defendants' conduct.

191.    The Count IV Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Plaintiff's injury.

192.    By virtue of the Count IV Defendants' violations of 18 U.S.C. § 1962(c), Plaintiff is entitled to recover from them three times the damages sustained by reason of the reports submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.  Plaintiff is entitled to recover an amount to be determined at trial, but in no event less than $149,202.25, for claims denied as a result of the aforementioned conduct.

### Fifth Cause of Action (Count V)
**Against Tatiana Sharahy, MD, Mitchell Ehrlich, MD, Joseph C. Cole, MD, Julio Westerband, MD, William A. Ross, MD, Warren Cohen, MD, Renat R. Sukhov, MD,   William S. Kritzberg, MD, Robert A. Sohn, DC, Stanley Ross, MD, Mitchell L. Weisman, MD, Mark Weber, MD, Gary J. Florio, MD, Antonio Martins, MD, Damion A. Martins, MD, M.S., Dante Brittis, MD, Christopher Ferrante, DC,  Denis Mann, DC, Andrew Miller, MD, Andrew Bazos, MD, Drew Stein (Collectively "Count V Defendants")**
**[Violation of RICO, 18 U.S.C § 1962(c)]**

193.    PLAINTIFF incorporates, as though fully set forth herein, each and every allegation as set forth in the paragraphs above.

194.    PATIENT FOCUS is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4).  PATIENT FOCUS engages in activities that affect interstate commerce.

195.    The Count V Defendants knowingly and willfully have conducted and participated in the conduct of PATIENT FOCUS' affairs through a pattern of racketeering activity.  Said pattern includes intentionally causing to be prepared and mailed fraudulent peer review and IME reports on a continuous basis for several years, causing claims for reimbursement submitted by Plaintiff to be denied. The reports are the result of pre-ordained decisions, are the work product of non-licensed entities, and deemed the medical services at issue to be not medically necessary regardless of the merits of the claims.  Said reports contain multiple false statements and were not prepared, read or signed by the doctors whose names appeared on the reports, despite the

fact that they contain statements to the contrary.  Annexed as *Exhibit 1* and incorporated herein by reference are charts depicting the fraudulent statements contained within the reports.

196.    The Count V Defendants authorized the one or more mailings of the fraudulent reports to cause denial of Plaintiff's claims, including, but not limited to, those dates identified in the *Exhibit 1* spreadsheets.

197.    As detailed above, the fraudulent peer review and IME reports were routinely delivered to insurance carriers through the U.S. Mail.

198.    As a direct result of and in reasonable reliance upon these misleading documents and misrepresentations, the insurance carriers denied payment to Plaintiff which Plaintiff was legally entitled to receive and which, but for Defendants' actions, would otherwise have been paid.

199. The Count V Defendants' pattern of authorizing fraudulent reports to be issued in their names, each report appearing legitimate its face, also prevented the insurance carriers or Plaintiff from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

200. The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

201. By filing numerous fraudulent reports in an ongoing scheme, the Count V Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. §1962(c).

202. The activities alleged in this case had the direct effect of causing funds to be transferred from the insurance carrier clients of Defendants to the Count IV Defendants for their benefit, while directly resulting in economic harm to Plaintiff as a result of denial of reimbursement of payments to which Plaintiff was entitled.

203. Plaintiff is in the business of providing prescribed medical equipment to persons who are injured in the state of New York as a result of motor vehicle accidents. Fraudulent schemes such as the one practiced by the Count V Defendants have a deleterious impact on Plaintiff's overall financial well-being.

204.    PATIENT FOCUS constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

205.    The Count V Defendants associated with the foregoing enterprise, and participated-both directly and indirectly-in the conduct of this enterprise through a pattern of racketeering activities.

206.    Plaintiff is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count V Defendants' conduct.

207.    The Count V Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Plaintiff's injury.

208.    By virtue of the Count V Defendants' violations of 18 U.S.C. § 1962(c), Plaintiff is entitled to recover from them three times the damages sustained by reason of the reports submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.  Plaintiff is entitled to recover an amount to be determined at trial, but in no event less than $149,202.25, for claims denied as a result of the aforementioned conduct.


### Sixth Cause of Action (Count VI)
**Against S. OSIASHVILI, B. OSIASHVILI, M. OSIASHVILI, VAYNER, E. DAGAN, MANAGER DEFENDANT A, MANAGER DEFENDANT B, MANAGER DEFENDANT C, MANAGER DEFENDANT D and MANAGER DEFENDANT E (Collectively "Count VI Defendants")**
**[Violation of RICO, 18 U.S.C § 1962(d)]**

209.    PLAINTIFF incorporates, as though fully set forth herein, each and every allegation as set forth in the paragraphs above.

210.    SCS is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4). SCS engages in activities that affect interstate commerce.

211.    The Count VI Defendants knowingly and willfully have agreed, combined and conspired conducted and participated, directly or indirectly, in the conduct of SCS's affairs through a pattern of racketeering activity.  Said pattern includes intentionally causing to be prepared and mailed fraudulent peer review and IME reports on a continuous basis for several years, causing claims for reimbursement submitted by Plaintiff to be denied. The reports are the result of pre-ordained decisions, are the work product of non-licensed entities, and deemed the medical services at issue to be not medically necessary on a predetermined basis regardless of the merits of the claims.  Said reports contain multiple false statements and were not prepared, read or signed by the

54

doctors whose names appeared on the reports, despite the fact that they contain statements to the contrary.  Annexed as *Exhibit 1* and incorporated herein by reference are charts depicting the fraudulent statements contained within the reports.

212.   The Count VI Defendants employed one or more mailings to cause denial of Plaintiff's claims, including, but not limited to, those dates identified in the *Exhibit 1* spreadsheets.

213.   As detailed above, the fraudulent peer review and IME reports were routinely delivered to insurance carriers across state lines through the U.S. Mail and by electronic mail.

214.   As a direct result of and in reasonable reliance upon these misleading documents and misrepresentations, the insurance carriers denied payment to Plaintiff which Plaintiff was legally entitled to receive and which, but for Defendants' actions, would otherwise have been paid.

215. The Count VI Defendants' pattern of issuing fraudulent reports, each report appearing legitimate its face, also prevented the insurance carriers or Plaintiff from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

216. The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

217. The Count VI Defendants knew of, agreed to, and acted in furtherance of the shared goals of issuing fraudulent reports in order to obtain economic gain and to cause claims to be denied in order to trigger the need for court appearances by Defendant Doctors.  By filing numerous fraudulent reports in an ongoing scheme, the Count VI Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. §1962(c).

218. The activities alleged in this case had the direct effect of causing funds to be transferred from the insurance carrier clients of Defendants to the Count VI Defendants for their benefit, while directly resulting in economic harm to Plaintiff as a result of denial of reimbursement of payments to which Plaintiff was entitled.

219. Plaintiff is in the business of providing prescribed medical equipment to persons who are injured in the state of New York as a result of motor vehicle accidents.

Fraudulent schemes such as the one practiced by the Count VI Defendants have a deleterious impact on Plaintiff's overall financial well-being.

220.    SCS constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

221.    The Count VI Defendants associated with the foregoing enterprise, and participated-both directly and indirectly-in the conduct of this enterprise through a pattern of racketeering activities.

222.    Plaintiff is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count VI Defendants' conduct.

223.    The Count VI Defendants' conduct in violation of 18 U.S.C. § 1962(d) was the direct and proximate cause of Plaintiff's injury.

224.    By virtue of the Count VI Defendants' violations of 18 U.S.C. § 1962(d), Plaintiff is entitled to recover from them three times the damages sustained by reason of the reports submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.  Plaintiff is entitled to recover an amount to be determined at trial, but in no event less than $149,202.25, for claims denied as a result of the aforementioned conduct.


**Seventh Cause of Action (Count VII)**
**Against S. OSIASHVILI, B. OSIASHVILI, M. OSIASHVILI, VAYNER, E. DAGAN, MANAGER DEFENDANT A, MANAGER DEFENDANT B, MANAGER DEFENDANT C, MANAGER DEFENDANT D and MANAGER DEFENDANT E**
**(Collectively "Count VII Defendants")**
**[Violation of RICO, 18 U.S.C § 1962(d)]**

225.    PLAINTIFF incorporates, as though fully set forth herein, each and every allegation as set forth in the paragraphs above.

226.    PATIENT FOCUS is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4).  PATIENT FOCUS engages in activities that affect interstate commerce.

227.    The Count VII Defendants knowingly and willfully have agreed, combined and conspired conducted and participated, directly or indirectly, in the conduct of SCS's affairs through a pattern of racketeering activity.  Said pattern includes intentionally causing to be prepared and mailed fraudulent peer review and IME reports on a continuous basis for several years, causing claims for reimbursement submitted by

56

Plaintiff to be denied. The reports are the result of pre-ordained decisions, are the work product of non-licensed entities, and deemed the medical services at issue to be not medically necessary on a predetermined basis regardless of the merits of the claims. Said reports contain multiple false statements and were not prepared, read or signed by the doctors whose names appeared on the reports, despite the fact that they contain statements to the contrary. Annexed as *Exhibit 1* and incorporated herein by reference are charts depicting the fraudulent statements contained within the reports.

228.   The Count VII Defendants employed one or more mailings to cause denial of Plaintiff's claims, including, but not limited to, those dates identified in the *Exhibit 1* spreadsheets.

229.   As detailed above, the fraudulent peer review and IME reports were routinely delivered to insurance carriers across state lines through the U.S. Mail and by electronic mail.

230.   As a direct result of and in reasonable reliance upon these misleading documents and misrepresentations, the insurance carriers denied payment to Plaintiff which Plaintiff was legally entitled to receive and which, but for Defendants' actions, would otherwise have been paid.

231. The Count VII Defendants' pattern of issuing fraudulent reports, each report appearing legitimate its face, also prevented the insurance carriers or Plaintiff from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

232. The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

233. The Count VII Defendants knew of, agreed to, and acted in furtherance of the shared goals of issuing fraudulent reports in order to obtain economic gain and to cause claims to be denied in order to trigger the need for court appearances by Defendant Doctors. By filing numerous fraudulent reports in an ongoing scheme, the Count VII Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. §1962(c).

234. The activities alleged in this case had the direct effect of causing funds to be transferred from the insurance carrier clients of Defendants to the Count VII Defendants

57

for their benefit, while directly resulting in economic harm to Plaintiff as a result of denial of reimbursement of payments to which Plaintiff was entitled.

235. Plaintiff is in the business of providing prescribed medical equipment to persons who are injured in the state of New York as a result of motor vehicle accidents. Fraudulent schemes such as the one practiced by the Count VII Defendants have a deleterious impact on Plaintiff's overall financial well-being.

236. PATIENT FOCUS constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

237. The Count VII Defendants associated with the foregoing enterprise, and participated-both directly and indirectly-in the conduct of this enterprise through a pattern of racketeering activities.

238. Plaintiff is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count VII Defendants' conduct.

239. The Count VII Defendants' conduct in violation of 18 U.S.C. § 1962(d) was the direct and proximate cause of Plaintiff's injury.

240. By virtue of the Count VII Defendants' violations of 18 U.S.C. § 1962(d), Plaintiff is entitled to recover from them three times the damages sustained by reason of the reports submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.   Plaintiff is entitled to recover an amount to be determined at trial, but in no event less than $149,202.25, for claims denied as a result of the aforementioned conduct.

**Eighth Cause of Action (Count VIII)**
**Against Tatiana Sharahy, MD, Mitchell Ehrlich, MD, Joseph C. Cole, MD, Julio Westerband, MD, William A. Ross, MD, Warren Cohen, MD, Renat R. Sukhov, MD,   William S. Kritzberg, MD, Robert A. Sohn, DC, Stanley Ross, MD, Mitchell L. Weisman, MD, Mark Weber, MD, Gary J. Florio, MD, Antonio Martins, MD, Damion A. Martins, MD, M.S., Dante Brittis, MD, Christopher Ferrante, DC,  Denis Mann, DC, Andrew Miller, MD, Andrew Bazos, MD, Drew Stein (Collectively "Count VIII Defendants")**
**[Violation of RICO, 18 U.S.C § 1962(d)]**

241. PLAINTIFF incorporates, as though fully set forth herein, each and every allegation as set forth in the paragraphs above.

58

242.    SCS is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4). SCS engages in activities that affect interstate commerce.

243.    The Count VIII Defendants knowingly and willfully have agreed, combined and conspired conducted and participated, directly or indirectly, in the conduct of SCS's affairs through a pattern of racketeering activity.  Said pattern includes intentionally causing to be prepared and mailed fraudulent peer review and IME reports on a continuous basis for several years, causing claims for reimbursement submitted by Plaintiff to be denied. The reports are the result of pre-ordained decisions, are the work product of non-licensed entities, and deemed the medical services at issue to be not medically necessary on a predetermined basis regardless of the merits of the claims.  Said reports contain multiple false statements and were not prepared, read or signed by the doctors whose names appeared on the reports, despite the fact that they contain statements to the contrary.  Annexed as *Exhibit 1* and incorporated herein by reference is are charts depicting the fraudulent statements contained within the reports.

244.    The Count VIII Defendants employed one or more mailings to cause denial of Plaintiff's claims, including, but not limited to, those dates identified in *Exhibit 1* spreadsheets.

245.    As detailed above, the fraudulent peer review and IME reports were routinely delivered to insurance carriers across state lines through the U.S. Mail and by electronic mail.

246.    As a direct result of and in reasonable reliance upon these misleading documents and misrepresentations, the insurance carriers denied payment to Plaintiff which Plaintiff was legally entitled to receive and which, but for Defendants' actions, would otherwise have been paid.

247. The Count VIII Defendants' pattern of issuing fraudulent reports, each report appearing legitimate its face, also prevented the insurance carriers or Plaintiff from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

248. The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

249. The Count VIII Defendants knew of, agreed to, and acted in furtherance of the shared goals of issuing fraudulent reports in order to obtain economic gain and to cause claims to be denied in order to trigger the need for court appearances by Defendant Doctors.  By filing numerous fraudulent reports in an ongoing scheme, the Count VIII Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. §1962(c).

250. The activities alleged in this case had the direct effect of causing funds to be transferred from the insurance carrier clients of Defendants to the Count VIII Defendants for their benefit, while directly resulting in economic harm to Plaintiff as a result of denial of reimbursement of payments to which Plaintiff was entitled.

251. Plaintiff is in the business of providing prescribed medical equipment to persons who are injured in the state of New York as a result of motor vehicle accidents. Fraudulent schemes such as the one practiced by the Count VIII Defendants have a deleterious impact on Plaintiff's overall financial well-being.

252.   SCS constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

253.   The Count VIII Defendants associated with the foregoing enterprise, and participated-both directly and indirectly-in the conduct of this enterprise through a pattern of racketeering activities.

254.   Plaintiff is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count VIII Defendants' conduct.

255.   The Count VIII Defendants' conduct in violation of 18 U.S.C. § 1962(d) was the direct and proximate cause of Plaintiff's injury.

256.   By virtue of the Count VIII Defendants' violations of 18 U.S.C. § 1962(d), Plaintiff is entitled to recover from them three times the damages sustained by reason of the reports submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.  Plaintiff is entitled to recover an amount to be determined at trial, but in no event less than $149,202.25, for claims denied as a result of the aforementioned conduct.

**Ninth Cause of Action (Count IX)**

**Against Tatiana Sharahy, MD, Mitchell Ehrlich, MD, Joseph C. Cole, MD, Julio Westerband, MD, William A. Ross, MD, Warren Cohen, MD, Renat R. Sukhov, MD,   William S. Kritzberg, MD, Robert A. Sohn, DC, Stanley Ross, MD, Mitchell L. Weisman, MD, Mark Weber, MD, Gary J. Florio, MD, Antonio Martins, MD, Damion A. Martins, MD, M.S., Dante Brittis, MD, Christopher Ferrante, DC,  Denis Mann, DC, Andrew Miller, MD, Andrew Bazos, MD, Drew Stein (Collectively "Count IX Defendants")**
**[Violation of RICO, 18 U.S.C § 1962(d)]**

257.    PLAINTIFF incorporates, as though fully set forth herein, each and every allegation as set forth in the paragraphs above.

258.    PATIENT FOCUS is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4).  SCS engages in activities that affect interstate commerce.

259.    The Count IX Defendants knowingly and willfully have agreed, combined and conspired conducted and participated, directly or indirectly, in the conduct of SCS's affairs through a pattern of racketeering activity.  Said pattern includes intentionally causing to be prepared and mailed fraudulent peer review and IME reports on a continuous basis for several years, causing claims for reimbursement submitted by Plaintiff to be denied. The reports are the result of pre-ordained decisions, are the work product of non-licensed entities, and deemed the medical services at issue to be not medically necessary on a predetermined basis regardless of the merits of the claims.  Said reports contain multiple false statements and were not prepared, read or signed by the doctors whose names appeared on the reports, despite the fact that they contain statements to the contrary.  Annexed as *Exhibit 1* and incorporated herein by reference are charts depicting the fraudulent statements contained within the reports.

260.    The Count IX Defendants employed one or more mailings to cause denial of Plaintiff's claims, including, but not limited to, those dates identified in the *Exhibit 1* spreadsheets.

261.    As detailed above, the fraudulent peer review and IME reports were routinely delivered to insurance carriers across state lines through the U.S. Mail and by electronic mail.

262.    As a direct result of and in reasonable reliance upon these misleading documents and misrepresentations, the insurance carriers denied payment to Plaintiff which Plaintiff

was legally entitled to receive and which, but for Defendants' actions, would otherwise have been paid.

263. The Count IX Defendants' pattern of issuing fraudulent reports, each report appearing legitimate its face, also prevented the insurance carriers or Plaintiff from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

264. The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

265. The Count IX Defendants knew of, agreed to, and acted in furtherance of the shared goals of issuing fraudulent reports in order to obtain economic gain and to cause claims to be denied in order to trigger the need for court appearances by Defendant Doctors. By filing numerous fraudulent reports in an ongoing scheme, the Count IX Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. §1962(c).

266. The activities alleged in this case had the direct effect of causing funds to be transferred from the insurance carrier clients of Defendants to the Count IX Defendants for their benefit, while directly resulting in economic harm to Plaintiff as a result of denial of reimbursement of payments to which Plaintiff was entitled.

267. Plaintiff is in the business of providing prescribed medical equipment to persons who are injured in the state of New York as a result of motor vehicle accidents. Fraudulent schemes such as the one practiced by the Count VIII Defendants have a deleterious impact on Plaintiff's overall financial well-being.

268. PATIENT FOCUS constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

269. The Count IX Defendants associated with the foregoing enterprise, and participated-both directly and indirectly-in the conduct of this enterprise through a pattern of racketeering activities.

270. Plaintiff is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count IX Defendants' conduct.

271. The Count IX Defendants' conduct in violation of 18 U.S.C. § 1962(d) was the direct and proximate cause of Plaintiff's injury.

272.     By virtue of the Count IX  Defendants' violations of 18 U.S.C. § 1962(d), Plaintiff is entitled to recover from them three times the damages sustained by reason of the reports submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.  Plaintiff is entitled to recover an amount to be determined at trial, but in no event less than $149,202.25, for claims denied as a result of the aforementioned conduct.

**Tenth Cause of Action (Count X)**
**Against All Defendants**
**(Common Law Fraud)**

273.     Plaintiff incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

274.     Defendants knowingly and intentionally made false and fraudulent statements of material fact to insurance carriers and concealed material facts from insurance carriers and from Plaintiff in the course of their submission of fraudulent peer review and IME reports to the carriers.

275.     The false and fraudulent statements of material fact and acts of fraudulent concealment include, but are not limited to:

   a.   The "prepared and read" statement:  The peer review reports at issue each contain the following false statement that was purported to be made by the Doctor Defendant whose name appears on the report as its author: *"I certify and affirm, under the penalty of perjury, that I prepared and have read the above report."*  However, the statement is false in that the Doctor Defendant did not in fact prepare or read the reports.

   b.   The "findings and conclusions" statement:  The peer review reports at issue each contain the following false statement that was purported to be made by the Doctor Defendant whose name appears on the report as its author: *"I hereby certify and affirm my findings and conclusions..."*  However, the statement is false in that the Doctor Defendant did not certify or affirm the findings and conclusions.

   c.   The fraudulent signatures:  The peer review reports at issue contain electronic signatures that were purported to be placed on the reports by the Doctor Defendants, but were in fact placed by unlicensed individuals.

   d.   The "review of records" statement:  On their face the peer review reports at issue universally contain a section entitled *"Review of Records"* and list a number of medical records that the Doctor Defendants purportedly reviewed.

Moreover the reports claim that the conclusions regarding medical necessity were based on a review of the submitted documents, when in fact no such review took place by Doctor Defendants.

**e.**  The preordained statement:  The peer review reports at issue universally contain the statement that the purpose of the peer review is to *"determine the medical necessity of"* the services at issue.  This statement is false since the conclusions of the peer review regarding medical necessity have been predetermined before the alleged review even takes place.

276.   Defendants intentionally made the above-detailed false and fraudulent statements and concealed material acts in a calculated effort to trigger denial of Plaintiff's claims on a pre-ordained basis in order to profit from the reports and to trigger the need for court testimony based on the reports.

277.   The insurance carriers to whom the reports were submitted justifiably relied on the false statements and issued denials based on the reports' contents and recommendation to deny reimbursement.  As a direct result and proximate case, Plaintiff was injured by having its claims for reimbursement, to which it was entitled, denied by the carriers.

278.   The conduct of Defendants deprived Plaintiff of over $75,000 worth of no-fault benefits that it is entitled to, the exact amount to be determined at trial.

279.   Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and dishonesty that entitles PLAINTIFF to recover punitive damages.

280.   Accordingly, by virtue of the foregoing, PLAINTIFF is entitled to compensatory and punitive damages/together with interest and costs, and any other relief the Court deems just and proper.

### Eleventh Cause of Action (Count XI)
**Against Tatiana Sharahy, MD, Mitchell Ehrlich, MD, Joseph C. Cole, MD, Julio Westerband, MD, William A. Ross, MD, Warren Cohen, MD, Renat R. Sukhov, MD,   William S. Kritzberg, MD, Robert A. Sohn, DC, Stanley Ross, MD, Mitchell L. Weisman, MD, Mark Weber, MD, Gary J. Florio, MD, Antonio Martins, MD, Damion A. Martins, MD, M.S., Dante Brittis, MD, Christopher Ferrante, DC,  Denis Mann, DC, Andrew Miller, MD, Andrew Bazos, MD, Drew Stein (Collectively "Count XI Defendants")**
**(Aiding and Abetting Fraud)**

64

281.    Plaintiff incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

282.    The Count XI Defendants knowingly aided and abetted the fraudulent scheme that was perpetrated on Plaintiff by E. DAGAN, S. OSIASHVILI, B. OSIASHVILI, M. OSIASHVILI, A. VAYNER and the remaining above-captioned Manager Defendants.

283.    The acts of the Count XI Defendants in furtherance of the scheme include: (a) authorizing and enabling Manager Defendants to create peer review and IME reports claiming to be prepared by the Count XI Defendants, when they were not; (b) authorizing and enabling Manager Defendants to create peer review and IME reports claiming contain findings and opinions certified and affirmed by the Count XI Defendants, when they don't; (c) authorizing and enabling Manager Defendants to create peer review and IME reports claiming to be electronically signed by the Count XI Defendants, when they were not; (d) authorizing and enabling Manager Defendants to create peer review and IME reports claiming to contain determinations regarding medical necessity based on the medical records and condition of the injured parties, when they are not; (e) authorizing Manager Defendants to create peer review and IME reports containing preordained opinions; and (f) appearing in court to testifying in support of the reports on a predetermined basis in order to drive more revenue into the organization.

284.    The conduct of the Count XI Defendants in furtherance of the scheme is substantial and material to the success of the scheme.  The conduct of the Count XI Defendants is necessary for the scheme to be successful since fraudulent peer review and IME reports could not be issued containing the names of colluding licensed physicians without their approval, and the organization would not be able to obtain fees for court appearances if the Count XI Defendants were not part of the scheme.

285.    The Count XI Defendants aided and abetted the fraudulent scheme by design in an effort obtain revenue from the creation of vast amounts of peer review and IME reports containing the fraudulent statements, as well as from the testimony that would be triggered from the practically universal recommendation against payment of Plaintiff's claims.

286.    The conduct of the Count XI Defendants caused Plaintiff to suffer more than $75,000 damages in denied claims for which it was entitled to reimbursement.

65

287.   The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiff to recover punitive damages.

288.   Accordingly, by virtue of the foregoing, Plaintiff is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**Twelfth Cause of Action (Count XII)**
**Against All Defendants**
**(Unjust Enrichment)**

289.   Plaintiff incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

290.   As set forth above, Defendants have engaged in unlawful and improper acts, resulting in harm to Plaintiff.

291.   When the insurance carriers paid for the peer reviews and IMEs to be performed, they reasonably believed that they were paying for legitimate reports to be created. Moreover, the premiums paid pursuant to the subject policies of insurance, under which Plaintiff is seeking reimbursement, are made with the expectation that claims for benefits will be either paid or denied pursuant to the results of legitimate peer reviews and IMEs performed by licensed medical practitioners based on the merits of each claim.

292.   Defendants have been enriched at Plaintiff's expense by causing denial of Plaintiff's claims for reimbursement, to which it is entitled, pursuant to the fraudulent scheme described herein.

293.   Defendants' retention of payments by the insurance carriers for the fraudulent reports and court appearances violates fundamental principles of equity and good conscience.

294.   By reason of the above, Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $75,000.

**Thirteenth Cause of Action (Count XIII)**
**Against All Defendants**
**(Tortious Interference)**

295.   Defendants at all relevant times have known that a contract of insurance exists between Plaintiff's assignors and the Defendants' insurance carrier clients.   This is

evidenced, among other things, by the fact that each of the peer review and IME reports lists the insurer, claim number and injured party under the applicable policy of insurance.

296.   Moreover, Defendants at all relevant times have known that claims were submitted by Plaintiff to the Defendants' insurance carrier clients under the applicable policies of insurance for reimbursement of no-fault benefits. This is evidenced, among other things, by the fact that each of the peer review reports at issue list the items in dispute and corresponding amounts sought for reimbursement, as well as the fact that each of the peer review reports at issue recommend that the insurance carrier clients not reimburse Plaintiff the amounts sought on the claim forms.

297.   Furthermore, Defendants at all relevant times have known that insurance carriers seeking to decide whether to deny or pay claims for reimbursement rely upon the conclusions contained within the reports issued by Defendants and the belief that said conclusions are independent, reflective of the purported authors' findings, based on the merits of each individual case and are sourced from the doctors whose name appear on the reports. Defendants are aware that the insurer clients and Plaintiff rely upon the assertion that the peer review and IME reports were done on an independent basis, were the work product of licensed practitioners, and were based on the merits of each claim on a case by case basis.

298.   Defendants at all relevant times have known that the reports created by them are relied upon by the insurance carrier clients to determine whether to pay or deny Plaintiff's claims, and that breaches of contract result due to reliance by the insurance carrier clients on the fraudulent peer and IME reports.

299.  Defendants at all relevant times have known that Plaintiff suffers direct economic in that its claims are denied based on assertions in the reports that the services in dispute were not medically necessary.

300.   At all times herein, the interference by Defendants was both willful and intentional.

301.   At all times relevant herein, Defendants have not been parties to the contract between Plaintiff and Defendants' insurance carrier clients.

302.    The injuries underlying this complaint occurred when denial of claim forms were issued to Plaintiff directly based on the fraudulent and illegitimate peer review and IME reports created and disseminated by the enterprise.

295.    By reason of the above, Plaintiff is entitled to compensatory damages for amounts that would have been paid had Defendants not caused the breach the insurance carriers' obligations under the subject insurance contracts.


**WHEREFORE**, Plaintiff Sky Medical Supply Inc., demands that a Judgment be entered in its favor:

A. On the First Cause of Action against Defendants named therein, a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 and 2202, declaring that all peer review and IME reports issued by Defendants causing Plaintiff's claims to be denied are null and void due to the fact that the conclusions contained in said documents were made pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants.

B. On the Second cause of action against the Defendants named therein, a judgment holding that by virtue of the Count II Defendants' violations of 18 U.S.C. § 1962(c), Plaintiff is entitled to recover from them three times the damages sustained by reason of the reports submitted by them, and others acting in concert with them, the amount to be determined at trial, but in no event less than **$149,202.25**, together with the costs of suit, including reasonable attorney's fees.

C. On the Third Cause of Action against Defendants named therein, a judgment holding that by virtue of the Count III Defendants' violations of 18 U.S.C. § 1962(c), Plaintiff is entitled to recover from them three times the damages sustained by reason of the reports submitted by them, and others acting in concert with them, the amount to be determined at trial, but in no event less than **$149,202.25**, together with the costs of suit, including reasonable attorney's fees.

D. On the Fourth Cause of Action against Defendants named therein, a judgment holding that by virtue of the Count IV Defendants' violations of 18 U.S.C. § 1962(c), Plaintiff is entitled to recover from them three times the damages sustained by reason of the reports submitted by them, and others acting in concert with them, the amount to be

68

determined at trial, but in no event less than **$149,202.25**, together with the costs of suit, including reasonable attorney's fees.

E. On the Fifth Cause of Action against Defendants named therein, a judgment holding that by virtue of the Count V Defendants' violations of 18 U.S.C. § 1962(c), Plaintiff is entitled to recover from them three times the damages sustained by reason of the reports submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

F. On the Sixth Cause of Action against Defendants named therein, a judgment holding that by virtue of the Count VI Defendants' violations of 18 U.S.C. § 1962(d), Plaintiff is entitled to recover from them three times the damages sustained by reason of the reports submitted by them, and others acting in concert with them, the amount to be determined at trial, but in no event less than **$149,202.25**, together with the costs of suit, including reasonable attorney's fees.

G. On the Seventh Cause of Action against Defendants named therein, a judgment holding that by virtue of the Count VII Defendants' violations of 18 U.S.C. § 1962(d), Plaintiff is entitled to recover from them three times the damages sustained by reason of the reports submitted by them, and others acting in concert with them, the amount to be determined at trial, but in no event less than **$149,202.25**, together with the costs of suit, including reasonable attorney's fees.

H. On the Eighth Cause of Action against Defendants named therein, a judgment holding that by virtue of the Count VIII Defendants' violations of 18 U.S.C. § 1962(d), Plaintiff is entitled to recover from them three times the damages sustained by reason of the reports submitted by them, and others acting in concert with them, the amount to be determined at trial, but in no event less than **$149,202.25**, together with the costs of suit, including reasonable attorney's fees.

I. On the Ninth Cause of Action against Defendants named therein, a judgment holding that by virtue of the Count IX Defendants' violations of 18 U.S.C. § 1962(d), Plaintiff is entitled to recover from them three times the damages sustained by reason of the reports submitted by them, and others acting in concert with them, the amount to be determined at trial, but in no event less than **$149,202.25**, together with the costs of suit, including reasonable attorney's fees.

J. On the Tenth Cause of Action against Defendants named therein, a judgment holding that by virtue of the allegations contained therein, Plaintiff is entitled to compensatory and punitive damages/together with interest and costs, the amount to be determined at trial, but in no event less than **$149,202.25**, together with reasonable attorney's fees, and any other relief the Court deems just and proper.

K.   On the Eleventh Cause of Action against Defendants named therein, a judgment holding that by virtue of the allegations contained therein, Plaintiff is entitled to compensatory and punitive damages/together with interest and costs, the amount to be determined at trial, but in no event less than **$149,202.25**, together with reasonable attorney's fees and any other relief the Court deems just and proper.

L.     On the Twelfth Cause of Action against Defendants named therein, a judgment holding that by virtue of the allegations contained therein, Plaintiff is entitled to compensatory and punitive damages/together with interest and costs, the amount to be determined at trial, but in no event less than **$149,202.25**, together with reasonable attorney's fees and any other relief the Court deems just and proper.

M.     On the Thirteenth Cause of Action against Defendants named therein, a judgment holding that by virtue of the allegations contained therein, Plaintiff is entitled to compensatory and punitive damages/together with interest and costs, the amount to be determined at trial, but in no event less than **$149,202.25**, together with reasonable attorney's fees and any other relief the Court deems just and proper.

Dated:  June 5, 2014

> Yours, etc.
>
> ____/s/_____
> Stefan M. Belinfanti
> GARY TSIRELMAN, P.C.
> Attorneys for Plaintiff
> *Sky Medical Supply, Inc.*
> 129 Livingston Street,
> 2nd Floor
> Brooklyn, NY  11201

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

Sky Medical Supply Inc.                                          Docket No. 12-CV-06383
                        *Plaintiff*

                                                                **Plaintiff Demands a Trial**
        - against -                                             **By Jury**

SCS Support Claim Services, Inc., Patient Focus
Medical Examinations, PC d/b/a All Borough
Medical, PC
                        *Enterprise Defendants*

        And

Nationwide Management Inc., BAB Management
Inc., Management Company A, Management
Company B, Management Company C,
Management Company D, Management Company E
                        *Management Company Defendants*

        And

Benjamin Osiashvili et al.
                        *Manager Defendants*

        And

Tatiana Sharahy, MD et al.

                        *Doctor Defendants*
        And

Linda Ackerman
Evgeniya Vakhidova
                        *Other Defendants*
----------------------------------------------------------X

# SECOND AMENDED COMPLAINT

GARY TSIRELMAN, PC
*Attorneys for Plaintiff*
129 Livingston St.
2nd Floor
Brooklyn, NY  11201

71