UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

Sky Medical Supply Inc.                                    Docket No. 12-CV-06383

                  *Plaintiff*

   - against -

SCS Support Claim Services, Inc., et al.,

                  *Defendants*

-----------------------------------------------------------------X


<u>PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS OBJECTIONS TO AND APPEAL OF HON. A. KATHLEEN TOMLINSON'S ORDER ON DEFENDANTS' MOTION TO QUASH</u>


GARY TSIRELMAN, PC
129 Livingston Street
2nd Floor
Brooklyn, NY  11201
(718) 438-1200
*Counsel for Plaintiff*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................. i

TABLE OF AUTHORITIES.......................................................................... ii

ARGUMENT .................................................................................................. 6

I.   The Magistrate Has Precluded Evidence of the Fraud That Followed "the Dates of Service" ........................................................................................ 6

II.   The Magistrate's Decision Precludes Discovery From a Time Period That This Court Already Found to be Relevant ............................................. 8

III.   The "Explicit Nexus" Language in DE 524 Should be Modified or Set Aside.......................................................................................................... 10

IV.   The Magistrate's Decision Restricts Sky's Ability to Prove Motive, the "Pattern" Element of its RICO Claims, and RICO Conspiracy .......................... 12

   A.   Motive ............................................................................................. 12

   B.   Pattern ............................................................................................ 15

   C.   Conspiracy ...................................................................................... 17

V.   The Magistrate Judge Improperly Applied an "Undue Burden" Analysis. 20

VI.   Sky's Subpoenas Survive Rule 26(b) Review and Seek Essential Information ................................................................................................ 22

CONCLUSION .............................................................................................. 25

# TABLE OF AUTHORITIES

<u>Federal Cases</u>

*Arch Assocs. v. HuAmerica Int'l*
93 Civ. 2168 (PKL), 1994 U.S. Dist. LEXIS 746 (S.D.N.Y. Jan. 28, 1994) ............................... 23

*Fireman's Fund Insurance Co. v. Great American Insurance Co. of New York*
284 F.R.D. 132 (S.D.N.Y. 2012) .......................................................................................... 22

*First Interregional Advisors Corp. v Wolff*
956 F. Supp. 480 (S.D.N.Y. 1997) ....................................................................................... 15

*Gov't Emples. Ins. Co. v. Hollis Med. Care, P.C.*
2011 U.S. Dist. LEXIS 130721 (E.D.N.Y. Nov. 9, 2011)......................................................... 18

*Gross v Waywell*
628 F. Supp. 2d 475 (S.D.N.Y. 2009) ................................................................................... 25

*H.J. Inc. v Northwestern Bell Tel. Co.*
492 U.S. 229 (1989)........................................................................................................ 16, 17

*Merrill Lynch, Pierce, Fenner & Smith v. Young*
1994 WL 88129 (Mar. 15, 1994) ........................................................................................... 17

*Ozbakir v. Scotti*
764 F. Supp. 2d 556 (W.D.N.Y. 2011) ............................................................................. 16, 17

*Quaker Chair Corp. v. Litton Bus. Sys.*
71 F.R.D. 527 (S.D.N.Y. 1976) ........................................................................................... 23

*Refco Grp. Ltd., LLC v. Cantor Fitzgerald, L.P.*
2014 U.S. Dist. LEXIS 155009 (S.D.N.Y. Oct. 24, 2014) ...................................................... 23

*SKS Constructors, Inc. v Drinkwine*
458 F. Supp. 2d 68 (E.D.N.Y. 2006) ..................................................................................... 16

*Sky Med. Supply Inc. v. SCS Support Claims Servs.*
17 F. Supp. 3d 207 (E.D.N.Y. 2014) ............................................................................. 4, 9, 18

*State Farm Mut. Auto. Ins. Co. v Fayda*
2015 US Dist LEXIS 162164 (SDNY Dec. 3, 2015) ...................................................... passim

*State Farm Mutual Automobile Insurance Co. v. CPT Medical Services, P.C.*
375 F. Supp. 2d 141 (E.D.N.Y. 2005) ................................................................ 19, 22

*State Farm Mutual Automobile Insurance Co. v. McGee*
No. 10 CV 3848, 2012 WL 8281725 (E.D.N.Y. Feb. 21, 2012) ................................... 23

*State Farm Mutual Automobile Insurance Co. v. Warren Chiropractic and Rehab Clinic, P.C.*
   No. 4:14 CV 11521, 2015 WL 4094115 (E.D. Mich. July 7, 2015) ............................ 22

*Taylor Precision Prods. v. Larimer Grp., Inc.*
No. 15-CV-4428 (ALC) (KNF), 2017 U.S. Dist. LEXIS 54603 (S.D.N.Y. Feb. 27, 2017) ........ 24

*United States v. Applins*
637 F.3d 59 (2d Cir. 2011) ......................................................................... 18

*United States v. Rastelli*
870 F.2d 822 (2d Cir.1989) ......................................................................... 19

*United States v. Socony-Vacuum Oil Co.*
310 U.S. 150 (1940) ................................................................................. 19

*United States v. Yannotti*
541 F.3d 112 (2d Cir. 2008) ....................................................................... 18

*Wells Fargo Century, Inc. v. Hanakis*, No. 04CV1381(SLT)(VVP)
2005 U.S. Dist. LEXIS 17440 (E.D.N.Y. June 28, 2005) ........................................ 16


<u>State Cases</u>
*Presbyt. Hosp. v. Md. Cas. Co.*
90 NY2d 274 (1997) ................................................................................. 24


<u>Rules</u>
Federal Rule of Evid. 401 .......................................................................... 23

Federal Rule of Civil Procedure 26(b).................................................. 21, 22, 23, 24

Federal Rule of Civil Procedure 26(g)............................................................... 24

Federal Rule of Civil Procedure 45(d)(3) ...................................................... 10, 21

iii

State Statutes

N.Y. Bus. Corp. Law § 1507 ......................................................................... 12

N.Y. Bus. Corp. Law § 1508 ......................................................................... 12

N.Y. Educ. Law § 6507(4)(c) ......................................................................... 12

# PRELIMINARY STATEMENT

Plaintiff Sky Medical Supply Inc. ("Sky") moves to modify or set aside that portion of Hon. A. Kathleen Tomlinson's Order at DE 524 concerning Defendants' motions to quash subpoenas for financial records served by Sky upon JP Morgan Chase Bank ("Chase").[1]  See ***Exhibit 1***.  Two of the subpoenas are for financial records of Defendants SCS Support Claim Services, Inc. ("SCS") and Nationwide Management Inc. ("Nationwide"), and the remaining two involve financial records for nonparties TCMR Management Inc. ("TCMR") and BDB Management NY Inc. ("BDB"), companies that, like Nationwide, are owned and controlled by the Oshiashvili Defendants.  See ***Exhibit 2***.

In its Second Amended Complaint ("Complaint"), Sky alleges that Defendants colluded to issue fraudulent peer review and IME reports causing insurance carriers to deny claims submitted by Sky and other health providers for services provided to injured parties.  Sky alleges, *inter alia*, that Defendants, consisting of independent medical examination ("IME") and peer review vendors, doctors and managers, took advantage of New York's volume-driven no-fault industry in order to benefit economically through fraudulent means. When insurers requested independent medical opinions as to whether to deny or pay the claims, Defendants created fraudulent IME and peer reports that universally recommended denial of the claims brought by Sky and other health providers.  The preordained reports deemed the services and products lacking in medical necessity regardless of the medical condition and history of each patient and the types of services or products provided. Contrary to affirmations contained in the reports, the conclusions contained therein were not based on a legitimate analysis of the pertinent medical records.  The reports were not created and signed by Doctor Defendants; they were

---

[1] Sky does not seek to disturb so much of the order that dealt with Sky's motion to quash Defendants' subpoena, nor does it challenge the Magistrate's striking of sections (d) and (e) of the Riders to the original subpoenas.

created and signed by laypersons in the doctors' names. Defendants used the laypersons to create such a massive volume of reports for such a low cost that they could not possibly be the legitimate work product of independent medical analysis.   The Doctor Defendants were paid a nominal sum for each report created by the laypersons while the majority of the revenue was filtered to SCS, Manager Defendants and Management Company Defendants through Patient Focus[2]. The fraud is enabled by the unlawful corporate structure of Patient Focus, a professional corporation owned on paper by Defendant Tatiana Sharahy, MD, but which is truly owned and controlled by Manager Defendants through their management companies. Manager Defendants directed the laypersons to recommended denial of all claims reviewed so that, in part, Defendants could generate extra revenue *via* court appearances that were required for testimony in support of the fraudulent reports.

Defendants' scheme resulted in across-the-board recommendations of denial of claims brought by health providers, including but not limited to the 177 claims that form Sky's damages.   The Complaint also details the procedures for processing no-fault insurance claims in New York, the framework of which contextualizes this motion. *Compl.* at par. 58-70.

The process begins when a health provider provides medical services or supplies to a person who has been injured in a motor vehicle accident.   The dates that the services are provided are commonly referred to as the "dates of service" or "D.O.S.".   The injured person assigns to the health provider his/her right to collect benefits directly from the insurer.   The health provider then generates a bill and submits it to the insurer, which in turn processes that bill by paying it, denying it outright, or requesting input from an independent medical consultant as to whether to pay the bill or deny it for lack of medical necessity.   In the latter instance, the

---

[2] Upon information and belief, Defendants filter money to the Osiashvili Defendant through BDB, TCMR, New Horizons Management Svs. and Chauffered Executive Transportation LLC (all owned by the Osiashvilis), and to Defendant Dagan through Integrated Document Solutions, a company owned by Dagan's brother.

insurer forwards the bill with the injured parties' medical records to a third-party-vendor responsible for selecting an appropriate medical consultant.   The consultant then makes a determination as to whether the services should be paid or denied as not medically necessary and memorializes the recommendation in a peer or IME report, which is subsequently submitted to the insurer.  The insurer then pays or denies the claim based on that report. Finally, with respect to denied bills, the health provider commences legal proceedings against the carriers for payment of the claims.

The Magistrate's ruling limiting the scope of the subpoenas requires modification.  First, in relying on the "dates of service" listed in the Damages Spreadsheet (***Exhibit 3***) to limit the bank subpoenas to those records that fall within the timeframe of January 2007 through January 2010, the Magistrate set an outer parameter (January 2010) that precedes the date that some of the fraud occurred.  The dates of service on the Damages Spreadsheet are the dates that the medical supplies were provided to the injured parties, which predate the creation of the bills for those supplies and the submission of those bills to the insurance carriers.  Only then did the insurers process those bills, forwarded them (along with the pertinent medical records) to the vendors for medical review and, eventually, deny those bills based on Defendants' sham reports.


Because the revenue obtained from the report creation necessarily postdated these steps, the Magistrate's reliance on the dates of service confines the financial documents to the activity leading up to the fraud, but not the fraud itself. Further, the Magistrate's ruling only takes into account the report creation aspect of the fraudulent scheme, when there are in fact many.

Sky also alleges that the massive volume of predetermined reports causing denial of health claims results in the health providers being forced to sue the carriers in civil court in order

3

to obtain payment for the denied claims.  Such lawsuits trigger the insurers' need to request that Doctor Defendants appear in court to testify in support of those reports, creating another substantial revenue stream for Defendants based on appearance fees.[3]  Indeed, this aspect of the scheme was one of the driving motivations for Doctor Defendants to agree to be involved in the first place. *Compl.* at par. 58-70.  Since the court appearances occurred long after the "dates of service" that the supplies were provided to the injured parties, the Court's decision cuts off a substantial amount of relevant and vital financial evidence.

Second, the Magistrate's ruling in DE 524 is inconsistent with prior orders issued in this case.  Your Honor has already ruled that Sky's damages did not accrue until the civil court actions brought by Sky against the insurers had terminated.[4]   In fact, Sky's original complaint was dismissed without prejudice on the sole basis that Sky had not listed those claims that had completed their circuit through the civil courts.  Your Honor allowed for Sky to replead, using a "Damages Spreadsheet" curing that defect. *Sky Med. Supply Inc. v. SCS Support Claims Servs.*, 17 F. Supp. 3d 207,  237 (E.D.N.Y. 2014). But as the Damages Spreadsheet reveals, some of the civil court actions were not terminated until 2014, years after the January 2010 parameter set by the Magistrate.  Thus the Court's order at DE 524 chokes off all relevant financial records bearing any temporal relationship to Sky's damages.  Additionally, the Nationwide Defendants filed a counterclaim against Sky, alleging tortious interference with business and contractual relationships as well as loss of income and business relationships as a result of the Complaint. DE 482.  The Court denied Sky's motion to dismiss those claims.  DE 502.  Thus financial discovery beyond the scope ordered by the Magistrate is required on order for Sky to defend against these allegations.

---

[3] *Compl* at par. 6, 85, 86, 91, 106, 217 and *passim*.
[4] *Sky Med. Supply Inc. v. SCS Support Claims Servs.*, 17 F. Supp. 3d 207,  231 (E.D.N.Y. 2014).

4

Third, the Magistrate's ruling at DE 524 limiting the bank subpoenas to those financial records having an "explicit nexus" to the 177 claims is, as currently written, impossible to comply with. The very nature of bank records makes it unfeasible for Sky or Chase to know which records pertain to 177 very specific and individual insurance claims.  A review of Patient Focus' bank records confirms that every check related to peer and IME reports covers multiple - in some cases hundreds - of reports, and lacks any claim-specific details.[5]  The checks for court appearance fees and payments to the Management Companies and Manager Defendants are equally vague. It is also unknown when in relation to those 177 claims the insurers paid the vendors for the reports, when the vendors paid Doctor Defendants, when the money was filtered to the management companies, and when those companies filtered the money to Manager Defendants.   Only Defendants could possibly clarify these facts, and that could only occur in depositions.

Fourth, the Magistrate erroneously applied an "undue burden" standard in her decision. The subpoenas were served upon nonparty Chase, not Defendants.   Defendants were not burdened in any way.  Chase never moved to quash; in fact it had already produced, without challenge, boxes of bank records for Patient Focus.[6]  Sky has previously represented that it would bear the full cost of production, just as it did with Patient Focus.  Moreover, the case law in this Circuit fully supports Sky's position, including the *Fayda* case relied upon by the Magistrate.[7]

Fifth, the Magistrate's ruling discards relevant evidence regarding motive, the pattern element of Sky's RICO causes of action and the alleged RICO conspiracy.

---

[5] This is true both for checks written by SCS to Patient Focus and from Patient Focus to Doctor Defendants.  Patient Focus' bank records were obtained in March 2016 and are not covered by the Court's ruling at DE 524.  No motions were ever made to quash that subpoena.
[6] Even if Chase had moved to quash, the relevant case law supports production of the requested records.
[7] *State Farm Mut. Auto. Ins. Co. v Fayda*, 2015 US Dist LEXIS 162164 (SDNY Dec. 3, 2015).

5

Finally, with respect to the facts of this case and allegations contained in the Complaint, the Magistrate's decision at DE 524 would hamstring Sky's ability to prosecute this case.

# ARGUMENT

## I.      The Magistrate Has Precluded Evidence of the Fraud That Followed "the Dates of Service"

The Magistrate excluded discovery regarding some of the very racketeering activity that is the subject of this action.  Sky alleges that Defendants' fraudulent scheme commenced after Patient Focus' incorporation in 2004 and continues to this day. Consequently, Sky's subpoenas demanded financial documents spanning the time frame from 2005 through 2015.   The Magistrate erred in limiting the subpoenas to financial records from November 3, 2006 to January 18, 2010, the dates of service that Sky provided medical equipment to the injured parties.[8]  This is apparent because the January 18, 2010 boundary predates two major aspects of the fraud alleged.

First, with respect to the "report creation" portion of the scheme, it is unknown when in relation to the creation of those reports that the carriers paid the vendors and when that revenue was subsequently distributed among Defendants.   What is certain, however, is that those financial transactions must have taken place after the dates of service that the supplies were rendered.

The Magistrate misapprehends the significance of the dates of service in the context of the no-fault insurance regulations and in this case.   As the Complaint describes, the creation and mailing of the fraudulent peer and IME reports resulting in the denial of Sky's claims took place

---

[8] "The vast majority of the 177 claims span a time period of approximately three years (January 2007 through January 2010) as measured from the earliest (November 3, 2006) and latest (January 18, 2010) **Dates of Service** enumerated in the Damages Spreadsheet. *See* Second Amended Complaint ("SAC"), Ex. 7. As such, the Chase Subpoenas need to be narrowly tailored to include only those bank records falling within this three-year time period encompassing the 177 claims in this action.[Emphasis added]." DE 524 at 26.

6

many steps *after* the dates that Sky administered supplies to the injured parties.  All payments made by the insurance carriers to SCS and Patient Focus for those reports and subsequent filtering of money to Doctor Defendants and Manager/Management Defendants took place well after the "dates of service."  The entire claims process only began when the medical supplies were administered by Sky to the injured parties. Sky then had to receive executed assignments of benefits from the injured parties, create the bills, and submit the claims to the insurance carriers. Next, the carriers processed the bills by submitting them to independent medical experts for recommendation as to how to proceed. Defendants then created the fraudulent peer review reports encouraging denial of Sky's claims and transmitted the reports to the carriers which, in relying upon those reports, denied Sky's claims. By relying on the "dates of service" of the claims in order to limit the timeframe of Sky's subpoenas, the Magistrate Judge has excluded financial discovery related to creation of and payments for the sham reports.

Second, the January 2010 limit predates another significant aspect of the scheme.  In its Complaint, Sky alleges that the scheme creates two main avenues of income for Doctor Defendants:  one is that they are paid a nominal sum for each of the thousands of reports created in their name. This sum is well below the industry standard for legitimate report creation, and is only feasible because the predetermined reports are created *en masse* by laypersons acting under the guise of the doctors whose signatures they place on the reports.[9]  In addition, Doctor Defendants benefit financially when the providers initiate lawsuits because the more claims that are denied by the insurers based on those reports, the more often Doctor Defendants are required

---

[9] Patient Focus' financial records bear this out for those doctors it paid directly.  For instance, in a three month period of time, Doctor Defendant Julio Westerband, an orthopedic surgeon, was paid for: "creating" 704 peer review reports, including reviewing each of the patients' medical records; conducting 1,436 separate independent medical exams (IMEs) and "creating" a report for each of those IMEs; and appearing in court to testify at least twice a week. This was all while allegedly maintaining a private practice.  His fee for each peer review report was $20 - $25, while his $50 fee for each IME, including examining the patient, reviewing medical records and creating the IME reports, was equally implausible.

to appear in court to support the reports.  *Compl.* at par. 85.  The doctors are paid for each court appearance, another motivating factor for Doctor Defendants to agree to be involved in this scheme in the first place.  Naturally, the commencement of the lawsuits by Sky against the insurance carriers and subsequent court appearances took place long after the dates of service of the claims.  Many of these appearances took place years after the "dates of service".  See ***Exhibit 4*** for a sampling of the dates of commencement of the lawsuits for Sky's claims, the court appearance dates and the notices of appearance for various Doctor Defendants.

The Magistrate's selection of January 2010 as the cutoff date for the bank subpoenas requires modification, as it excludes financial discovery that is clearly relevant to this action.

## II.     The Magistrate's Decision Precludes Discovery From a Time Period That This Court Already Found to be Relevant

In deciding Defendants' collective round of initial motions to dismiss, Your Honor ruled that Sky's damages did not accrue until after the civil court actions brought by Sky against the insurers had terminated.[10]  Sky's original Complaint was dismissed without prejudice on the sole basis that Sky's damages were not "clear and definite" because it had not specified those claims that had completed their circuit through the civil courts.  Leave was granted to replead, conditioned upon the inclusion of an itemization of those claims that had been litigated in civil court and eventually dismissed or settled.[11]  Thus the instant amended Complaint was filed with an attached "Damages Spreadsheet" as a curative measure.  The Damages Spreadsheet lists the

---

[10] "And it is clear from the face of the second amended complaint the very nature of the RICO damages at issue in this case is premised on those civil court judgments being final…"  *Bianco Tr.* pg. 13 at 14. See ***Exhibit 5.***

[11] "The Court also considers plaintiff's request for leave to file a second amended complaint. Specifically, plaintiff's counsel indicated at oral argument that plaintiff could remedy its inadequate allegations of RICO damages by including in a second amended complaint a list of all denied no-fault claims underlying this lawsuit, along with information about whether each claim is pending or not in state court or arbitration proceedings. Given plaintiff's counsel's representation at oral argument, and the fact that plaintiff's RICO claims are otherwise well-pleaded, the Court grants plaintiff leave to amend its RICO claims within thirty days of this Memorandum and Order."  *Sky Med. Supply Inc. v SCS Support Claims Servs.*, 17 F. Supp. 3d 207, 214 (E.D.N.Y. 2014).

177 claims from terminated civil court actions and contains claim numbers, patients' initials, dates of service of the supplies, claim amounts, and dates that the cases were resolved in the civil courts. These items were placed on the spreadsheet merely as identifying factors to particularize the claims that had been litigated to completion so that Sky's damages were "clear and definite".

The Damages Spreadsheet shows that reliance on the "dates of service" for curtailing discovery was erroneous. The court disposition dates range from 08/10/2009 to 5/9/2014, up to four years after the dates of service. Accordingly, Sky's damages accrued years after the January 2010 date selected by the Magistrate Judge. Moreover, Doctor Defendants' appearances in court in order to support the reports occurred during the litigation of these matters. Any dismissals that occurred as a result of Doctor Defendants' appearances would render the dismissal dates relevant, since Doctor Defendants were either paid for the appearances at the time of they occurred or thereafter. But pursuant to DE 524, the Magistrate chokes off financial records related to the actual accrual of Sky's damages and a major aspect of the scheme that immediately preceded those damages.

Furthermore, the "Nationwide Defendants" (consisting of Nationwide Management Inc., Benjamin Osiashvili, Mikael Osiashvili, Svetlana Osiashvili, and Alex Vayner) filed counterclaims against Sky, alleging tortious interference with business and contractual relationships, loss of income and contractual relationships as a result of this action. DE 482. The Court denied Sky's motion to dismiss those claims. DE 502 ("[H]owever, the motions to dismiss the tortious interference with business relations claims brought by the remaining counterclaimants are denied".). Since Sky's original complaint [DE 1] was filed on December 27, 2012, and the instant Complaint [DE 294] was filed on June 6, 2014, Sky is entitled to

9

financial discovery beyond the date of January 2010 in order to defend against these counterclaims.

The Magistrate's order should be modified in that the January 2010 cutoff date is either amended to a 2015 date or removed in its entirety.

**III.    The "Explicit Nexus" Language in DE 524 Should be Modified or Set Aside**

While Sky agrees with Judge Tomlinson's decision at DE 524 holding that Defendants' bank records are relevant, the language limiting the records to those having an "explicit nexus" to the 177 claims requires review.  Specifically, the Magistrate ruled:

> [A]s presently written, the subpoenas are overly broad and unduly burdensome in scope as they bear no relationship to the 177 surviving claims in this lawsuit. Consequently, in accordance with Rule 45(d)(3), the Court directs that the Chase Subpoenas be modified to include only those bank records having an <u>explicit nexus</u> to the 177 remaining insurance claims necessarily encompassing the three-year period (January 2007 through January 2010) as measured from the earliest (November 3, 2006) and latest (January 18, 2010) Dates of Service enumerated in the Damages Spreadsheet. *See* SAC, Ex. 7. A. [Emphasis added].

This portion DE 524 requires modification for several reasons.  First, the very nature of bank records makes it impossible to determine which financial records have an "explicit nexus" to the 177 particular claims listed on the Damages Spreadsheet.  This is confirmed by the bank records for Patient Focus that Sky has already obtained.  For instance, Sky alleges that thousands of peer review and IME reports were created each year in the name of each Doctor Defendant.  As to be expected in a volume-driven enterprise of this magnitude, Patient Focus neither received nor issued checks on an individualized basis for each claim.  Rather, the checks that SCS wrote to Patient Focus had no claim-specific information. *See e.g. **Exhibit 6***.  The same holds true for the checks issued by Patient Focus to those particular Doctor Defendants that it was responsible for paying directly, where the checks could cover over 100 reports. *See e.g.*

10

*Exhibit 7*. The checks do not identify exactly which reports they pertain to. Only Defendants could possibly know which exact transactions relate to each of the 177 claims.

Second, the ruling at DE 524 makes it impossible to link each of the 177 claims to the funds filtered through the vendors to Manager Defendants and their companies. Sky has a well-founded belief that money was filtered to Defendant Vayner through BAB Management Inc. ("BAB"), to the Osiashvili Defendants through Nationwide, BDB, TCMR, New Horizons Management Svcs. ("New Horizons"), Chauffeured Executive Transportation LLC ("Chauffeured"), and Healthy Life of NY Inc. ("Healthy Life") and to Defendant Eitan Dagan through Integrated Document Solutions, a company owned by his brother Yaniv Dagan. Of particular import are Sky's allegations concerning Patient Focus' illegal corporate structure. The Complaint asserts that one reason the peer and IME reports can be generated in such massive quantities and for such a low cost is because they are created by laypersons that are controlled in part by Patient Focus, a fraudulently incorporated professional corporation that exists in violation of N.Y. Bus. Corp. Law §§ 1507, 1508, and N.Y. Educ. Law § 6507(4)(c).

Necessarily operating under the semblance of being a professional medical organization in the business of conducting peer review reports and IMEs Patient Focus is unlawfully structured in that it is owned on paper by Defendant Tatiana Sharahy, MD ("Sharahy"), but is truly owned and controlled by Defendants B. Osiashvili, S. Osiashvili, M. Osiashvili and Vayner. The Complaint alleges that although the insurance carriers would pay SCS and Patient Focus for the peer and IME reports created in the doctors' names, most of that money would be filtered to Manager Defendants through their respective Management Companies. Sharahy, the supposed sole owner of Patient Focus, would receive a fraction of the profit. *Compl.* at par. 80 and *passim*.

11

Patient Focus' bank records confirm as much.   Patient Focus' extensive bank records spanning many years consistently reveal massive amounts of money being filtered to the aforementioned management companies, with a fraction of that going to Sharahy.  Moreover, as expected, money was not filtered to the management companies, such as Nationwide, on a per-check/per claim basis.  Rather, the checks written by Patient Focus to the management companies could range anywhere from a few thousand dollars to over $100,000.  See sample checks annexed as **Exhibit 8**.  The face of the records provides no insight as to which financial transactions are linked to which particular claims from the Damages Spreadsheet.

Logically, there is no reason to believe that the bank records of SCS, Nationwide, BDB and TCMR would be any different from Patient Focus', making it impossible to know which transactions bear an "explicit nexus" to the 177 claims.   Only Defendants would know the exact details of those transactions - not the bank and certainly not Sky.  This information could only be clarified *after* the bank records are received and made the subject of depositions.

Third, the Magistrate's determination that the subpoenas seek information that "bear no relationship to the 177 surviving claims in this lawsuit" is unfounded.  This information goes to the heart of the RICO scheme that resulted in Sky's injuries; they *all* bear sufficient nexus to the 177 claims and are relevant to the prosecution of this action. Therefore the portion of the Magistrate's decision limiting the bank subpoenas to those records with an "explicit nexus" to the 177 claims should be modified.

## IV.   The Magistrate's Decision Restricts Sky's Ability to Prove Motive, the "Pattern" Element of its RICO Claims, and RICO Conspiracy

### A.     Motive

The Magistrate's decision hamstrings Sky's ability to prove motive. As Sky has repeatedly asserted, the driving force behind Defendants' scheme is *volume*.  It is a volume-

driven enterprise in a volume-driven industry, and wouldn't be viable but for that fact. "Within the New York no-fault insurance industry, the sheer volume of claims that could potentially necessitate a review by a medical consultant for a determination on medical necessity is so large that it has created a fertile ground for the type of organization that this complaint describes." *Compl.* at par. 17. The entire economy of the enterprise hinges upon large scale production. "Insofar as economic benefits to Doctor Defendants are concerned, absent the involvement with Patient Focus and SCS, 'valid' peer review and IME reports could not be generated at a volume, speed and cost comparable to what could be accomplished once the fraudulent scheme was up and running. By allowing SCS and Patient Focus to create and sign the reports, Doctor Defendants are able to obtain payment as the purported authors of an exponentially larger number of reports than if they were actually doing legitimate peer reviews and IMEs." *Compl.* at par. 85.

One of the reasons that "Doctor Defendants agreed with SCS and Patient Focus that the peer review reports and IME reports would contain predetermined opinions that the services rendered by healthcare providers universally lacked medical necessity" was that "the more reports that are issued triggering denial of benefits, the more court appearances would be needed for testimony by Doctor Defendants in support of the reports." *Id.* This had great economic import for the participants because "a significant portion of the organization's revenue is derived from expert witness fees paid to SCS for Doctor Defendants' court appearances in support of the fraudulent reports." *Id.* The symbiotic relationship between the parties was such that "Doctor Defendants are essential to the fraudulent scheme in that Manager Defendants would not be able engage in the peer review and IME business unless the reports submitted to the insurance carrier clients contained the name and purported signatures of licensed health care practitioners" while

"in return, Doctor Defendants are paid a sum of money per report in exchange for their willingness to allow the reports to be generated in their names, and are also paid for court and arbitration appearances on those very same reports." *Id.*

Here the Magistrate Judge removed any financial discovery dealing with the very essence of Defendants' motivation. Defendants certainly weren't motivated to create this scheme to deny only 177 claims – they were motivated to do so because the huge volume of denied claims would provide significant financial benefit. Without proving the context within which Defendants operated, Sky's 177 claims will exist in a vacuum with no frame of reference.

Sky must be able to prove the volume aspect of the fraud, such as that the peer review and IME reports were generated at a "volume, speed and cost" far outstripping that of any legitimate business, that "Doctor Defendants are able to obtain payment as the purported authors of exponentially larger number of reports than if they were actually doing legitimate peer reviews and IMEs", that in this multimillion dollar enterprise, most of the profits obtained are "filtered to Manager Defendants" and that Sky's damages were the result of a generalized protocol aimed at all health providers affected, not just Sky and not just for those 177 claims. This could only be accomplished with financial records beyond the 177 claims. Sky must also be granted the opportunity to prove the frequency of the court appearances that resulted from the denied claims, because "a significant portion of the organization's revenue is derived from expert witness fees paid to SCS for Doctor Defendants' court appearances in support of the fraudulent reports." *Compl* at par. 85. The frequency of those court appearances and the fact that Doctor Defendants would regularly appear to testify on each other's reports are relevant.[12]

---

[12] "As an indication that testimony would be predetermined, SHARAHY was not paid to review any of peer review reports allegedly authored by other Doctor Defendants. SHARAHY was also not paid to review any medical records, regardless of how voluminous. SHARAHY was only paid if she actually appeared in court, and she only appeared in Court if she would be testifying in support of the peer review reports." *Compl.* at par. 91(b).

B.     Pattern

With respect to RICO matters in this Circuit, evidence of injuries to parties other than the plaintiff stemming from the same scheme is consistently found to be relevant to establishing the pattern element of a RICO enterprise.  "[Plaintiff] has alleged a scheme that defrauded not one but several lenders and was supported by numerous predicate acts that occurred over a period of almost fourteen months." *First Interregional Advisors Corp. v Wolff*, 956 F. Supp. 480, 486 (S.D.N.Y. 1997).

This is also relevant for establishing that the fraudulent conduct is a product of Defendants' general business practice, since "the Supreme Court has held that the continuity requirement can be met where it is shown that the predicate racketeering acts were a "regular way of conducting defendants' ongoing legitimate business." *Id.* at 486.  *See also SKS Constructors, Inc. v Drinkwine*, 458 F. Supp. 2d 68, 80 (E.D.N.Y. 2006) ("Defendants argue that the involvement of non-party victims cannot be alleged in support of the continuity element because Plaintiff lacks standing to pursue claims on behalf of others.  While Plaintiff may not be able to collect damages with respect to the injuries of other, unnamed parties, it does not necessarily follow that Plaintiff may not allege injury to others in support of allegations of an ongoing fraudulent scheme, or pattern of racketeering activity.") and *Ozbakir v. Scotti*, 764 F. Supp. 2d 556, 571-72 (W.D.N.Y. 2011) ("In some circumstances, evidence that defendants have engaged in similar acts aimed at other victims may tend to show continuity, insofar as it shows that fraudulent behavior amounted to the defendants' 'regular way of doing business.'") citing *H.J. Inc. v Northwestern Bell Tel. Co.*, 492 U.S. 229, 242 (1989).

Sky has consistently alleged that its damages were the result of a widespread scheme that universally affected health providers whose claims were reviewed by Defendants.  See eg. DE

15

294, 483.  It is a volume-driven scheme that could not work but for the fact that the reports were created on such a massive scale and for many health providers.  The "pattern" in this case is inextricably linked to Sky's damages, rendering financial discovery necessary beyond the 177 claims.   "[I]f…only the acts involving Plaintiff can be considered in determining whether the scheme alleged was continuous, then schemes could remain in force, provided the orchestrators changed targets prior to the accrual of a "substantial" period of time." *Wells Fargo Century, Inc. v. Hanakis*, No. 04CV1381(SLT)(VVP), 2005 U.S. Dist. LEXIS 17440, at *14 (E.D.N.Y. June 28, 2005).

Sky was not an isolated target, it was caught in Defendants' web of fraud aimed at all similarly situated health providers whose claims Defendants "reviewed."  Thus, financial discovery concerning these other providers is relevant.  Furthermore,

> Given Congress' goal in defining a "pattern of racketeering" to "exclude from the reach of RICO criminal acts that were merely 'isolated' or 'sporadic,'" *Merrill Lynch, Pierce, Fenner & Smith v. Young*, 1994 U.S. Dist. LEXIS 2929, 1994 WL 88129, at *27 (Mar. 15, 1994) (quoting *H.J.*, 492 U.S. at 239), and "Congress'…concern [with]…long-term criminal conduct," *H.J.*, 492 U.S. at 242, this Court considers those acts alleged to have been committed by Defendant in acquiring loans from other lenders as part of the same scheme. If those lenders were party to this action, certainly the acts alleged would count. Continuity of a scheme cannot turn on identity of the plaintiffs in a given action. Therefore, Plaintiff has sufficiently pleaded close-ended continuity.

*Id.* "[E]vidence that defendants have engaged in similar acts aimed at other victims may tend to show continuity, insofar as it shows that fraudulent behavior amounted to the defendants' 'regular way of doing business'." *Ozbakir v. Scotti*, 764 F. Supp. 2d 556, 571-72 (W.D.N.Y. 2011) citing *H. J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 242 (1989).

Additionally, Sky alleges that before linking up with Patient Focus, SCS "provided peer review services for certain insurers, but produced them on a scale that was a mere fraction of what would occur once the partnership with PATIENT FOCUS was formed." *Compl.* at par. 79. Patient Focus was in the business of subcontracting the peer review and IME services to entities other than SCS. *Compl.* at par. 80. It was Defendants' relationship with each other that powered the conspiracy. *Compl* at par. 81, 83 and passim. The bank records for SCS sought by Sky will reveal that peer and IME doctors who were not involved in the scheme created far fewer reports and were paid substantially more money per report than those who were, thereby further confirming the pattern of fraud alleged in this action.  But this comparison cannot be made without obtaining financial records that don't have an "explicit nexus" to the 177 claims.

It should also be noted that, in their initial motions to dismiss, some of the Doctor Defendants, such as Stanley Ross, MD, argued that dismissal was warranted because their names were not listed on any peer review or IME reports denying Sky's claims; however, that argument was rejected by this Court because "allegations that S. Ross permitted his name to be used on fraudulent IME and peer review reports are relevant to the pattern element of the RICO claims, even if some of those reports were not prepared for plaintiff's no-fault claims." *Sky Med. Supply Inc. v SCS Support Claims Servs.*, 17 F. Supp. 3d 207, 227 n.8 (E.D.N.Y. 2014)

In light of the above, the Magistrate effectively excluded essential and relevant information key to establishing the "pattern element" aspect of a RICO claim.  Application of this approach would deprive Sky of the ability to prove the pattern element of its RICO claims.

    C.    *Conspiracy*

"[T]o be found guilty of RICO conspiracy, a defendant need only know of, and agree to, the general criminal objective of a jointly undertaken scheme. *United States v. Yannotti*, 541 F.3d

17

112, 122 (2d Cir. 2008)." *See also Gov't Emples. Ins. Co. v. Hollis Med. Care, P.C.*, 2011 U.S.

Dist. LEXIS 130721, at *31 (E.D.N.Y. Nov. 9, 2011).

"The Second Circuit has explained that this agreement may be shown if a defendant

'possessed knowledge of only the general contours of the conspiracy'." *Id.* quoting *United States*

*v. Applins*, 637 F.3d 59, 75 (2d Cir. 2011).

Here, Sky alleges that each Defendant knew of, and agreed to, a general unlawful

protocol based on issuing sham reports that were geared towards denying claims by health

providers, including Sky. Since they agreed to issue predetermined reports in the first place, they

entered this arrangement without regard for the identity of the victims, all having supporting

roles in the overall scheme that led to denial of individual claims. Doctor Defendants were

interchangeable, often appearing in court to testify in support of each other's reports. *Compl* at

92(a)-(d). Further,

> [C]onsistent with long-standing principles enshrined in both
> criminal and civil jurisprudence relating to "conspiracy," a
> "conspiracy may exist even if a conspirator does not agree to
> commit or facilitate each and every part of the substantive
> offense." *Id.* at 63 (citing *United States v. Socony-Vacuum Oil Co.*,
> 310 U.S. 150, 253-54, 84 L. Ed. 1129, 60 S. Ct. 811 (1940)).
>
>         ***
>
> Stated differently, defendants may be liable for aiding and
> abetting, i.e., supporting, the alleged conspiracy. *United States v.*
> *Rastelli*, 870 F.2d 822, 832 (2d Cir.) ("Case law unequivocally
> establishes … that a defendant may be convicted of a RICO
> conspiracy violation if he aids and abets the commission of
> racketeering acts") (citations omitted), cert. denied, 493 U.S. 892,
> 107 L. Ed. 2d 516, 110 S. Ct. 515 (1989).

*State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C.*, 375 F. Supp. 2d 141, 151 (E.D.N.Y.

2005). Financial documents supporting Sky's conspiracy claims (Counts VI – IX) are relevant,

and require production of financial documents beyond the 177 claims.

In their second round of motions to dismiss, some Doctor Defendants argued that they could not be held liable if their names did not appear on the 177 claims.  Your honor summarized their position, stating:

> I now turn to the arguments made by the several individual defendants including Dr. Cohen, Dr. Florio, and the SCS defendants on behalf of Drs. Kritzberg, Sukhov, Weber, and Weisman who contend that the second amended complaint fails to adequately have pled their participation in the RICO enterprise.  First, the four SCS doctors and Dr. Cohen argue that after plaintiff narrowed the list of relevant IME's to the current 177 reports all the reports they purportedly lent their name to are no longer part of the suit which the plaintiff conceded at oral argument is correct. Dr. Cohen, who appears pro se, in fact contends that he did not offer any reports whatsoever. Therefore, because the damages stemming from the claims in this case are now limited to those claims, those defendants argue that if none of their purported work product was the direct cause of a claim being denied then they themselves cannot be a proximate cause of the plaintiff's injury and the claims as against them must be dismissed.

But Your Honor rejected their argument, holding:

> I find those arguments unpersuasive at the motion to dismiss stage although certainly these issues can be raised again at summary judgment. As I noted in the May 7th 10 order, "The pleadings and exhibits attached to the complaint also identify specific IME and peer review reports bearing the names of doctor defendants which plaintiff alleges are fraudulent. These well pointed allegations that each of the manager defendants and doctor defendants violated Sections 1962(c) also support an inference of an agreement to join the RICO conspiracy." However, even though the reports that these doctors purportedly authored may have been extracted from the larger group of reports initially at issue in this case, Second Circuit precedent indicates that at this stage of the litigation the RICO claims against these defendants may still go forward because plaintiff has still alleged that the doctors pledged the use of their name and credentials in the management defendants in support of the fraudulent scheme." *Trscr.* at pg. 21, lines 7-24. See ***Exhibit 5***.

Absent modification, the Magistrate's ruling would cripple Sky's ability to defend against any summary judgment motions brought by those Doctor Defendants whose names are not listed on the reports for the 177 claims.   Proof of their conspiracy to engage in the overarching scheme that resulted in Sky's damages would be unattainable simply because their names happen to not appear on those reports.

## V.      The Magistrate Judge Improperly Applied an "Undue Burden" Analysis

In limiting the scope of the subpoenas, the Magistrate Judge applied an "undue burden" standard.   Specifically, the Court held that "[t]he vast majority of the 177 claims span a time period of approximately three years (January 2007 through January 2010) as measured from the earliest (November 3, 2006) and latest (January 18, 2010) Dates of Service enumerated in the Damages Spreadsheet. *See* SAC, Ex. 7. As such, the Chase Subpoenas need to be narrowly tailored to include only those bank records falling within this three-year time period encompassing the 177 claims in this action. To further enlarge this temporal period would result in an undue burden which outweighs the potential benefit here. That result would contravene the requirement that discovery be proportional to the needs of each case. To further enlarge this temporal period would result in an undue burden which outweighs the potential benefit here. That result would contravene the requirement that discovery be proportional to the needs of each case." *DE 524 at pg. 26.*

The Court's interpretation of Rule 45(d)(3) was in error, as Defendants were not burdened by the subpoenas in any way.   The subpoenas were served upon nonparty Chase, which made no attempt to quash or limit the scope of the subpoena.   Defendants are not required to expend any time or money in producing the demanded records.   Sky previously represented that it would bear the costs incurred in supplying the documents, as it did with respect to Patient Focus' records.   Thus it is unclear how exactly the burden in producing the subpoenaed documents outweighs the benefit, as Defendants were not burdened at all.   Even if Chase had moved to quash, courts in this Circuit overwhelmingly rule in favor of broad production of financial records.   This has been a repeated theme in RICO actions pertaining to New York's no-fault insurance industry.

20

The Magistrate relies heavily upon *State Farm Mut. Auto. Ins. Co. v. Fayda*, 2015 U.S. Dist. LEXIS 162164 (S.D.N.Y. Dec. 3, 2015); however, *Fayda* does not involve subpoenas, makes no reference to Rule 45 and, in any event, actually supports Sky's position.   *Fayda*, which discusses the revised Rule 26(b) standards, involved far fewer claims and damages than Sky. State Farm had demanded six years of bank records for defendant Kiner.  Citing the amendment to Rule 26(b)(1), Kiner objected, asserting that such discovery was not proportional to the case, as State Farm's damages consisted of a limited number of paid claims totaling a mere $12,000.

The Court *rejected* that argument, noting: "The Kiner Defendants allege that State Farm paid them approximately $12,000 and that the discovery requested is therefore of little value to the case. (Def. Memo. at 1, 4). However, they have failed to rebut State Farm's showing that the financial records are relevant and material to its case against them. Nor have they established that the plaintiff has an alternative source for the information or that producing it would be particularly burdensome." *Fayda* at 13-14.

The *Fayda* court went further:

> The burden of demonstrating relevance remains on the party seeking discovery, and the newly-revised rule "does not place on the party seeking discovery the burden of addressing all proportionality considerations." Id. In general, when disputes are brought before the court, "the parties' responsibilities [] remain the same" as they were under the previous iteration of the rules, so that the party resisting discovery has the burden of showing undue burden or expense. *Id.*; see *also Fireman's Fund Insurance Co. v. Great American Insurance Co. of New York*, 284 F.R.D. 132, 135 (S.D.N.Y. 2012) ("Once relevance has been shown, it is up to the responding party to justify curtailing discovery."). Moreover, information still "need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1).

*State Farm Mut. Auto. Ins. Co. v. Fayda*, 2015 U.S. Dist. LEXIS 162164, at *7-8 (S.D.N.Y. Dec. 3, 2015). The Court further held:

21

> Case law indicates that evidence of a defendant's motive for participation in a fraudulent medical billing scheme is relevant to such claims and that financial documents like these are discoverable to establish that motive. *See, e.g.*, *State Farm Mutual Automobile Insurance Co. v. CPT Medical Services, P.C.*, 375 F. Supp. 2d 141, 155-56 (E.D.N.Y. 2005) (financial records "may be relevant to establishing that defendants profited from their willingness" to order medically-unnecessary tests); *see also State Farm Mutual Automobile Insurance Co. v. Warren Chiropractic and Rehab Clinic, P.C.*, No. 4:14 CV 11521, 2015 U.S. Dist. LEXIS 87661, 2015 WL 4094115, at *6 (E.D. Mich. July 7, 2015); *State Farm Mutual Automobile Insurance Co. v. McGee*, No. 10 CV 3848, 2012 U.S. Dist. LEXIS 188346, 2012 WL 8281725, at *2 (E.D.N.Y. Feb. 21, 2012)

*Id.* at 11.

In consistently ordering the broad production of financial records, this Circuit recognizes that the nature of fraud in New York's volume-driven no-fault industry is such that documents cannot be limited on a claim-by-claim basis.

### VI.    Sky's Subpoenas Survive Rule 26(b) Review and Seek Essential Information

As stated in *Fayda,* the standard of review for financial documents is relevance, and this standard has not been nullified by the revised Rule 26(b) of the Federal Rules of Civil Procedure. Information is relevant if: "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Relevance is a matter of degree, and the standard is applied more liberally in discovery than it is at trial. "'[I]t is well established that relevance for the purpose of discovery is broader in scope than relevance for the purpose of the trial itself.'" *Refco Grp. Ltd., LLC v. Cantor Fitzgerald, L.P.*, 2014 U.S. Dist. LEXIS 155009, at *19 (S.D.N.Y. Oct. 24, 2014) (brackets in original), quoting *Arch Assocs. v. HuAmerica Int'l,* 93 Civ. 2168 (PKL), 1994 U.S. Dist. LEXIS 746, at *3 (S.D.N.Y. Jan. 28, 1994) and citing to *Quaker Chair Corp. v. Litton Bus. Sys.*, 71 F.R.D. 527, 530-531 (S.D.N.Y. 1976).

22

The current Fed. R. Civ. P. 26(b)(1) states, *inter alia,*

> parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

But as per the Civil Rules Advisory Committee, the amended rule "does not change the existing responsibilities of the court and the parties to consider proportionality." Fed. R. Civ. P. 26 advisory committee's note to 2015 amendment. Proportionality in discovery has always been an element of the Federal Rules, such as Rule 26(b)(2)(C)(iii) and Rule 26(g)(1)(B)(iii).

The proportionality analysis adopted by this Circuit consists of the following prongs: the importance of the issues at stake in the litigation; the amount in controversy; the parties' relative access to relevant information; the parties' resources; the importance of discovery in resolving issues; and whether the burden or expense of the discovery is outweighed by the benefit Fed. R. Civ. P. 26(b). *Taylor Precision Prods. v. Larimer Grp., Inc.*, No. 15-CV-4428 (ALC) (KNF), 2017 U.S. Dist. LEXIS 54603 (S.D.N.Y. Feb. 27, 2017)

Here, Sky's subpoenas pass the proportionality test. First, with respect to the "importance of the discovery in resolving the issues", Sections I through V above provide a detailed analysis as to why Sky requires financial records beyond January 2010 and beyond the 177 claims listed in the Damages Spreadsheet. These documents go to the heart of motive, support the pattern element of the RICO causes of action, will help establish the illegitimate nature of the reports themselves, will elucidate the relationship between and financial gain

23

realized by the various Defendants and are necessary to defend against Defendants' counterclaims.

Second, the "importance of the issues at stake" prong also weighs in Sky's favor. The primary legislative objective of New York's no-fault insurance laws is "to provide prompt uncontested, first-party insurance benefits" and "a tightly timed process of claim, disputation and payment." *Presbyt. Hosp. v. Md. Cas. Co.*, 90 NY2d 274, at 285 and 281 (1997). Sky alleges that Defendants have issued thousands of fraudulent peer review and IME reports that have affected health providers other than Sky, and that the scheme has been ongoing for at least ten years.

Across the board, Defendants are denying reimbursement to health providers that provide services in good faith and, via IMEs, cutting off future benefits to injured parties:

> [T]he greater the elements of continuity -- the number, duration, dimensions, degree, complexity, gravity or nature of the RICO predicate acts weighed as a whole -- the greater is the likelihood that the unlawful conduct charged will define  a pattern of racketeering activity sufficiently serious not only to produce injury to the victim, but also to cause public harm or pose threats to larger societal interests of the type and magnitude Congress contemplated in enacting RICO, and for which the law's severe punitive and deterrent purposes are justifiable.

*Gross v Waywell*, 628 F. Supp. 2d 475, 492 (S.D.N.Y. 2009).

Third, with respect to the "relative access to relevant information" prong, this Circuit looks to whether the demands are "duplicative" or "cumulative". Here, the documents sought in Sky's subpoenas are certainly not cumulative, duplicative, or more easily obtainable from other sources. Sky's subpoenas were issued more than one year ago, in April 2016 and Defendants' motion to quash was filed on May 20, 2016. During the pendency of that motion, the Court issued an order at DE 503, where the Magistrate Judge denied Sky's motion to compel SCS and

24

Nationwide to provide the same documents as requested here.  Moreover, SCS has already represented that it does not have any bank records from the relevant period in its possession, custody or control, related to the 177 claims or otherwise.  Regarding BDB and TCMR, both are nonparties and were not subject to any prior motions to compel.  Therefore, the banking institution is clearly the best - and likely only - source from which to obtain the documents.

Fourth, the burden of providing the discovery is outweighed by the benefit.  Defendants would bear no burden as a result of the subpoenas.  Sky, which has already stated that it takes full responsibility for the costs of obtaining the documents from the bank, repeats and reiterates the arguments set forth in Section "V" above.

Fifth, the amount in controversy is not insubstantial.  The damages sought are for $149,202.25, which, when trebled under the RICO statute, equate to $447,606.75, plus applicable interest and attorney fees.  Courts have ordered broad production of bank records in other RICO actions involving far less damages.  See *Fayda,* supra.

In light of the foregoing, the Magistrate's order should be modified by expanding the scope of the subpoenas to cover years 2005 through 2015 as well as striking the language limiting the subpoenas to those records having an "explicit nexus" to the 177 claims.


## CONCLUSION

Sky has set forth compelling reasons why the order at DE 524 should be modified or set aside.  Therefore, it is respectfully requested that the order at DE 524 be amended to account for the issues articulated herein.

Dated:  Brooklyn, NY
May 12, 2017

GARY TSIRELMAN, P.C.
BY: */s/ Stefan Belinfanti*
_____

Stefan Belinfanti, Esq.
Gary Tsirelman, Esq.
Nicholas Bowers, Esq.
129 Livingston Street
2nd and 3rd Floors
Brooklyn, NY  11201
(718)438-1200