UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
SKY MEDICAL SUPPLY INC.,

                          Plaintiff,

           - against -

SCS SUPPORT CLAIMS SERVICES, INC.,
*et al.*,

                    Defendants.
-----------------------------------------------------------x

**MEMORANDUM & ORDER**
12-CV-6383 (PKC) (SIL)

PAMELA K. CHEN, United States District Judge:

      Plaintiff Sky Medical Supply, Inc. ("Sky Medical" or "Plaintiff") commenced this action on December 27, 2012, against dozens of corporate and individual defendants, related to an allegedly fraudulent scheme within New York's no-fault insurance industry. (*See* Compl., Dkt. 1.) On June 6, 2014, Plaintiff filed its Second Amended Complaint, the operative complaint, alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and numerous state law claims. (*See* Second Am. Compl., Dkt. 294 ("SAC").) Pending before the Court are four motions for summary judgment or partial summary judgment on statute of limitations grounds filed by the following defendants (collectively, "Defendants"): (1) Nationwide Management Inc., Benjamin Osiashvili, Mikael Osiashvili, Svetlana Osiashvili, and Aleksey Vayner a/k/a Alex Vayner, (the "Nationwide Defendants"); (2) Damion A. Martins, M.D. ("Martins"); (3) Patient Focus Medical Examinations, P.C. d/b/a All Borough Medical, P.C. ("Patient Focus") and Tatiana Sharahy, M.D. (the "Patient Focus Defendants"); and (4) Dante

Brittis, M.D., Joseph C. Cole, M.D., Christopher Ferrante, D.C., Robert A. Sohn, M.D.[1], and Julio Westerband, M.D., (the "GW Defendants").

For the reasons set forth below, the Court grants in part and denies in part Defendants' motions for summary judgment.

## BACKGROUND

### I.    Relevant Factual Background[2]

#### A.    The Alleged Fraud Scheme[3]

Plaintiff's Second Amended Complaint details a fraud scheme by which Defendants—vendors handling peer review reports and independent medical examinations ("IMEs") for

---

[1] The Court was notified of Defendant Robert A. Sohn, M.D.'s death on January 25, 2024, and as no motion for substitution was filed, dismissed this action against him. (*See* Suggestion of Death, Dkt. 706; 5/1/2024 Order Dismissing Party.)

[2] Unless otherwise noted, a standalone citation to a party's Local Rule 56.1 statement denotes that the Court has deemed the underlying factual allegation undisputed. Any citation to a party's Local Rule 56.1 statement incorporates by reference the documents cited therein. Where relevant, the Court may cite directly to an underlying document. However, where either party (i) admits or (ii) denies without citing to admissible evidence certain of the facts alleged in the other's 56.1 statement, the Court may deem any such facts undisputed. *See* Loc. Civ. R. 56.1(c)–(d); *Lumbermens Mut. Cas. Co. v. Dinow*, No. 06-CV-3881 (TCP), 2012 WL 4498827, at *2 n.2 (E.D.N.Y. Sept. 28, 2012) ("Eastern District Local Rule 56.1 requires . . . that disputed facts be *specifically* controverted by admissible evidence. Mere denial of an opposing party's statement or denial by general reference to an exhibit or affidavit does not specifically controvert anything." (emphasis in original)); *Risco v. McHugh*, 868 F. Supp. 2d 75, 86 n.2 (S.D.N.Y. 2012). In addition, the Court will not consider "factual assertions" contained in the 56.1 statements "that are otherwise unsupported in the record," *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) (citation omitted), or "legal conclusions contained in the various [56.1] statements[,]" *Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 52 (2d Cir. 2012) (quotation and citation omitted). The Court construes the facts in the light most favorable to Plaintiff, the non-moving party. *See Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

[3] The Court relies on allegations in Plaintiff's Second Amended Complaint for this section, and elsewhere, to provide the background necessary to understand how the alleged fraud scheme worked, which is not fully included in the parties' Rule 56.1 Statements or motion briefing. The Court, however, does not consider these allegations to be undisputed facts for purposes of Defendants' summary judgment motions.

insurance companies, their owners, and the doctors who claimed to have authored the reports—colluded to generate fraudulent peer review reports and IMEs that resulted in the mass denial of Plaintiff's no-fault insurance claims. (*See generally* SAC.)

In New York, all non-garaged motor vehicles are required to carry insurance coverage, including no-fault personal injury protection. (*Id.* ¶ 58.) Under these policies, insurance carriers must cover expenses for medical services and equipment provided to injured parties. (*Id.* ¶ 60.) Injured parties who receive treatment for injuries from motor vehicle accidents in New York can assign their contractual and statutory rights to reimbursement to the providers of medical services and equipment, like Plaintiff, who then submit the no-fault claims to the insurance companies. (*Id.* ¶ 64.) When insurance companies receive a no-fault insurance claim, they typically have 30 days to either pay or deny the claim. (*Id.* ¶ 62.) One basis they can assert to deny no-fault benefits is that the billed-for services were not "medically necessary." (*Id.* ¶ 65.) In order to assert this defense, the denial must be based on a peer review report or IME from a licensed independent health consultant. (*Id.* ¶ 66.) Thus, many insurance companies work with third-party vendors to obtain unbiased medical determinations as to whether the services should be paid or denied as not medically necessary. (*Id.* ¶ 67.)

Plaintiff alleges that Defendants manipulated this process for economic gain by mass-producing and submitting to insurance companies fraudulent peer review and IME reports. (*Id.* ¶¶ 70, 81.) Under this alleged scheme, the vendor companies would secure contracts with insurance companies to conduct the peer review reports and IMEs, have laypersons (i.e., not medical professionals) located in Florida prepare those reports, and then pass them off to the insurance companies as having been authored by legitimate, licensed medical professionals. (*Id.* ¶¶ 82–84.) Plaintiff alleges that the doctors named on the reports participated in the corrupt activity

3

by allowing the vendor companies to create a massive amount of peer review and IME reports in their names, without actually conducting those reviews or examinations. (*Id.* ¶ 85.) According to Plaintiff, the doctors were incentivized to participate in the scheme because they could obtain payment for a much larger number of reports in their name than if they were authoring legitimate reports themselves. (*Id.*) In addition, peer review and IME reports that triggered claim denials led to more paid court and arbitration appearances by the doctors to testify in support of the denials. (*Id.*) Plaintiff alleges that the outcomes of the reports were predetermined, resulting in the mass denial of no-fault insurance claims as "not medically necessary." (*Id.* ¶¶ 86, 89.)

To the extent relevant to the pending motions, the evidence regarding Defendants' specific involvement in the alleged fraud scheme and how that scheme was allegedly perpetrated against Plaintiff is described below.

### B.    The Parties

Plaintiff Sky Medical is a medical supply company that provides durable medical equipment to patients, including those injured in automobile accidents. (GW Defs.' R. 56.1 Statement, Dkt. 702 ("GW 56.1") ¶¶ 2–3.)[4] Edi Kalontarov ("Kalontarov") founded Plaintiff Sky Medical in 2006 and is its sole owner. (*Id.* ¶ 5; Kalontarov Dep., Dkt. 700-2 at 27:24–28:6.)

---

[4] Each group of Defendants filed a separate Rule 56.1 Statement, (*see* GW 56.1; Nationwide Defs.' R. 56.1 Statement, Dkt. 694 ("Nationwide 56.1"); Martins R. 56.1 Statement, Dkt. 696-2 ("Martins 56.1"); Patient Focus Defs.' R. 56.1 Statement, Dkt. 698-3 ("Patient Focus 56.1")), and Plaintiff responded to each separately, (*see* Pl.'s Resp. GW 56.1, Dkt. 700-20 ("Pl.'s Resp. GW 56.1"); Pl.'s Resp. Nationwide 56.1, Dkt. 700-19 ("Pl.'s Resp. Nationwide 56.1"); Pl.'s Resp. Martins 56.1, Dkt. 700-16 ("Pl.'s Resp. Martins 56.1"); Pl.'s Resp. Patient Focus 56.1, Dkt. 700-18 ("Pl.'s Resp. Patient Focus 56.1")). As all Defendants are moving on substantially the same grounds and factual material, the Court has reviewed the evidentiary record collectively and considers the undisputed facts overall for all four motions. The Court, however, has considered, and acknowledges herein, any unique factual assertions and arguments when material.

Separately, the Court also notes that attached to Plaintiff's opposition brief was a "Rule 56.1 Statement in response to Defendant Florio's Rule 56.1 Statement." (Dkt. 700-15.) As far as the Court is aware, Defendant Gary Florio, M.D., has not filed a motion for summary judgment,

The GW Defendants are individual doctors who were each affiliated with SCS Support Claim Services, Inc. ("SCS")[5], an independent vendor that works with physicians to produce peer review reports and IMEs requested by insurance companies to test the legitimacy of requests for no-fault reimbursement.  (GW 56.1 ¶ 1.)  Defendant Martins is a sports medicine and internal medicine doctor who, as a minor part of his practice, conducted peer reviews on behalf of SCS. (Martins 56.1 ¶¶ 5, 9–10.)

According to Plaintiff's Second Amended Complaint, Defendant Patient Focus is a New York corporation, owned by Defendant Tatiana Sharahy, M.D., that "provided back office and clerical services to peer review and IME[] vendors that operate in New York's no-fault and workers' compensation industries."  (SAC ¶ 13.)  Plaintiff also alleges that Defendant Nationwide Management Inc. is another New York corporation affiliated with Patient Focus, owned and managed by Defendants Benjamin Osiashvili, Mikael Osiashvili, and Svetlana Osiashvili.  (*Id.* ¶ 14.)  Defendant Alex Vayner testified that until March 2007, he had a 50% ownership interest in Defendant BAB Management Inc.,[6] another company allegedly affiliated with Patient Focus, and that Benjamin Osiashvili held the other 50% ownership interest.  (Vayner Dep., Dkt. 693-14

---

let alone his own 56.1 Statement.  Nor is the Court aware of any intention of Dr. Florio to join one of the motions currently pending, as it seems he has not appeared on the docket since 2015.  (*See* 12/10/2015 Florio Letter, Dkt. 403.)    The Court therefore disregards Plaintiff's Rule 56.1 Statement that purports to respond to Defendant Florio's Rule 56.1 Statement.

[5] SCS was previously named as a defendant in this action but was dismissed on January 3, 2019, after stipulation of the parties on December 20, 2018.  (*See* Order of Dismissal, Dkt. 626; Stip. of Dismissal, Dkt. 620.)

[6] Defendant BAB Management Inc. has not appeared in this action, but Plaintiff has not yet moved for default against it.

("Vayner Dep.") at 20:12–21:17; Nationwide 56.1 ¶ 19; Pl.'s Resp. Nationwide 56.1 ¶ 21;[7] SAC ¶ 15.)

Although their individual roles and involvement in the fraud scheme varied, all Defendants allegedly assisted with the preparation and/or submission of fraudulent IME or peer review reports recommending the denial of Plaintiff's no-fault insurance claims.

### C.    Plaintiff's No-Fault Insurance Claim Denials

From 2006 until 2012 or 2013, Plaintiff sought reimbursement from insurance companies for no-fault insurance claims it submitted for medical equipment provided to accident victims. (GW 56.1 ¶ 3.)  When claims were denied, the insurance companies gave Plaintiff a written claim denial that provided reasons for the denial, including that the equipment provided was not "medically necessary" based on an IME or peer review report by a doctor.  (*Id.* ¶ 4.)  When Plaintiff received claim denials on this basis, the claim denial forms would identify the doctor who authored the peer review report and sometimes attach a copy of the report; in other instances, it would indicate that the peer review report could be released upon written request.  (*Id.* ¶ 5; Pl.'s Resp. GW 56.1 ¶ 5.)[8]

Between 2006 and 2012, Plaintiff received persistent denials of its no-fault insurance claims.  (Patient Focus 56.1 ¶ 7.)  When Kalontarov received denials, he would review the claim denial forms from the insurance companies himself and would then forward them to Plaintiff's attorneys, usually within two to three weeks.  (GW 56.1 ¶ 6; Patient Focus 56.1 ¶ 11.)  Kalontarov sent denials to Plaintiff's counsel with the intention of contesting them with the insurance

---

[7] The Court notes that there is a numbering discrepancy in Plaintiff's response to the Nationwide Defendants' 56.1 Statement.

[8] The Court notes that there is also a numbering discrepancy in Plaintiff's response to the GW Defendants' 56.1 Statement.

companies.  (Patient Focus 56.1 ¶ 11.)  The parties dispute whether Plaintiff reviewed the peer review reports contemporaneously with the claim denial forms when the reports were attached.  (*See* Pl.'s Resp. Patient Focus 56.1 ¶ 13; Pl.'s Resp. Nationwide 56.1 ¶ 17.)  Kalontarov's deposition testimony is unclear on this point; he states that he received peer review reports but did not review them "in detail," (Kalontarov Dep., Dkt. 700-12 at 56:20–58:2, 68:21–69:5), but he also testified that he had the opportunity to go over peer review reports with Plaintiff's attorney "during the whole time," (*id.* at 59:20–60:50).  Kalontarov testified that he was aware of "many other companies" who had received "thousands" of payment denials based on similar peer review reports.  (Patient Focus 56.1 ¶ 9.)  Kalontarov's cousin was facing similar issues with his medical supply company, and the two would discuss it at family events or in the office with Kalontarov's attorney—though it is unclear both when these conversations took place and when Kalontarov was aware that other companies were also denied payment on no-fault insurance claims.  (Kalontarov Dep., Dkt. 700-12 at 76:21–77:15.)

At issue in this case are 177 of Plaintiff's no-fault insurance claims that were denied by insurance companies, mostly between 2006 and 2008.  (Nationwide 56.1 ¶ 1; Martins 56.1 ¶ 29; *see* Damages Chart, SAC Ex. 7, Dkt. 294-7.)  Plaintiff and its counsel were aware of the insurance companies' denial of each of the specific 177 claims, as well as the purported grounds for each denial, shortly after each such denial.  (Patient Focus 56.1 ¶ 12.)

### D.    Plaintiff's Investigation of Claim Denials

Plaintiff stopped dealing primarily with no-fault insurance claims around 2012 because it "didn't make sense"; Plaintiff was providing the equipment but not being paid because "more than 90 percent of [the no-fault claims] were denied."  (Kalontarov Dep., Dkt. 700-12 at 45:20–46:19; Patient Focus 56.1 ¶ 7.)  Kalontarov became aware of the denial rate by doing "some math" based

on the bills sent to the insurance company and the checks Sky Medical received. (Kalontarov Dep., Dkt. 700-12 at 46:24–47:5.)

Though Kalontarov had been turning over claim denials to Plaintiff's counsel since 2006, it was not until 2012 that he obtained information suggesting that the doctors who signed the peer review reports did not author the reports or conduct any actual peer review. (*Id.* at 88:22–89:12.) Kalontarov only discovered Defendants' "fraud" after asking Plaintiff's attorneys to investigate the claim denials in 2012. (Pl.'s Resp. Patient Focus 56.1 ¶ 14; Kalontarov Dep., Dkt. 700-12 at 53:16–23, 55:20–24.) Through Plaintiff's counsel, Kalontarov learned that the doctors were paid only $20 per peer review report, produced the reports at a high volume within a short period of time, and used similar signatures, medical literature, and grammar in every report. (Kalontarov Dep., Dkt. 700-12 at 84:3–85:3, 86:13–23; 87:21–89:8; 63:2–63:10.) Based on this information, Kalontarov concluded that the peer review reports that were used to support denials of Plaintiff's no-fault insurance claims were likely being prepared by laypersons—based on predetermined outcomes—and not by the doctors purportedly authoring them. (*Id.* at 89:22–91:3.) Plaintiff had no knowledge of the Nationwide Defendants' role in the alleged scheme until 2012, or the Patient Focus Defendants' role until shortly before filing Plaintiff's lawsuit. (Pl.'s Resp. Patient Focus 56.1 ¶ 14.)

## II.    Relevant Procedural History

On December 27, 2012, Plaintiff commenced this action against Defendants and close to 80 other corporate and individual defendants, seeking monetary damages for violations of RICO and numerous New York state laws. (*See* Compl. Dkt. 1.) Plaintiff filed a RICO statement on May 3, 2013, which was amended with the Court's permission on June 5, 2013. (*See* Dkts. 190, 209-1, 213.)

### A.    Plaintiff's First Amended Complaint

Plaintiff filed its First Amended Complaint on July 31, 2013, reducing the number of defendants to 44 after many were dismissed by stipulation.  (First Am. Compl., Dkt. 236.)  On October 23, 2013, several groups of defendants moved to dismiss the First Amended Complaint for failure to state a claim and lack of standing, and as time-barred.  (*See* Dkts. 252, 256, 258, 260, 263).

On May 7, 2014, the Honorable Joseph F. Bianco, then-presiding, granted all five motions to dismiss on standing grounds.  *Sky Med. Supply Inc. v. SCS Support Claims Servs., Inc.*, 17 F. Supp. 3d 207 (E.D.N.Y. 2014).  Judge Bianco held that Plaintiff had adequately alleged RICO violations, but that Plaintiff's claims were not ripe because its damages were not yet "clear and definite," a requirement for RICO plaintiffs to establish standing.  *Id.* at 214.  As Judge Bianco noted, "when a no-fault insurer denies a claim for benefits, the claimant has two options to obtain relief: (1) file against the insurer in New York Civil Court, or (2) submit the dispute to arbitration."  *Id.* at 231.  Based on Plaintiff's acknowledgement that it was still litigating some of the contested no-fault insurance claims in state court or arbitration, Judge Bianco dismissed Plaintiff's RICO claims for lack of standing and declined to exercise supplemental jurisdiction over Plaintiff's remaining state law claims.  *Id.* at 232, 234, 236.  However, finding no other defects in Plaintiff's pleading, the Court granted Plaintiff leave to amend to remedy the "failure to plead clear and definite damages by submitting with an amended complaint a list of all no-fault claims underlying plaintiff's RICO claims."  *Id.* at 237.

Notably, with respect to the statute of limitations issue, Judge Bianco explained that Plaintiff's RICO claims "accrued when plaintiff discovered or should have discovered that its claims were fraudulently denied, and not when its claims for reimbursement were denied, as some

defendants suggest." *Id.* at 222. Because this is a "fact[-]sensitive issue," Judge Bianco ruled that he could not decide whether Plaintiff's RICO claims were time-barred and thus declined to dismiss the First Amended Complaint on that basis. *Id.* (quoting *Allstate Ins. Co. v. Elzanaty*, 916 F. Supp. 2d 273, 300–01 (E.D.N.Y. 2013)).

### B.    Plaintiff's Second Amended Complaint

Plaintiff filed the operative Second Amended Complaint on June 6, 2014, bringing causes of action for RICO violations, declaratory relief, common law fraud, aiding and abetting fraud, unjust enrichment, and tortious interference. (*See* SAC ¶¶ 140–295.) Plaintiff details Defendants' alleged scheme to produce fraudulent peer review reports and IMEs that resulted in the mass denial of Plaintiff's no-fault insurance claims. (*Id.*) Attached as Exhibit 1 to Plaintiff's Second Amended Complaint is a "non-exhaustive sample of the claims that were denied as a direct result of Defendants' collective activity," which lists hundreds of specific claim denials and, *inter alia*, the dates they were denied (the "Claims Chart"). (*Id.* ¶ 134; Claims Chart, SAC Ex. 1, Dkt. 294-1.) Attached as Exhibit 7 to Plaintiff's Second Amended Complaint is a list of the 177 claims "that were denied as a result of Defendants' wrongdoing and that have already been litigated in Civil Court," (the "Damages Chart"). (SAC ¶ 137; Damages Chart, SAC Ex. 7, Dkt. 294-7.) The Damages Chart includes, *inter alia*, the date of service of the underlying insurance claim, the civil court disposition date, and the remaining financial loss for each claim, but does not list the initial claim denial dates. (*See* SAC ¶ 137; Damages Chart, SAC Ex. 7, Dkt. 294-7.) For the 177 claim denials at issue, Plaintiff alleges it has sustained $149,202.25 in damages. (SAC ¶ 138.)

In October 2014, Defendants moved to dismiss the Second Amended Complaint for failure to state a claim, (*see* Dkts. 342, 349, 353, 356–57), which the Court granted in part and denied in part at a hearing on September 21, 2015, (Dkt. 381; *see* 9/21/2015 Min. Entry). The Court granted

Defendants' motion with respect to Plaintiff's claims for common law fraud and unjust enrichment, but denied the motion in all other respects.  (Dkt. 381.)  At present, only Plaintiff's RICO, tortious interference, and declaratory judgment claims remain.  The parties engaged in discovery, and the pending motions for summary judgment were fully briefed as of December 19, 2023.  (*See* Dkts. 691–704.)

## LEGAL STANDARD

To obtain summary judgment, the moving party must establish that "there is no genuine dispute as to any material fact," and, thus, that the party is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party.  *Holcomb*, 521 F.3d at 132.  "Where the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of the claim, any factual disputes with respect to other elements become immaterial and cannot defeat a motion for summary judgment."  *Chandok v. Klessig*, 632 F.3d 803, 812 (2d Cir. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

"The moving party bears the burden of showing that he or she is entitled to summary judgment."  *Ramirez v. Rifkin*, 568 F. Supp. 2d 262, 267 (E.D.N.Y. 2008).  Where the defendant is the moving party, there is "no express or implied requirement" that the defendant "negat[e] [the plaintiff's] claim" with evidence of its own, as long as it "point[s] out to the district court . . . that there is an absence of evidence to support [the plaintiff's] case."  *Celotex Corp.*, 477 U.S. at 323, 325 (emphasis omitted).  Once a defendant has met this burden, the plaintiff must "do[ ] more than simply rely on the contrary allegation[s] in [their] complaint," *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970), and "go beyond the pleadings" to "designate specific facts showing that there is a genuine issue for trial," *Celotex Corp.*, 477 U.S. at 324 (internal quotation marks

omitted); *see also D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998) (explaining that a "non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence" to defeat summary judgment) (collecting cases). That is, "a plaintiff opposing summary judgment may not rely on [their] complaint to defeat the motion." *Champion v. Artuz*, 76 F.3d 483, 485 (2d Cir. 1996) (per curiam). Instead, the party opposing summary judgment must "come forward with specific facts showing that there is a genuine issue for trial." *Ramirez*, 568 F. Supp. 2d at 267 (emphasis omitted) (quoting *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002)).

## DISCUSSION

### I. Plaintiff's RICO Claims[9]

Defendants move for summary judgment on the grounds that Plaintiff's RICO claims are almost entirely time-barred. Specifically, Defendants argue that the no-fault insurance claims denied prior to December 27, 2008, are barred by RICO's four-year statute of limitations. (*See* Nationwide Defs.' Mem. L. Supp. Mot. Summ. J., Dkt. 692 ("Nationwide Br.") at 6, 9; Patient Focus Defs.' Mem. L. Supp. Mot. Summ. J., Dkt. 698-2 ("Patient Focus Br.") at 1–2; GW Defs.' Mem. L. Supp. Mot. Summ. J., Dkt. 703 ("GW Br.") at 2–3; Cerullo Aff. Supp. Martins' Mot. Summ. J., Dkt. 696-1 ("Cerullo Aff.") ¶¶ 18–20.) The Nationwide and Patient Focus Defendants seek dismissal of Plaintiff's RICO claims as to all but 11 of the 177 no-fault insurance claims, and the Nationwide Defendants further seek dismissal as to all RICO claims against Defendant Alex

---

[9] The Court notes that the scope of the present motions for summary judgment is limited to the statute of limitations issue. (*See* 8/12/2022 Order ("Defendants are directed to file pre-motion letters addressing summary judgment solely as to the statute of limitations issue addressed on the record at the Court's most recent status conference"); 10/20/2022 Order (referring to the "summary judgment motions regarding the statute of limitations").) Thus, to the extent Defendants assert arguments on the merits of Plaintiff's claims, the Court will disregard them.

Vayner.  (Nationwide Br. at 9; Patient Focus Br. at 1–2.)  The GW Defendants assert that only 60 of the 177 claim denials are attributable to them, all but eight of which are purportedly untimely, and therefore seek dismissal of Plaintiff's RICO claims as to all but those eight claim denials, as well as all RICO claims against Defendant Cole.  (GW Br. at 3.)  Defendant Martins contends that all RICO claims against him are time-barred.  (Cerullo Aff. ¶ 20.)

The Court finds that because there remain material factual disputes as to when Plaintiff discovered or should have discovered the alleged fraud, Defendants' motions for summary judgment as to Plaintiff's RICO claims must be denied.

### A.    Applicable Statute of Limitations and Claim Accrual

The RICO statute provides a private cause of action for "[a]ny person injured in [their] business or property by reason of a violation of § 1962 of this chapter."  18 U.S.C. § 1964(c).  Civil RICO claims are subject to a four-year statute of limitations.  *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987).  The clock begins to run when the plaintiff discovers or should have discovered the injury.  *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 150–51 (2d Cir. 2012).  The plaintiff must have actual or "inquiry" notice for a RICO claim to accrue.  *Id.*  "Inquiry notice" is triggered "once there are sufficient 'storm warnings,'" which requires a showing of "knowledge of facts that would suggest to a reasonably intelligent person the probability that the person has been injured."  *Id.* at 153.  "Storm warnings 'need not detail every aspect of the alleged fraudulent scheme,' and can trigger the statute of limitations 'even where the full extent of the RICO scheme is not discovered until a later date.'"  *Rosenshein v. Meshel*, 688 F. App'x 60, 63 (2d Cir. 2017) (summary order) (citing *Koch*, 699 F.3d at 151).  Civil RICO actions are also "subject to a rule of separate accrual" under which "each time plaintiff discovers or should have discovered an injury caused by defendants' [RICO violation], a new cause of action

13

arises as to that injury, regardless of when the actual violation occurred." *Bankers Tr. Co. v. Rhoades*, 859 F.2d 1096, 1105 (2d Cir. 1988).

Plaintiff, however, contends that the statute of limitations for civil RICO claims cannot begin to run until a plaintiff has standing, i.e., when the claims become ripe. (Pl.'s Mem. L. Opp. Mots. Summ. J., Dkt. 700 ("Pl.'s Br.") at 6–8.) Citing Judge Bianco's earlier decision in this case, Plaintiff argues that its civil RICO claims were not ripe until Plaintiff's damages were "clear and definite," (*id.* at 10 (citing *Sky Med. Supply Inc.*, 17 F. Supp. at 222)), and that therefore its civil RICO claims did not "accrue"—and the statute of limitations did not begin to run—until each claim was denied in state court, which occurred between 2010 and 2014,[10] (*id.* at 11; *see* Damages Chart, SAC Ex. 7, Dkt. 294-7). This argument, however, incorrectly conflates the definition of "injury" for purposes of determining ripeness/standing and the definition of "injury" for purposes of triggering the statute of limitations in civil RICO actions. Ripeness and statute of limitations are separate doctrines, and the point at which "injury" occurs is not the same under each doctrine, though they can coincide depending on the facts of the case. *See In re Merrill Lynch Ltd. P'ships Litig.*, 7 F. Supp. 2d 256, 265 (S.D.N.Y. 1997) (noting that "the statute of limitations does not always begin to run when the claim is ripe," but rather "when the plaintiff is on actual or inquiry notice of the fraud"), *aff'd*, 154 F.3d 56 (2d Cir. 1998); *Butala v. Agashiwala*, 916 F. Supp. 314, 317 (S.D.N.Y. 1996) ("The plaintiffs' argument that their cause of action did not accrue until their damages were ascertainable is premised on a misunderstanding of the difference between when an injury occurs and when the damages resulting from that injury are fully quantifiable.").

---

[10] The Court notes that, though Plaintiff states that the claims at issue here were all terminated between 2010 and 2014, (Pl.'s Br. at 11), the Damages Chart also includes claims terminated in 2009, (*see* Damages Chart, SAC Ex. 7, Dkt. 294-7).

The decision that Plaintiff heavily relies on in arguing that "injury" is defined the same for purposes of ripeness/standing and the statute of limitations in civil RICO cases is *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994), and, in particular, this language from the decision:

> A RICO plaintiff "only has standing if, and can only recover to the extent that, he has been *injured* in his business or property by the conduct constituting the violation." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985); *see Hecht* [*v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir. 1990)]. Furthermore, as a general rule, a cause of action does not accrue under RICO until the amount of damages becomes clear and definite. *See Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1106 (2d Cir. 1988).[11] Thus, a plaintiff who claims that a debt is uncollectible because of the defendant's conduct can only pursue the RICO treble damages remedy after his contractual rights to payment have been frustrated. *See Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1166 (2d Cir. 1993).

*Id*. at 768 (emphasis added). The Court disagrees with Plaintiff's reading of *First Nationwide Bank*. It is clear that the *sole* issue being addressed in this section is standing and ripeness, not the statute of limitations. There is therefore no basis to equate—as Plaintiff does—the reference to "injury" in the first sentence of this passage to "injury" as used to determine when the statute of limitations begins to run. Nor does the second sentence in this passage—explaining when a RICO action "accrue[s]"—provide a basis to link the two distinct definitions of "injury" because this sentence, again, states a principle that applies only to standing. Indeed, it is the same principle Judge Bianco relied on in previously finding that Plaintiff's civil RICO claims were not yet ripe

---

[11] It should be noted that in *Bankers Trust Co.*, cited here, the Second Circuit separately affirmed the discovery principle with respect to the application of the statute of limitations period, based on the same "accrual" theory. *See Bankers Tr. Co.*, 859 F.2d at 1105 (explaining that "each time plaintiff discovers or should have discovered an injury caused by defendants' [RICO violation] [i.e., the 'rule of separate accrual'], a new cause of action arises as to that injury, regardless of when the actual violation occurred").

and that Plaintiff therefore had failed to establish *standing* to bring those claims at that time.  *Sky Med. Supply Inc.*, 17 F. Supp. 3d at 231–34.[12]

Thus, the question of when the statute of limitations began to run on Plaintiff's civil RICO claims is squarely governed by the well-established principle in this Circuit that "a plaintiff's cause of action accrues against a defendant for a specific injury on the date that plaintiff discovers or should have discovered that injury," *Koch*, 699 F.3d at 149 (citation omitted), not when Plaintiff's damages became "clear and definite" for the purposes of establishing standing.

### B.    Defendants Fail to Show that Plaintiff's RICO Claims are Time-Barred

Defendants fail to show that Plaintiff's RICO claims are time-barred as a matter of law. Viewing the facts in the light most favorable to Plaintiff as the non-moving party, a jury could find that Plaintiff did not discover that its claims were being denied because of Defendants' fraud until 2012—the same year Plaintiff filed this suit.  (Pl.'s Resp. Patient Focus 56.1 ¶ 14; Kalontarov Dep., Dkt. 700-12 at 53:16–23, 55:20–24; *see* Compl. Dkt. 1.)  Kalontarov testified that he asked Plaintiff's counsel to investigate the mass denials of the no-fault insurance claims, and only then did Plaintiff discover evidence that its claims were denied because of fraudulently prepared peer review reports and IMEs.  (Kalontarov Dep., Dkt. 700-12 at 88:22–91:3.)  Thus, the question becomes whether Plaintiff *should have* discovered its injuries prior to 2012.

Defendants contend that each time one of Plaintiff's claims for reimbursement was denied, Plaintiff was on notice of the RICO injury.  (GW Br. at 13–14; Nationwide Defs.' Reply Supp. Mot. Summ. J., Dkt. 695 ("Nationwide Reply") at 5; Martins' Reply. Supp. Mot. Summ. J.,

---

[12] Plaintiff also relies heavily on non-binding caselaw pertaining to takings cases under the Fifth Amendment, *not* RICO cases, without sufficient explanation as to why the analysis for a completely distinct cause of action is applicable here.  (*See* Pl.'s Br. at 7–8 (citing *Stensrud v. Rochester Genesee Reg'l Transp. Auth.*, 507 F. Supp. 3d 444, 451 (W.D.N.Y. 2020)).)

Dkt. 697 ("Martins Reply") ¶ 13; Patient Focus Defs.' Reply Supp. Mot. Summ. J., Dkt. 699 ("Patient Focus Reply") at 4–5.)    The Court finds this contention entirely implausible.    By Defendants' logic, Plaintiff should have been on notice of Defendants' alleged fraud as early as 2006, when the very first claim denial occurred.    The record does not support Defendants' position, particularly given that it was not until Plaintiff reviewed the peer review reports *collectively* that it discovered the improbably fast rate at which the same doctors were purportedly completing the reports and the use of similar signatures, medical literature, and grammar.    (Kalontarov Dep., Dkt. 700-12 at 84:3–85:3, 86:13–23; 87:21–89:8; 63:2–63:10.)    And again, Plaintiff's RICO claims "accrued when plaintiff discovered or should have discovered that its claims were *fraudulently* denied, and *not when its claims for reimbursement were denied*, as some defendants suggest." *Sky Med. Supply Inc.*, 17 F. Supp. at 222 (emphasis added) (citing *Koch*, 699 F.3d at 151–53 (RICO cause of action accrued when plaintiff became aware that wine might have been fraudulently labeled, not when he first purchased the wine)).

The Court acknowledges, however, that at some point, the accumulation of the no-fault insurance claim denials could have been sufficient to put Plaintiff on inquiry notice of the fraud. "Storm warnings 'need not detail every aspect of the alleged fraudulent scheme,' and can trigger the statute of limitations 'even where the full extent of the RICO scheme is not discovered until a later date.'"    *Rosenshein*, 688 F. App'x at 63 (quoting *Koch*, 699 F.3d at 151).    However, Defendants fail to show an absence of undisputed material fact as to when such "storm warnings" arose.

Kalontarov testified that he was aware of "many other companies" who had similar problems, including his cousin's company, but it is unclear from the record when he was aware of this.    (Patient Focus 56.1 ¶ 9; Kalontarov Dep., Dkt. 700-12 at 74:2–10, 76:21–77:15.)    The Court

is also unpersuaded that this alone would be sufficient to put Plaintiff on notice of fraudulent activity by Defendants versus a legitimate explanation for the no-fault insurance claim denials, or an issue within the insurance companies themselves.  Though Plaintiff concedes that Kalontarov was able to review the peer review reports he received, there is also evidence in the record suggesting that some claim denial forms did not include the peer review reports, instead noting that the report could be released upon written request.  (Pl.'s Resp. GW 56.1 ¶ 5.)  Plaintiff further argues that certain evidence that alerted Plaintiff to the fraud was not apparent from the face of the claim denial forms or peer review reports themselves, such as the doctors' extremely low fees for producing the reports.  (Pl.'s Resp. Patient Focus 56.1 ¶ 14.)  Ultimately, a jury could find that the peer review reports, in themselves, would not "suggest to a person of ordinary intelligence the probability that he has been defrauded."  *Koch*, 699 F.3d at 152.

In sum, Defendants have failed to meet their burden of showing "that there is an absence of evidence to support [Plaintiff's] case."  *Celotex Corp.*, 477 U.S. at 323, 325.  Because there remain genuine disputes of material fact as to whether Plaintiff should have known of the allegedly fraudulent denial of its no-fault insurance claims, the Court cannot find that any of Plaintiff's RICO claims are time-barred as a matter of law.[13]  Defendants' motions for summary judgment as to Plaintiff's RICO claims are therefore denied.[14]

---

[13] Because the Court finds that Defendants have failed to show Plaintiff's RICO claims accrued prior to December 27, 2008, the Court declines to consider Plaintiff's argument that the statute of limitations for its RICO claims should be tolled based on fraudulent concealment.  (*See* Pl.'s Br. at 24.)

[14] The parties are reminded that Judge Bianco previously found that Plaintiff has adequately stated civil RICO fraud claims.  *Sky Med. Supply Inc.*, 17 F. Supp. 3d at 231–34.  The Court therefore will not consider any other motions to dismiss Plaintiff's RICO claims.

## II.    Plaintiff's Tortious Interference Claim

The Nationwide Defendants, Patient Focus Defendants, and GW Defendants also move for summary judgment as to Plaintiff's claim for tortious interference with a contract, asserting it is either entirely or almost entirely time-barred.[15]  (Nationwide Br. at 9–10; GW Br. at 15–16; Patient Focus Br. at 13–14.)  The Court agrees that Plaintiff's tortious interference claim is nearly, but not entirely, time-barred—surviving only with respect to Plaintiff's no-fault insurance claims that were denied on or after December 27, 2009, of which there appears to be only one.

### A.    Statute of Limitations for Tortious Interference Claims

Under New York law, "[t]he statute of limitations for tortious interference claims is three years."  *Atl. Int'l Movers, LLC v. Ocean World Lines, Inc.*, 914 F. Supp. 2d 267, 279 (E.D.N.Y. 2012) (citing *Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 257 (S.D.N.Y. 2012)).  Tortious interference claims begin to run "when an injury is sustained, not discovered."  *Id.* (citation omitted).  "[T]ortious interference with a contract is not a continuing tort."  *Id.* (alteration in original) (citing *Chevron Corp.*, 871 F. Supp. 2d at 258).  Thus, unlike Plaintiff's RICO claims, Plaintiff's tortious interference claim is not subject to the discovery rule.

### B.    Plaintiff's Tortious Interference Claim is Almost Entirely Time-Barred

The crux of Plaintiff's tortious interference claim is that Defendants "interfered with [Plaintiff's] business by, among other things, submitting fraudulent reports to insurers to induce the insurers to deny No-Fault claims and pay Defendants to testify in court in support of their fraudulent reports."  (Pl.'s Br. at 24–25.)  The injury, then, for purposes of determining when the

---

[15] Defendant Martins does not move for summary judgment on Plaintiff's tortious interference claim, but "reserves all rights" to do so.  (Cerullo Aff. ¶ 2 n.1.)  However, that reservation of rights cannot include any argument based on the statute of limitations, since the time to make that argument has passed with the briefing of Defendants' summary judgment motions.

statute of limitations begins to run, is the denial of Plaintiff's no-fault insurance claims based on the allegedly fraudulent peer review reports. Since the statute of limitations starts to run when the injury was sustained, not from when it was discovered, *Atl. Int'l Movers, LLC*, 914 F. Supp. at 279, only the no-fault insurance claims that were denied within three years of this lawsuit being commenced are timely, i.e., claims denied on or after December 27, 2009, which leaves only one claim.

In an effort to avoid this result, Plaintiff first argues that the injury occurred when Plaintiff's no-fault insurance claims were denied in state court and arbitration, not when the claims were initially denied by the insurance company. (Pl.'s Br. at 25.) Plaintiff cites no legal authority for this application of the relevant standard, which is contradicted by Plaintiff's own description of its tortious interference claim: Defendants "interfered with [Plaintiff's] business by, among other things, submitting fraudulent reports to insurers *to induce the insurers to deny No-Fault claims* and pay Defendants to testify in court in support of their fraudulent reports." (*Id.* at 24–25 (emphasis added).) Thus, the alleged tortious interference occurred as soon as the insurance company denied Plaintiff's no-fault claims based on Defendants' fraudulent reports. The Court therefore rejects this argument.

Plaintiff next contends that the statute of limitations should be tolled due to Defendants' fraudulent concealment. (*Id.* at 25.) Plaintiff devotes all of two sentences to this argument, again citing no legal authority. (*Id.*) And as for factual support, Plaintiff merely states that "Defendants accomplished [the concealment of their fraudulent scheme] by hiding that the peer review reports were created using fraudulent protocols created by and for the benefit of the layperson Defendants," citing to its own complaint. (*Id.* (citing SAC ¶¶ 122–29).) A plaintiff "cannot defeat [a motion for summary judgment] by relying on the allegations in [its] pleading, or on conclusory

statements." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996); *see also D'Amico*, 132 F.3d at 149 (explaining that a non-moving party "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence" to defeat summary judgment) (collecting cases). Given Plaintiff's failure to identify any law or evidence to support its fraudulent concealment tolling argument, the Court rejects it.

Thus, the Court grants Defendants' motions for summary judgment on Plaintiff's tortious interference claim with respect to any insurance claims that were denied prior to December 27, 2009, which leaves a single insurance claim denial that was allegedly mailed to Plaintiff on January 12, 2010,[16] Claim No. 0373672770101017, (*see* Claims Chart, SAC Ex. 1, Dkt. 294-1 at ECF[17] 105; Damages Chart, SAC Ex. 7, Dkt. 294-7 at ECF 1), to support Plaintiff's tortious interference claim.[18]

---

[16] The precise timing of this insurance claim is still unclear because the moving Defendants failed to attach the actual claim denial form that was produced in discovery to their motions, relying only on the Claims Chart and Damages Chart attached to Plaintiff's Second Amended Complaint. These charts indicate that the date of service for this claim was January 18, 2010, and that the report was mailed to Plaintiff on January 12, 2010. (*See* Claims Chart, SAC Ex. 1, Dkt. 294-1 at ECF 105; Damages Chart, SAC Ex. 7, Dkt. 294-7, at ECF 1.) The timing here seems incorrect, however, as the claim would have been denied before Plaintiff provided the medical equipment. (*See* Pl.'s Resp. Patient Focus 56.1 ¶ 5 (noting that "D.O.S." refers to the date Plaintiff provided medical equipment).) Further, Plaintiff asserts that the date the denial was mailed is distinct from the date it was denied, which would occur upon receipt. (*Id.*) Nonetheless, because all relevant dates for this claim occurred in 2010, it is timely.

[17] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

[18] The Court does not decide whether this single claim denial is sufficient to state a claim for tortious interference, since Defendants' motions were limited to addressing the statute of limitations issue. Furthermore, though Defendants contend that Plaintiff's tortious interference claim should be dismissed as to certain individual defendants, the Court need not address those arguments because, as discussed above, only one insurance claim is left from Plaintiff's tortious interference claim.

## CONCLUSION

For the reasons set forth above, the Court denies Defendants' motions for summary judgment as to Plaintiff's RICO claims, and partially grants Defendants' motions for summary judgment as to Plaintiff's tortious interference claim for any no-fault insurance denials issued prior to December 27, 2009.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: March 28, 2025
        Brooklyn, New York